Andrea Lynn Chasteen
Will County Circuit Clerk
Twelfth Judicial Circuit Court
Electronically Filed
2023CH000141
Filed Date: 8/3/2023 4:32 PM
Envelope: 23823018
Clerk: GMA

**IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
WILL COUNTY, ILLINOIS**

| | | |
|---|---|---|
| IHAB NASERALLAH and AHMAD M. ALKHATIB, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **2023CH000141** |
| vs. | ) | Case No. |
| | ) | |
| RICHARD TROJAN, | ) | |
| | ) | |
| Defendant. | ) | |

**VERIFIED COMPLAINT FOR AN ACCOUNTING, INJUNCTIVE RELIEF,
DECLARATORY JUDGMENT AND OTHER RELIEF**

NOW COME plaintiffs, IHAB NASERALLAH and AHMAD M. ALKHATIB, by and through their attorney, John E. Partelow, and complaining of Defendant, RICHARD TROJAN, states as follows:

**A.    Introduction**

1.    This is a lawsuit between two of the three members of three Illinois limited liability companies ("the Companies"), against the third member, seeking a variety of relief.  The defendant has served as the chief financial officer or comptroller of all three entities and in that capacity, the defendant has had full control of the books and records of each entity and full control over the income, expenses, distributions and payments, tax elections and other financial matters for all three entities since their inception. This action seeks: (a) an order compelling defendant to produce the books and records of the Companies for inspection by plaintiffs, (b) a full accounting

Initial case management set for
11/21/2023 at: 9:00 a.m.    ROOM 905

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20...

Exhibit A
Notice of Removal

from defendant for his operation of the three Companies, (c) damages, and (d) the execution of certain documents allowing the transfer of certain membership interests and the admission of a new member.

## B. **The Companies**

2.    SEVEN EIGHT SIX PARTNERS LLC (hereinafter "786") is an Illinois limited liability company, created and organized in accordance with the Illinois Limited Liability Company Act (805 ILCS 180/1-60). 786 has its principal place of business and its principal asset in Will County, Illinois.

3.    ROSE CITY INVESTMENT LLC (hereinafter "Rose City") is an Illinois limited liability company, created and organized in accordance with the Illinois Limited Liability Company Act (805 ILCS 180/1-60).  Rose City has its principal place of business and its principal asset in Will County, Illinois.

4.    FLEET RAIL TERMINALS LLC (hereinafter "FRT") is an Illinois limited liability company, created and organized in accordance with the Illinois Limited Liability Company Act (805 ILCS 180/1-60).  FRT has its principal place of business and its principal asset in Will County, Illinois.

## C.    **The Parties And Venue**

5.    Plaintiff IHAB NASERALLAH (hereinafter "Naserallah") is an individual resident of the County of Cook, State of Illinois.  Naserallah is also the owner and holder of a

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20

33-1/3% membership interest in each of the aforementioned three
Illinois limited liability companies, 786, Rose City and FRT.

6. Plaintiff AHMAD M. ALKHATIB (hereinafter "Alkhatib") is an
individual resident of the County of Cook, State of Illinois.
Alkhatib is also the owner and holder of a 33-1/3% membership
interest in each of the aforementioned three Illinois limited
liability companies, 786, Rose City and FRT.

7. Defendant RICHARD TROJAN (hereinafter "Trojan"), is an
individual resident of the Village of Wilmette, County of Cook,
State of Illinois. Trojan is also the owner and holder of a
membership interest in each of the aforementioned three Illinois
limited liability companies, 786, Rose City and FRT. Trojan's
membership interest was initially a 33-1/3% interest until he
agreed to sell, with the knowledge and agreement of plaintiffs
and fellow members, Naserallah and Alkhatib, a portion of his
membership interests in all three companies to Azme Taha.

8. The events which gave rise to this complaint, which are
more fully set forth herein, all took place within the County of
Will, State of Illinois.

### D. Defendant Trojan's Role

9. Trojan has served as the chief financial officer or
comptroller of all three entities, 786, Rose City and FRT. In
that capacity, Trojan has had full control of the books and

**Exhibit A**

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/2023 REQUEST OF PLAINTIFF **Notice of Removal**

records of each entity and full control over the income, expenses, distributions and payments, tax elections and other financial matters for all three entities since their inception.

### E. Formation Of The Companies

#### (i) Seven Eight Six Partners LLC

10. In July of 2021, defendants Trojan, Naserallah and Alkhatib agreed to become founding members of 786 for the purpose of purchasing certain real estate and operating a logistics business thereon in Will County, Illinois.

11. 786 was created by the filing of its Articles of Organization with the Illinois Secretary of State on July 28, 2021. It has remained operating and in good standing ever since its creation.

12. The initial agreement between the founding members of 786 was for each to own one-third (33-1/3%) of the membership interests in the company, contribute equal shares of the necessary start-up capital to the company and share in the various management and operational responsibilities of the company.

13. Pursuant to the terms of its operating agreement 786 is a manager-managed limited liability company. The 786 Operating Agreement provides, in pertinent part:

> The Managers of the Company shall be Ahmad M. Alkhatib, Richard W. Trojan and Ihab Naserallah. ... If there is more than one (1) manager, all decisions and actions to

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/2023 — NOT FOR RE

be taken by the Manager pursuant to this Agreement

> shall be determined by majority vote of all Managers.
> *786 Operating Agreement, Article 6.4*

It further provides, in additional pertinent part:

> All withdrawals (of Company funds) over One Thousand
> Dollars ($1,000.00) shall require the signature of two
> Managers (Parenthetical and emphasis added).
> *786 Operating Agreement, Article 10.5*

A true and correct copy of the 786 Operating Agreement is

attached hereto as Exhibit "A".

14. 786 was formed by the founding members for the purpose

of purchasing a certain 20 acre parcel of real estate located in

Will County, Illinois and commonly known as 2300 Channahon Road,

Joliet, Illinois ("the 786 real estate"). That purchase would

require a substantial, and equal, capital contribution from each

of the members.

### (ii) Fleet Rail Terminals LLC

15. In or about September 2021, defendants Trojan,

Naserallah and Alkhatib agreed to become equal members of Fleet

Rail Terminals LLC, an Illinois limited liability company to be

formed for the purpose of managing the business and real estate

owned by 786 and FRT in and about Will County, Illinois.

16. FRT was created by the filing of its Articles of

Organization with the Illinois Secretary of State on October 30,

2021. It has remained operating and in good standing ever since

its creation.

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20

**Exhibit A**
**Notice of Removal**

17.   The initial agreement between the founding members of FRT was for each to own one-third (33-1/3%) of the membership interests in the company, contribute equal shares of the necessary start-up capital to the company and share in the various management and operational responsibilities of the company.

18.   Pursuant to the terms of its operating agreement FRT is a manager-managed limited liability company.  The FRT Operating Agreement provides, in pertinent part:

> The Managers of the Company shall be Ahmad M. Alkhatib, Richard W. Trojan and Ihab Naserallah. ... If there is more than one (1) manager, all decisions and actions to be taken by the Manager pursuant to this Agreement shall be determined by majority vote of all Managers. *FRT Operating Agreement, Article 6.4*

It further provides, in additional pertinent part:

> All withdrawals (of Company funds) over One Thousand Dollars ($1,000.00) shall require the signature of two Managers (Parenthetical and emphasis added). *FRT Operating Agreement, Article 10.5*

A true and correct copy of the FRT Operating Agreement is attached hereto as Exhibit "B".

### (iii) Rose City Investment LLC

19.   In November of 2021, defendants Trojan, Naserallah and Alkhatib agreed to become equal members of Rose City, an Illinois limited liability company previously formed by defendants Naserallah and Jim Walters (whose interest was subsequently acquired by defendant Trojan in January of 2021) in 2020, for

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/2023 FOR PURPOSE OF

the purpose of operating a certain business located in and about Will County, Illinois. Rose City's principal asset was a 5.6 acre parcel of real estate located in Channahon, Illinois, already owned by the company.

20.  The agreement between the three members of Rose City was for each to own one-third (33-1/3%) of the membership interests of the company, contribute equal shares of the necessary start-up capital to the company and share in the various management and operational responsibilities of the company. Rose City has remained operating and in good standing ever since its creation.

21.  Pursuant to the terms of its operating agreement FRT is a member-managed limited liability company. The FRT Operating Agreement provides, in pertinent part:

> The business and affairs of the Company shall be Managed by its Members.
> *Rose City Operating Agreement, Article 5.1*

A true and correct copy of the FRT Operating Agreement is attached hereto as Exhibit "C". Rose City's current members are plaintiffs Naserallah and Alkhatib and defendant Trojan.

### F. Defendant Trojan's Agreement To Sell A Portion Of His Interests In The Companies

22.  In September of 2021, shortly after the formation of 786, defendant Trojan agreed to sell a portion of his membership interests in 786, Rose City and FRT to Azme Taha ("Taha") ("the

**Exhibit A**
**Notice of Removal**

purchase agreement").

23.  The purchase agreement to sell a portion of Trojan's membership interests in 786, Rose City and FRT to Taha was entered into with the full knowledge and agreement of members Naserallah and Alkhatib.

24.  At the time Trojan entered into the purchase agreement with plaintiff Taha, to sell a portion of his membership interests in 786, Rose City and FRT, 786 was actively working to secure sufficient resources to purchase, and then improve, the 786 real estate. The agreement to sell a portion of Trojan's interests to Taha was one of several necessary steps taken by the founding members of 786 to raise sufficient capital to consummate the purchase of, and thereafter improve, the 786 real estate.

25.  The purchase agreement between Taha and defendant Trojan provided that plaintiff would purchase the following membership interests from Trojan for the following amounts ("the purchase price"):

| Entity | Membership Interest | Amount |
|---|---|---|
| 786 | 14% Interest | $187,287.90 |
| Rose City | 22.2% Interest | $ 77,770.00 |
| FRT | 14% Interest | $ see above |

26.  At the time that defendant Trojan and Taha entered into the purchase agreement, the then members of the three companies (Trojan, Naserallah and Alkhatib) agreed as follows ("the members' agreement"): (a) that the transfer to Taha of the

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20

portion of Trojan's interests in each of the three companies contemplated by the purchase agreement was, and would be considered, a "permitted transfer" under the operating agreements of each company, (b) any formal written notice for the permitted transfer from defendant to Taha, required by the operating agreements, were unanimously and immediately waived, (c) any rights of first refusal to which the company or its members were entitled to under the operating agreements were unanimously and immediately waived, (d) that the members would cause to be prepared, and each of the members would execute, any documents necessary to fully effectuate the transfer of the portion of Trojan's membership interests purchased by Taha to Taha, and (e) that Taha would be admitted as an additional member and the members would take all necessary action to admit Taha as an additional member.

27. That the members' agreement was a necessary and material precondition to Taha's willingness and obligation to fund the purchase of the portion of defendant Trojan's membership interests the three companies contemplated by the purchase agreement and was necessary for 786 to have sufficient capital to purchase the 786 real estate.

28. That but for the members' agreement, Taha would not have made the agreed upon payment for the purchase of the member interests of defendant Trojan contemplated by the purchase

agreement and 786 would have been unable to timely complete the purchase of the 786 real estate.

### G. Taha's Payment

29. That pursuant to the terms of the purchase agreement and the members' agreement Taha did pay the agreed purchase price to Trojan and the companies, as directed by Trojan, and did all other things required by the purchase agreement.

30. Subsequent to Taha's payment of the purchase price ("the Taha funds") to, and at the direction of Trojan, 786 did complete the purchase of the 786 real estate with the use, in part, of the Taha funds.

### H. Defendant Trojan's Refusal To Transfer

31. Subsequent to the completion of the purchase of the 786 real estate, defendant Trojan has refused to execute the documents necessary to transfer the portion of his membership interests in the three companies purchased by Taha to Taha, despite Taha's repeated demands that he do so.

32. At all times relevant hereto, the other members of the three companies, plaintiffs Alkhatib and Naserallah, were, and are, ready, willing and able to execute all necessary documents and to do all other things necessary to transfer the portion of defendant Trojan's membership interests purchased by Taha to Taha. But defendant Trojan continues to refuse to take the steps necessary to complete the transfer to Taha.

## H.  **Defendant Trojan's Wrongdoing**

33.  Subsequent to the events described above, a dispute has arisen between the members of the three companies, plaintiff Alkhatib and Naserallah, and defendant Trojan.

34.  Despite repeated demands by plaintiffs Alkhatib and Naserallah, defendant Trojan has refused to allow them to inspect the complete books and records of any of the three companies, all of which are under his exclusive possession and control.

35.  In addition, upon information and belief, plaintiffs allege that defendant Trojan has committed one or more of the following wrongful acts as chief financial officer of the companies:

(a) made unauthorized transfers of company funds between the companies to the detriment of the interests of the companies and the individual members, plaintiffs Alkhatib and Naserallah,

(b) made certain tax related elections on behalf of the companies, without authorization of the managers or members, to the detriment of the companies and/or the individual members,

(c) issued, or caused to be issued, checks from the companies without the required two signatures of its managers and/or members,

(d) made, or caused to be made, payments to vendors, suppliers or other entities owned or controlled by defendant Trojan without authorization of the members and/or managers,

Exhibit A

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20... Notice of Removal

which were not in the best interests of the companies or its members,

(e) made, or caused to be made, false and fraudulent payments of company funds to himself or entities controlled by him, without authorization of the members and/or managers, and which were not in the best interests of the companies or its members,

(f) entered into contracts or agreements with vendors or other entities for his own benefit, without disclosure to, or authorization of, the members and/or managers, and to the detriment of the companies and/or the individual members,

(g) engaged in other self-dealing to his benefit and to the detriment of the companies and/or their members,

(h) embezzled funds from the companies, to the detriment of the individual members,

(i) taken distributions from the companies which were, or should have been in accordance with the purchase agreement, properly allocated and paid to Taha,

(j) prepared false and fraudulent tax returns on behalf of the companies, or claimed false and/or improper tax deductions on his own behalf or the companies, which are not in the best interests of the companies or their members and are designed to improperly benefit himself,

(k) otherwise engaged in conduct which violated his duty of loyalty to the other members of the companies,

(l) otherwise breached the covenant of good faith and fair dealing he owed to the companies and their members in his actions as the chief financial officer of each of the companies.

36. As a result, plaintiffs have repeatedly attempted to exercise their rights as members and/or managers of the companies and defendant has repeatedly refused to allow them to do so, by engaging in one or more of the following wrongful acts, to the detriment of each of the companies and/or its members:

(a) refusing to meet with plaintiffs Alkhatib and Naserallah to discuss and approve financial decisions on behalf of the companies,

(b) refusing to attend, or participate in, management meetings for the companies,

(c) refusing to attend, or participate in, properly noticed and held special meetings of the members of each of the companies,

(d) refusing to comply with proper and lawful resolutions proposed, considered, voted on and passed at properly noticed and held special meetings of the members,

(e) refusing to submit checks, withdrawals or payments of company funds in excess of $1,000.00 for a second signature or approval by at least two members,

(f) refusing to obtain authorization from the other members for transactions that benefitted himself personally to the detriment of the companies and/or the other members,

(g) refusing to allow inspection of the complete books and records of any of the companies, as required by the operating agreements and the provisions of the Illinois Limited Liability Company Act (805 ILCS 180/1-40(b)).

<u>**COUNT I**</u>
**(Inspection Of The Books And Records Of Rose City)**

37.  Plaintiff repeats and realleges paragraphs 1-36 above in their entirety as paragraphs 37 of this Count I as if fully set forth herein.

38.  Article 9.3 of the Rose City Operating Agreement provides, in pertinent part:

> Upon reasonable request, each Member or Economic Interest Owner shall have the right, during ordinary business hours, to inspect and copy all accounts, books and other relevany Company documents at the requesting Member's and Economic Interest Owner's expense. *Rose City Operating Agreement, Article 9.3*

39.  Plaintiffs have made repeated and reasonable demands on defendant Trojan for an inspection of the complete books and records of Rose City but defendant Trojan has unreasonably ignored and refused those demands. That refusal is wrongful and violates the terms of the operating agreement and Section 1-40 (b) of the Illinois Limited Liability Company Act ("the Act")(805 ILCS 180/1-40(b)).

40.  As a direct result of defendant Trojan's wrongful refusal of plaintiff's reasonable demands for an inspection of the books and records of Rose City, plaintiffs have been denied their rights as members of Rose City pursuant to the provisions of the operating agreement and the Act.

WHEREFORE, plaintiffs AHMAD M. ALKHATIB and IHAB NASERALLAH pray this honorable court for the entry of an order granting them the following relief:

A.  Ordering defendant RICHARD TROJAN to produce the complete books and records of Rose City Investment LLC, including, but not limited to, those required by the Act, for inspection and copying by plaintiffs and/or their designated representatives, at a designated time and place, within a date certain,

B.  Awarding plaintiffs their attorneys fees and costs incurred in bringing this action, to be paid by defendant Trojan personally and not with the funds of the company,

C.  Such other, further and different relief as the court deems just.

### COUNT II
### (Inspection Of The Books And Records Of 786)

41.  Plaintiff repeats and realleges paragraphs 1-36 above in their entirety as paragraphs 41 of this Count II as if fully set forth herein.

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/2023 DGLLC REQUEST ID #R

42. Section 1-40(b) of the Illinois Limited Liability Company Act ("the Act")(805 ILCS 180/1-40(b)) provides, in pertinent part:

> Records kept under this Section may be inspected and copied at the request and expense of any member or legal representative of a deceased member or member under legal disability during ordinary business hours. *805 ILCS 180/1-40(b)*

43. Plaintiffs have made repeated and reasonable demands on defendant Trojan for an inspection of the complete books and records of 786 but defendant Trojan has unreasonably ignored and refused those demands. That refusal is wrongful and violates the terms of Section 1-40(b) of the Act.

44. As a direct result of defendant Trojan's wrongful refusal of plaintiff's reasonable demands for an inspection of the books and records of 786, plaintiffs have been denied their rights as members of 786 pursuant to the provisions of the Act.

WHEREFORE, plaintiffs AHMAD M. ALKHATIB and IHAB NASERALLAH pray this honorable court for the entry of an order granting them the following relief:

A. Ordering defendant RICHARD TROJAN to produce the complete books and records of Seven Eight Six Partners LLC including, but not limited to, those required by the Act, for inspection and copying by plaintiffs and/or their designated representatives, at a designated time and place, within a date

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20

certain,

B.  Awarding plaintiffs their attorneys fees and costs incurred in bringing this action, to be paid by defendant Trojan personally and not with the funds of the company,

C.  Such other, further and different relief as the court deems just.

## COUNT III
### (Inspection Of The Books And Records Of FRT)

45.  Plaintiff repeats and realleges paragraphs 1-36 above in their entirety as paragraphs 45 of this Count III as if fully set forth herein.

46.  Section 1-40(b) of the Illinois Limited Liability Company Act ("the Act")(805 ILCS 180/1-40(b)) provides, in pertinent part:

> Records kept under this Section may be inspected and copied at the request and expense of any member or legal representative of a deceased member or member under legal disability during ordinary business hours. *805 ILCS 180/1-40(b)*

47.  Plaintiffs have made repeated and reasonable demands on defendant Trojan for an inspection of the complete books and records of FRT but defendant Trojan has unreasonably ignored and refused those demands. That refusal is wrongful and violates the terms of Section 1-40(b) of the Act.

48.  As a direct result of defendant Trojan's wrongful refusal of plaintiff's reasonable demands for an inspection of

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20

the books and records of FRT, plaintiffs have been denied their rights as members of FRT pursuant to the provisions of the Act.

WHEREFORE, plaintiffs AHMAD M. ALKHATIB and IHAB NASERALLAH pray this honorable court for the entry of an order granting them the following relief:

A.  Ordering defendant RICHARD TROJAN to produce the complete books and records of Freight Rail Terminals LLC including, but not limited to, those required by the Act, for inspection and copying by plaintiffs and/or their designated representatives, at a designated time and place, within a date certain,

B.  Awarding plaintiffs their attorneys fees and costs incurred in bringing this action, to be paid by defendant Trojan personally and not with the funds of the company,

C.  Such other, further and different relief as the court deems just.

<u>**COUNT IV**</u>
**(Action for an Accounting)**
**(Seven Eight Six Partners LLC)**

49.  Plaintiff repeats and realleges paragraphs 1-36 above in their entirety as paragraphs 49 of this Count IV as if fully set forth herein.

50.  Defendant Trojan has acted as the chief financial officer or comptroller of 786, on behalf of the members, since

Exhibit A
Notice of Removal

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20

its creation. In that role, he has been exclusively responsible for all of bookkeeping for 786, including, but not limited to: (a) the receipt, allocation, recording and management of all the income of the company, (b) the receipt, management of, paying, or causing to be paid, of all of the costs and expenses of the company, (c) all aspects of the company's tax matters, including the election of its tax status and all matters relating to its compliance therewith, including making any filings and payment of any necessary interim tax payments, and (d) the timely and accurate preparation and filing of its tax returns, (e) the proper compliance with, and payment of, any governmental rules, regulations and fees, (f) management and payment of all legitimate company debt, and (g) properly recording and documenting of all of the company's financial affairs into the company's books and records.

51. Defendant Trojan is responsible for managing the financial affairs of 786 (hereinafter "the company") to benefit the company and all of its members, including: (i) insuring that all income due and owing to, or otherwise belonging to, the company, is collected by the company and deposited in company accounts, (ii) that only the legitimate and authorized expenses of the company are paid by the company with company funds.

52. As the company's chief financial officer, defendant Trojan was, and is, charged with the duty of: (a) keeping

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20 Notice of Removal

comprehensive and accurate books and records of the company, its business and all of its financial dealings, (b) obtaining all required authorizations for payments made by the company, (c) insuring that only legitimate and authorized payments and distributions are made by the company to its customers, vendors, officers and members/managers, and (d) reporting to, or providing written and accurate financial reports to, the members regarding the company's finances.

53. Defendant Trojan has now abdicated his responsibilities as chief financial officer by failing to provide the members with financial information regarding the company and refusing all inquiries from plaintiffs for access to the books and records of the company.

54. This refusal is a violation of defendant Trojan's fiduciary duty to fellow members, Alkhatib and Naserallah. This breach of his duty to plaintiffs has caused, and continues to cause, significant harm to plaintiffs.

55. Moreover, plaintiffs are informed and believe, and upon information and belief allege, that defendant's refusal to supply financial information about the company to plaintiffs, and to refuse access to the books and records, is an attempt to conceal defendant's misappropriation of company assets for his own and exclusive benefit. Plaintiffs believe that this financial misconduct is ongoing and that defendant may have moved, or may

**Exhibit A**

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20 **Notice of Removal**

intend to move, company assets outside of the jurisdiction of this court.

56.  Plaintiffs have no adequate remedy at law for the ongoing misappropriation of company assets and the moving them out of the jurisdiction.

57.  Plaintiffs are suffering irreparable harm by defendant's refusal to provide access to the company's books and records, the ongoing efforts to misappropriate company funds and/or assets and to move them out of the jurisdiction.

58.  Therefore, plaintiffs are entitled to, and are seeking, an order of this court as follows: (i) enjoining the defendant from moving company funds and/or assets outside the jurisdiction of this court, (ii) commanding defendant to provide a full and complete accounting of all financial activities of the company since its inception within a date certain, and (iii) any other relief the court deems appropriate under the circumstances.

WHEREFORE, plaintiffs AHMAD M. ALKHATIB and IHAB NASERALLAH pray this honorable court for the entry of an order granting them the following relief:

A.  Restraining and enjoining defendant RICHARD TROJAN from moving, transferring or encumbering the funds or assets of Seven Eight Six Partners LLC outside of the jurisdiction,

B.  Restraining and enjoining defendant RICHARD TROJAN from taking any further action as chief financial officer of Seven

**Exhibit A**

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20**Notice** of **Removal**

Eight Six Partners LLC without prior written authorization of all the members of the company until further order of court,

C.  Ordering defendant RICHARD TROJAN to provide to this court (in camera) and to plaintiffs a full and complete accounting of all financial transactions of Seven Eight Six Partners LLC since its formation within a date certain, but not more than 14 days from the date of the court's order.

D.  Awarding plaintiffs their attorneys fees and costs incurred in bringing this action, to be paid by defendant Trojan personally and not with the funds of the company,

E.  Such other, further and different relief as the court deems just.

<u>**COUNT V**</u>
**(Action for an Accounting)**
**(Freight Rail Terminals LLC)**

59.  Plaintiff repeats and realleges paragraphs 1-36 above in their entirety as paragraphs 59 of this Count V as if fully set forth herein.

60.  Defendant Trojan has acted as the chief financial officer or comptroller of FRT, on behalf of the members, since its creation. In that role, he has been exclusively responsible for all of bookkeeping for FRT, including, but not limited to: (a) the receipt, allocation, recording and management of all the income of the company, (b) the receipt, management of, paying, or causing to be paid, of all of the costs and expenses of the

**Exhibit A**
**Notice of Removal**

company, (c) all aspects of the company's tax matters, including the election of its tax status and all matters relating to its compliance therewith, including making any filings and payment of any necessary interim tax payments, and (d) the timely and accurate preparation and filing of its tax returns, (e) the proper compliance with, and payment of, any governmental rules, regulations and fees, (f) management and payment of all legitimate company debt, and (g) properly recording and documenting of all of the company's financial affairs into the company's books and records.

61. Defendant Trojan is responsible for managing the financial affairs of FRT (hereinafter "the company") to benefit the company and all of its members, including: (i) insuring that all income due and owing to, or otherwise belonging to, the company, is collected by the company and deposited in company accounts, (ii) that only the legitimate and authorized expenses of the company are paid by the company with company funds.

62. As the company's chief financial officer, defendant Trojan was, and is, charged with the duty of: (a) keeping comprehensive and accurate books and records of the company, its business and all of its financial dealings, (b) obtaining all required authorizations for payments made by the company, (c) insuring that only legitimate and authorized payments and distributions are made by the company to its customers, vendors,

officers and members/managers, and (d) reporting to, or providing written and accurate financial reports to, the members regarding the company's finances.

63.  Defendant Trojan has now abdicated his responsibilities as chief financial officer by failing to provide the members with financial information regarding the company and refusing all inquiries from plaintiffs for access to the books and records of the company.

64.  This refusal is a violation of defendant Trojan's fiduciary duty to fellow members, Alkhatib and Naserallah.  This breach of his duty to plaintiffs has caused, and continues to cause, significant harm to plaintiffs.

65.  Moreover, plaintiffs are informed and believe, and upon information and belief allege, that defendant's refusal to supply financial information about the company to plaintiffs, and to refuse access to the books and records, is an attempt to conceal defendant's misappropriation of company assets for his own and exclusive benefit.  Plaintiffs believe that this financial misconduct is ongoing and that defendant may have moved, or may intend to move, company assets outside of the jurisdiction of this court.

66.  Plaintiffs have no adequate remedy at law for the ongoing misappropriation of company assets and the moving them out of the jurisdiction.

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20 Notice of Removal

67.  Plaintiffs are suffering irreparable harm by defendant's refusal to provide access to the company's books and records, the ongoing efforts to misappropriate company funds and/or assets and to move them out of the jurisdiction.

68.  Therefore, plaintiffs are entitled to, and are seeking, an order of this court as follows: (i) enjoining the defendant from moving company funds and/or assets outside the jurisdiction of this court, (ii) commanding defendant to provide a full and complete accounting of all financial activities of the company since its inception within a date certain, and (iii) any other relief the court deems appropriate under the circumstances.

WHEREFORE, plaintiffs AHMAD M. ALKHATIB and IHAB NASERALLAH pray this honorable court for the entry of an order granting them the following relief:

A.  Restraining and enjoining defendant RICHARD TROJAN from moving, transferring or encumbering the funds or assets of Freight Rail Terminals LLC outside of the jurisdiction,

B.  Restraining and enjoining defendant RICHARD TROJAN from taking any further action as chief financial officer of Freight Rail Terminals LLC without prior written authorization of all the members of the company until further order of court,

C.  Ordering defendant RICHARD TROJAN to provide to this court (in camera) and to plaintiffs a full and complete accounting of all financial transactions of Freight Rail

**Exhibit A**

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/2023 PURSUANT **Notice of Removal**

Terminals LLC since its formation within a date certain, but not more than 14 days from the date of the court's order.

D.  Awarding plaintiffs their attorneys fees and costs incurred in bringing this action, to be paid by defendant Trojan personally and not with the funds of the company,

E.  Such other, further and different relief as the court deems just.

**COUNT VI**
**(Action for an Accounting)**
**(Rose City Investment LLC)**

69.  Plaintiff repeats and realleges paragraphs 1-36 above in their entirety as paragraphs 69 of this Count VI as if fully set forth herein.

70.  Defendant Trojan has acted as the chief financial officer or comptroller of Rose City, on behalf of the members, since its creation. In that role, he has been exclusively responsible for all of bookkeeping for Rose City, including, but not limited to: (a) the receipt, allocation, recording and management of all the income of the company, (b) the receipt, management of, paying, or causing to be paid, of all of the costs and expenses of the company, (c) all aspects of the company's tax matters, including the election of its tax status and all matters relating to its compliance therewith, including making any filings and payment of any necessary interim tax payments, and (d) the timely and accurate preparation and filing of its tax

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/2023 FROM SDG

returns, (e) the proper compliance with, and payment of, any governmental rules, regulations and fees, (f) management and payment of all legitimate company debt, and (g) properly recording and documenting of all of the company's financial affairs into the company's books and records.

71. Defendant Trojan is responsible for managing the financial affairs of Rose City (hereinafter "the company") to benefit the company and all of its members, including: (i) insuring that all income due and owing to, or otherwise belonging to, the company, is collected by the company and deposited in company accounts, (ii) that only the legitimate and authorized expenses of the company are paid by the company with company funds.

72. As the company's chief financial officer, defendant Trojan was, and is, charged with the duty of: (a) keeping comprehensive and accurate books and records of the company, its business and all of its financial dealings, (b) obtaining all required authorizations for payments made by the company, (c) insuring that only legitimate and authorized payments and distributions are made by the company to its customers, vendors, officers and members/managers, and (d) reporting to, or providing written and accurate financial reports to, the members regarding the company's finances.

Exhibit A
Notice of Removal

73.   Defendant Trojan has now abdicated his responsibilities as chief financial officer by failing to provide the members with financial information regarding the company and refusing all inquiries from plaintiffs for access to the books and records of the company.

74.   This refusal is a violation of defendant Trojan's fiduciary duty to fellow members, Alkhatib and Naserallah.  This breach of his duty to plaintiffs has caused, and continues to cause, significant harm to plaintiffs.

75.   Moreover, plaintiffs are informed and believe, and upon information and belief allege, that defendant's refusal to supply financial information about the company to plaintiffs, and to refuse access to the books and records, is an attempt to conceal defendant's misappropriation of company assets for his own and exclusive benefit.  Plaintiffs believe that this financial misconduct is ongoing and that defendant may have moved, or may intend to move, company assets outside of the jurisdiction of this court.

76.   Plaintiffs have no adequate remedy at law for the ongoing misappropriation of company assets and the moving them out of the jurisdiction.

77.   Plaintiffs are suffering irreparable harm by defendant's refusal to provide access to the company's books and records, the ongoing efforts to misappropriate company funds

and/or assets and to move them out of the jurisdiction.

78.  Therefore, plaintiffs are entitled to, and are seeking, an order of this court as follows: (i) enjoining the defendant from moving company funds and/or assets outside the jurisdiction of this court, (ii) commanding defendant to provide a full and complete accounting of all financial activities of the company since its inception within a date certain, and (iii) any other relief the court deems appropriate under the circumstances.

WHEREFORE, plaintiffs AHMAD M. ALKHATIB and IHAB NASERALLAH pray this honorable court for the entry of an order granting them the following relief:

A.  Restraining and enjoining defendant RICHARD TROJAN from moving, transferring or encumbering the funds or assets of Rose City Investment LLC outside of the jurisdiction,

B.  Restraining and enjoining defendant RICHARD TROJAN from taking any further action as chief financial officer of Rose City Investment LLC without prior written authorization of all the members of the company until further order of court,

C.  Ordering defendant RICHARD TROJAN to provide to this court (in camera) and to plaintiffs a full and complete accounting of all financial transactions of Rose City Investment LLC since its formation within a date certain, but not more than 14 days from the date of the court's order.

Exhibit A

Notice of Removal

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/2023 11:39:05 AM

D.  Awarding plaintiffs their attorneys fees and costs incurred in bringing this action, to be paid by defendant Trojan personally and not with the funds of the company,

E.  Such other, further and different relief as the court deems just.

## COUNT VII
### (Damages)

79.  Plaintiff repeats and realleges paragraphs 1-36 above in their entirety as paragraphs 79 of this Count VI as if fully set forth herein.

80.  Upon information and belief plaintiffs allege that defendant Trojan has engaged in one or more of the following wrongful acts:

(a) Misappropriated funds from one or more of 786, FRT and/or Rose City for his personal benefit to the detriment of the company and/or its members, including plaintiffs,

(b) Paid, or caused to be paid, funds from one or more of 786, FRT and/or Rose City to companies or other entities owned or controlled by Trojan, for his personal benefit, to the detriment of the company and/or its members, including plaintiffs,

(c) Diverted business or other economic opportunities from one or more of 786, FRT and/or Rose City to companies or other entities, owned or controlled by Trojan, for his personal benefit, to the detriment of the company and/or its members, including plaintiffs,

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20...

(d) Otherwise breached his fiduciary duty to one or more of 786, FRT and/or Rose City and to its members, including plaintiffs causing economic damages to plaintiffs,

81. For the above and foregoing reasons, plaintiffs are entitled to a judgment in their favor and against defendant Richard Trojan in an amount in excess of $50,000.00 to be proven at trial.

82. Plaintiffs are also entitled to an award of punitive damages in their favor and against defendant Trojan in excess of $500,000.00.

WHEREFORE, plaintiffs AHMAD M. ALKHATIB and IHAB NASERALLAH pray this honorable court for the entry of an order granting them the following relief:

A. Entering judgment in their favor and against defendant RICHARD TROJAN in an amount in excess of $50,000.00 to be proven at trial,

B. Entering an additional judgment in their favor and against defendant RICHARD TROJAN, as and for punitive damages, in a amount of $500,000.00 or such other and different amount as the court deems appropriate,

C.  Awarding plaintiffs their attorneys fees and costs

incurred in bringing this action.

**IHAB NASERALLAH and AHMAD M. ALKHATIB**

By: _____
        Their Attorney

John E. Partelow, Esq.
Attorney for Plaintiffs
54 North Ottawa Street
Suite 310
Joliet, Illinois  60432
(779) 206-4652
Attorney No. 6188346
jepartelow@aol.com

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20...

Exhibit A
Notice of Removal

COUNTY OF WILL )
)ss.
STATE OF ILLINOIS )

### VERIFICATION

IHAB NASERALLAH, being first duly sworn upon his oath, deposes and states that he is one of the plaintiffs in the above action, that he has read the above and foregoing allegations of the Complaint and that each of said allegations are true and correct to the best of his knowledge, information and belief, except those allegations made upon information and belief and as to those allegations he verily believes them to be true.

_____
Ihab Naserallah

SUBSCRIBED AND SWORN TO
before me this ___ day
of August, 2023.

_____
NOTARY PUBLIC

Official Seal
Annette Marie Kuzma
Notary Public State of Illinois
My Commission Expires 02/16/2026

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/29/20...

**Exhibit A**
**Notice of Removal**

COUNTY OF WILL )
                          )ss.
STATE OF ILLINOIS )

### VERIFICATION

AHMAD M. ALKHATIB, being first duly sworn upon his oath, deposes and states that he is one of the plaintiffs in the above action, that he has read the above and foregoing allegations of the Complaint and that each of said allegations are true and correct to the best of his knowledge, information and belief, except those allegations made upon information and belief and as to those allegations he verily believes them to be true.

_____
AHMAD M. ALKHATIB

SUBSCRIBED AND SWORN TO
before me this 1st day
of August, 2023.

```
CHRISTINA SANCHEZ
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires
March 15, 2024
```

_____
NOTARY PUBLIC

## FIRST AMENDED AND RESTATED OPERATING AGREEMENT

## OF SEVEN EIGHT SIX PARTNERS, LLC

**THIS FIRST AMENDED AND RESTATED OPERATING AGREEMENT** is made and entered into as of the 8th day of November, 2021 (the "Effective Date") by and among the Persons executing this Agreement as a Member on the signature page hereof ("Members").

**WHEREAS,** the Members have caused Seven Eight Six Partners, LLC (the "Company") to be formed as a limited liability company under the Act (as hereinafter defined) and, as required thereunder.

**NOW, THEREFORE,** in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

### Article 1.
### FORMATION AND OFFICES

**1.1**     **Formation.**

Pursuant to the Act, the Members have formed an Illinois limited liability company effective upon the filing of the Articles of the Company with the Secretary of State of Illinois.

**1.2**     **Principal Office.**

The principal office of the Company shall be located at 1131 W. Bryn Mawr Avenue, 2nd Floor, Chicago, Illinois 60660, or at such other place(s) as the Manager may determine from time to time.

**1.3**     **Registered Office and Registered Agent.**

The location of the registered office and the name of the registered agent of the Company in the State of Illinois shall be as stated in the Articles, as determined from time to time by the Manager.

**1.4**     **Purpose of Company.**

The purposes for which the Company is organized is to engage in any or all lawful business for which a limited liability company may be organized under the Act. Subject to the provisions of this Agreement, the Company shall have the power to do any and all acts and things necessary, appropriate, advisable or convenient for the furtherance and accomplishment of the purposes of the Company, including, without limitation, to engage in any kind of activity and to enter into and perform obligations of any kind necessary to or in connection with, or incidental to, the accomplishment of the purposes of the Company, so long as said activities and obligations may be lawfully engaged in or performed by a limited liability company under the Act.

**1.5**     **Duration.**

The duration of the Company shall be perpetual unless dissolved as provided herein.

**1.6**     **Name.**

The name of the Company shall be Seven Eight Six Partners, LLC.

**1.7**     **Governing Law.**

This Agreement shall be construed according to and governed by the laws of the State of Illinois, including without limitation the Act. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that any portion of this Agreement is inconsistent with any provision of the Act, this Agreement shall govern the extent permitted by the Act.

1

EXHIBIT

"A"

**Exhibit A
Notice of Removal**

## Article 2.
## DEFINITIONS

### 2.1   Terms Defined Herein.

As used herein, the following terms shall have the following meanings, unless the context otherwise requires:

"Act" shall mean the Illinois Limited Liability Company Act at 805 ILCS 180/9 - 9, *et seq.*, as amended from time to time.

"Affiliate" of a specified Person (the "Specified Person") means any Person (a) who directly or indirectly controls, is controlled by, or is under common control with the Specified Person; (b) who owns or controls ten percent (10%) or more of the Specified Person's outstanding voting securities or equity interests; (c) in whom such Specified Person owns or controls ten percent (10%) or more of the outstanding voting securities or equity interests; (d) who is a director, partner, manager, executive officer or trustee of the Specified Person; (e) in whom the Specified Person is a director, partner, manager, executive officer or trustee; or (f) who has any relationship with the Specified Person by blood, marriage or adoption, not more remote than first cousin.

"Agreement" means this First Amended and Restated Operating Agreement, as amended or restated from time to time.

"Articles" means the Articles of Organization of the Company filed with the Secretary of State of Illinois, as amended or restated from time to time.

"Assignee" means any Person who is the holder of an Interest but is not then a Member. An Assignee (i) shall not be entitled to participate in the management of the business and affairs of the Company, (ii) shall not be entitled to become a Member unless otherwise permitted under Article 8 hereof, (iii) shall not be entitled to exercise the rights of a Member, (iv) shall not be entitled to vote a Member's Interest, (v) shall not have the right to require any information or accounting of the Company's business and/or (vi) shall not have the right to inspect the Company's books and records. An Assignee shall only be entitled to receive, to the extent of the Interest held by such Assignee, the share of distributions and profits, including distributions representing the return of Capital Contributions, to be made to the transferring Member hereunder with respect to the Interest during the time Assignee is the holder of such Interest; provided, however, that (i) no Assignee shall be entitled to any distributions to be made to the transferring Member unless such Assignee has made or caused the Member to make any and all required Additional Capital Contributions required to be made prior to such distribution date and not yet made by such transferring Member and/or (ii) if any loans have been made to the transferring Member under Section 3.2(i), all such loans that are outstanding under Section 3.2(i) with respect to such transferring Member shall be made to the lending Member(s) first until such loans are repaid in full, including interest due thereon.

"Capital Contribution" means the total amount of cash, other property, the use of property, services rendered, promissory note or other binding written obligation to contribute cash or property or perform services or other valuable consideration contributed to the Company by each Member pursuant to the terms of this Agreement. Any reference in this Agreement to the Capital Contribution of a Member shall include the Capital Contribution made by any predecessor holder of the Interest of that Member.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, including the rules and regulations promulgated thereunder.

"Company" means Seven Eight Six Partners, LLC.

"Defaulting Member" shall mean a Member who (i) has failed to make its capital contribution under Section 3.2 hereof; and/ or (ii) a Member that is an Involuntary Offeror under Section 8.3 hereof.

"Interest" refers to an Interest Holder's share as set forth herein of the profits and losses of and the right to receive distributions from the Company which would be made to a Member hereunder.

"Interest Holder" means any Person who holds an Interest whether as a Member or an Assignee.

2

Exhibit A
Notice of Removal

"Liquidation Proceeds" means all Property at the time of liquidation of the Company and all proceeds thereof.

"Majority in Interest" means any individual Member or group of Members holding an aggregate of more than 50% of the Percentage Interests held by all Members; provided that if a holder of an Interest is an Assignee, such Percentage Interests shall be calculated as though such Interest was not included.

"Manager(s)" means the Person(s) designated or elected from time to time pursuant to this Agreement as manager(s) of the Company, acting in their capacity as Manager(s).

"Members" means those Persons executing this Agreement as members of the Company, including any substitute Members or additional Members permitted under Article 8 hereof, in each such Person's capacity as a Member of the Company.

"Net Cash Flow" means, with respect to any fiscal period, all operating and investment revenues during such period and any amounts theretofore held in any reserve which the Manager determines need not be held any longer in reserve, all determined in accordance with the Company's method of accounting, less Operating Expenses.

"Notice" means a writing, containing the information required by this Agreement to be communicated to a Person in accordance with Section 11.3.

"Operating Expenses" means, with respect to any fiscal period, (a) to the extent paid other than with cash withdrawn from reserves therefor, the amount of cash disbursed in such period in order to operate the Company and to pay all expenses (including, without limitation, management fees, wages, taxes, insurance and/or other costs and expenses) incident to the operation of the Company or its Property and (b) the amount of any reserves created during such period or the amount of any increase in any existing reserve, as provided in Section 4.3.

"Percentage Interest" of a Member means, at any particular time, a Member's Interest in the Company. The Members' percentage interests are set forth on Schedule A and shall hereafter be reflected in the books and records of the Company.

"Permitted Assignee" means (i) any Member, a Member's then current spouse (which shall not include any spouse that has instituted or is a party to a divorce proceeding with such Member) or any of a Member's descendants, (ii) the settlor of a trust that is a Member; (iii) any trust for the primary benefit of a Member, a Member's spouse or any of a Member's descendants, so long as, in each case, each trustee entitled to vote thereunder is also either a Member or a settlor of a trust that is a Permitted Assignee.

"Permitted Transfer" shall have the meaning given it in Section 8.2 hereof.

"Person" means any individual, partnership, domestic or foreign limited partnership, domestic or foreign limited liability company, domestic or foreign corporation, trust, business trust, employee stock ownership trust, real estate investment trust, estate, association and other business or not for profit entity.

"Property" means all properties and assets that the Company may own or otherwise have an interest in from time to time.

"Transfer" means (a) when used as a verb, to give, sell, exchange, assign, transfer, pledge, hypothecate, bequeath, devise or otherwise dispose of or encumber, in whole or in part and (b) when used as a noun, the nouns corresponding to such verbs, in either case voluntarily or involuntarily, by operation of law, judgment or otherwise in whole or in part.

"Unreturned Capital Contributions" means with respect to each Member, the amount of such Member's Capital Contribution less any amounts paid to such Member as a return of its Capital Contributions as required by Sections 4.1 and 9.4.

3

Exhibit A
Notice of Removal

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

## Article 3.
## CAPITALIZATION OF THE COMPANY

**3.1** __Initial Capital Contributions.__

Upon execution hereof, each Member shall make its initial Capital Contribution to the capital of the Company as set forth in the books and records of the Company in the amounts set forth on Schedule A attached hereto

**3.2** __Additional Capital Contributions.__ If the Manager, in its commercially reasonable discretion, determines that additional funds are required to fund any actual or anticipated expenses of the Company, including without limitation reserves, the provisions of this Section 3.2 shall apply. Upon such determination, the Manager shall notify all Members of the need for such Additional Funds and upon the consent of the Majority in Interest of Members to such capital call, the Interest Holder shall pay such additional funds as additional capital contributions ("Additional Capital") within ten days of request by the Manager in proportion to the Members' respective Percentage Interests. If any or all of the Interest Holders do not pay their Additional Capital, such non-paying Interest Holder shall be considered a Defaulting Member and the following procedures shall apply:

(i)     any other Member or Members (in proportion to their respective Percentage Interests if more than one Member desires to make such loans) may make or cause to be made a short term ninety (90) day loan to the Defaulting Member equal to the unpaid Additional Capital. Such loan shall bear interest at the rate per annum equal to the sum of (a) five percent (5%) plus (b) the higher of the prime rate then being published by the *Wall Street Journal* as its prime rate ("Prime Rate"), which rate shall change when and as such prime rate or other rate changes. Any and all loans made under this Subsection 3.2(i) including interest accrued thereon shall be repaid prior to any other distributions to such Defaulting Member to be made hereunder. Such lending Member(s) shall have a lien upon the Interests of the Defaulting Member as security for the loan, including interest accrued thereon and such Defaulting Member shall execute any and all pledges or other documents evidencing and/or perfecting same upon request of the lending Member. The Defaulting Member hereby directs the Company to pay the Defaulting member's share of any Company distributions to the lending Member(s) for application upon the loan until the loan has been paid in full. This direction is non-revocable unless the revocation is consented to in writing by the lending Member(s). As long as a portion of the advance and interest remains unpaid by the Defaulting Member, the Defaulting Member shall have no right to vote on Company matters, and, accordingly, during such time for purposes of determining whether any matter requiring the consent of the members has received the requisite percentage of votes or unanimous approval, such Defaulting Member's Interest shall be excluded as if not outstanding. In the event that the loan is not repaid within ten (10) days after the Maturity Date together with any and all interest thereon, then, in any such event, the lending Member(s) may elect, at any time, thereafter to either (1) cause a redistribution of the Percentage Interest of the Defaulting Member in accordance with the provisions of this subsection 3.2(i) by ten (10) days' notice thereof to the Defaulting Member or (2) purchase within thirty (30) days the entire interest of the Defaulting Member at a purchase price equal to the sum of the aggregate Capital Contributions made by such Defaulting Member to the date of such purchaser minus the principal and unpaid interest of the unpaid loan to the date of such purchase. The Defaulting Member shall have an absolute right to cure the deficiency by paying all principal, interest and reasonable costs arising out of the loan at any time prior to the expiration of the ten (10) day notice period required under this subsection 3.2(i), thereby terminating any right of redistribution or purchase by the lending Member(s) making the loan.;

(ii)    any other Member or Members (in proportion to their respective Percentage Interests if more than one Member desires to make such contribution) may contribute such unpaid Additional Capital to the Company. Upon any such contribution, the Percentage Interests of the Members shall be adjusted so that each Member's Percentage Interest equals (i) the total Capital Contributions made by such Member over (ii) the aggregate Capital Contributions of all Members, determined after all Capital Contributions to date, including the then existing Additional Capital;

(iii)   if the Member(s) choose, in their discretion, not to make the loan(s) and/or capital contributions referenced in subsections 3.2(i) and (ii) above, then the Manager shall attempt to seek financing from another party to meet such Additional Capital needs on terms acceptable to the Manager and/or may, without approval of the Defaulting Members, admit new Members into the Company in order to raise such capital contributions and in connection with any financing or additional Member, Manager shall be authorized to pledge or cause to be transferred the Defaulting Member's Percentage Interests or so much thereof as is necessary to obtain such funds;

(iv)    if the Member(s) choose, in their discretion, not to make the loan(s) and/or capital contributions referenced in subsections 3.2(i) and (ii) above, then the Manager shall have the right, in its sole discretion, to adjust the

4

Exhibit A
Notice of Removal

Member's Percentage Interests to reduce the Defaulting Member's Percentage Interest to (i) the total Capital Contributions made by such Member over (ii) the aggregate Capital Contributions of all Members, determined after all Capital Contributions to date, including the then existing Additional Capital;

In the event that a Member advances a Defaulting Members Additional Capital Contribution and does not specify in writing the election between Subsections (i) and (ii) above, then alternative (i) shall apply.

### 3.3    Capital Contributions.

No Member shall have the right to reduce such Member's Capital Contribution or to receive any distributions from the Company except as provided in Sections 4.1 and 9.4. No Member shall be entitled to receive or be credited with any interest on the balance of such Member's Capital Contribution at any time.

### 3.4    Loans to Company.

Nothing in this Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company and on such terms as are agreed to by a Majority in Interest; provided, however, that (i) all Members shall have the right to participate in any loans made pursuant to this Section 3.4 in proportion to the relative Percentage Interests of the Members so electing to participate; and (ii) the loans shall be repaid from available cash revenues and funds of the Company prior to any distributions to Members of cash of other property.

### 3.5    Loans to Members.

Nothing in this Agreement shall prevent the Company from making loans to Members on such terms as are agreed to by a Majority in Interest, including, if desired, a requirement that such loans to be secured by a pledge of such Member's Interest in the Company.

### Article 4.
### CASH DISTRIBUTIONS; PROFITS AND LOSSES FOR TAX PURPOSES

### 4.1    Cash Distributions Prior to Dissolution.

(a)    No Member and/or Interest Holder has a right to demand distributions of Net Cash Flow or any other Property of the Company. It is the primary intent of the Company to retain funds and Property in amounts and as determined by the Manager in its sole discretion to meet the needs of the Company.

(b)    Except as otherwise provided in this Sections 4.1, from time to time, the Managers shall determine and distribute the Cash Flow to the Members in the following order and amounts:

(i) First, to the Members in payment of loans to the Company owing to the Members; if more than one Member has loaned funds to the Company, the repayment of such loans shall be made on a pari passu basis; and

(ii) Second, to the Members in proportion to their Percentage Interests, as may be adjusted from time to time, pursuant to this Agreement.

(c)    If there is a change in a Member's Percentage Interest in the Company during a Fiscal Year, any distributions thereafter shall be made so as to take into account the varying Interests of the Members during the period to which the distribution relates in any manner chosen by the Managers that is provided in Code Section 706(d) and the Regulations thereunder.

(d) Notwithstanding any other provision of this Agreement, if any Member is allocated Profit which exceeds, on a cumulative basis, the amount of Losses previously allocated to such Member for tax purposes (the "Excess Income Allocation"), then such Member shall be entitled to receive a "Minimum Distribution" to the extent that there is available Cash Flow to make such Minimum Distribution. The Minimum Distribution is the amount, if any, by which (i) the Excess Income Allocation multiplied by the combined maximum individual federal and state income tax rates (reduced to reflect the maximum individual federal tax benefit from the deduction of state income taxes), exceeds (ii) the amount of cash previously distributed to such Member. The Minimum Distribution shall be payable

5

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/27/2023 10:14:28 AM

before any other distributions. Any Minimum Distribution received by a Member shall be credited against and reduce the amount of distributions that such Member shall be entitled to receive in the future. If the Manager determines that a distribution is to be considered a repayment of Unreturned Capital Contributions, such distribution shall be made to all the Members *pro rata* in an amount equal to their respective Unreturned Capital Contributions; provided, however, that if any loans are outstanding under Section 3.2(i) above, any distributions to the Defaulting Member shall be made to the lending Member(s).

(e)     Notwithstanding anything to the contrary herein provided, no distribution hereunder shall be permitted to the extent prohibited by the Act.

(f)     No distribution of Net Cash Flow or other cash made to any Member shall be determined a return or withdrawal of a Capital Contribution unless so designated by the Manager in its sole and exclusive discretion.

### 4.2     Persons Entitled to Distributions.

All distributions of Net Cash Flow to the Members under **Section 4.1** hereof shall be made to the Persons shown on the records of the Company to be Members as of the last day of the fiscal period prior to the time for which such distribution is to be made, unless the transferring Member and a Permitted Assignees otherwise agree in writing to a different distribution and such distribution is consented to in writing by the Manager.

### 4.3     Reserves.

The Manager shall have the right to establish, maintain and expend reserves to provide for working capital, future investments, debt service and such other purposes as it may deem necessary or advisable.

### 4.4     Allocation of Profits and Losses for Tax Purposes and Special Allocations.

Unless otherwise determined by Manager, all Profits and Losses for Tax Purposes of the Company and all special allocations of the Company shall be made in accordance with attached **Schedule B**.

### 4.5     Withholding Taxes.

If the Company is required to withhold any portion of any amounts distributed, allocated or otherwise attributable to a Member of the Company by applicable U.S. federal, state, local or foreign tax laws, the Company may withhold such amounts and make such payments to taxing authorities as are necessary to ensure compliance with such tax laws. Any funds withheld by reason of this **Section 4.5** shall nonetheless be deemed distributed to such Member in question for purposes of **Article 4** and **Article 9**. If the Company does not withhold from actual distributions any amounts it was required to withhold by applicable tax laws, the Company may, at its option, (i) require the Member to which the withholding was credited to reimburse the Company for withholding required by such laws, including any interest, penalties or additions thereto; or (ii) reduce any subsequent distributions to such Member by such withholding, interest, penalties or additions thereto. The obligation of a Member to reimburse the Company for such amounts shall continue after such Member transfers or liquidates its interest in the Company. Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist in determining the extent of, and in fulfilling, any withholding obligations it may have.

### 4.6     Return of Contribution Nonrecourse to Other Members.

Except as provided by Law, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

Exhibit A
Notice of Removal
REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08...

## Article 5.
## MEMBERS

### 5.1    Meetings of Members; Place of Meetings.

Meetings of the Members may be held for any purpose or purposes, unless otherwise prohibited by law or by the Articles, and may be called by the Manager. All meetings of the Members shall be held at the principal offices of the Company as set forth in **Section 1.2** hereof, or at such other place as shall be designated from time to time by the Manager and stated in the Notice of the meeting or in a duly executed waiver of the Notice thereof. Members may participate in a meeting of the Members by means of conference telephone or other similar communication equipment whereby all Members participating in the meeting can hear each other. Participation in a meeting in this manner shall constitute presence in person at the meeting.

### 5.2    Quorum; Voting Requirement.

The presence, in person or by proxy, of a Majority In Interest shall constitute a quorum for the transaction of business by the Members.

### 5.3    Proxies.

At any meeting of the Members, every Member having the right to vote thereat shall be entitled to vote in person or by proxy appointed by an instrument in writing (by means of electronic transmission or as otherwise permitted by applicable law) signed by such Member and bearing a date not more than one year prior to such meeting.

### 5.4    Action Without Meeting.

Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting, without prior Notice and without a vote if a consent in writing setting forth the action so taken is signed by all the Members.

### 5.5    Notice.

Notice stating the place, day and hour of the meeting and, the purpose for which the meeting is called shall be delivered not less than ten (10) days nor more than sixty (60) days before the date of the meeting by or at the direction of the Manager or other Persons calling the meeting, to each Member entitled to vote at such meeting. When any Notice is required to be given to any Member hereunder, a waiver thereof in writing signed by the Member, whether before, at, or after the time stated therein, shall be equivalent to the giving of such Notice. A Member may also waive Notice by attending a meeting without objection to a lack of Notice.

### 5.6    Powers of the Members.

Except as otherwise provided herein, no Member, acting solely in his, her or its capacity as a Member, shall act as an agent of the Company or have any authority to act for or to bind the Company.

### 5.7    Other Business Ventures.

(a)    Any Member or the Manager (or Affiliate thereof) may engage in or possess an interest in other business ventures of every nature and description, independently or with others, whether or not similar to the business of the Company, and neither the Company nor the Members shall have any right by virtue of this Agreement in or to such other business ventures or to the income or profits derived therefrom; provided, however, that each Member and the Manager agree that the confidential information and trade secrets of the Company, if any, are the proprietary property of the Company and may not be used by such Member or Manager (or an Affiliate thereof) for the benefit of any Person not the Company.

(b)    Unless otherwise agreed to, the Manager shall not be required to devote all such Manager's time or business efforts to the affairs of the Company, but shall devote so much of such Manager's time and attention to the Company as is reasonably necessary and advisable to manage the affairs of the Company to the best advantage of the Company.

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

**Exhibit A**
**Notice of Removal**

### 5.8 Defaulting Members.

A Defaulting Member shall not have any right to vote hereunder and/or attend any meetings of the Members and all votes, including without limitation determining a quorum, shall be calculated without taking into account the Interests held by such Defaulting Member. A Defaulting Member shall not have the right to review and/or inspect the Company's books and records nor receive any copies thereof.

## Article 6.
## MANAGERS

### 6.1 Powers of the Manager.

Except as otherwise provided hereunder, the business and affairs of the Company shall be managed by the Manager. Any decision or act of the Manager within the scope of the Manager's power and authority granted hereunder shall control and shall bind the Company.

### 6.2 Limitation on Powers of Manager.

Without the approval of a Majority in Interest of Members, the Manager shall not have the authority to:

(a)     terminate, dissolve or wind-up the Company;

(b)     issue an Interest to any Person and admit such Person as an additional Member except as provided in Section 8.6;

(c)     change the status of the Company from one in which management is vested in the Manager to one in which management is vested in the Members;

(d)     The purchase or sale of any real property;

(e)     The lease of any real property;

(f)     Cancellation or amendment of the Articles of Organization or this Agreement;

(g)     Approval of mergers or consolidations of the Company with or into any other entity;

(h)     Approval of any transactions outside the ordinary course of the Company's business;

(i)     The borrowing of money or incurrence of debt on behalf of the Company;

(j)     The pledging of assets of the Company to secure any indebtedness;

(k)     The confession of judgment against the Company;

(l)     The assignment of the Company's assets for the benefit of creditors or filing a voluntary bankruptcy petition by the Company;

(m)     The lending of money or Company property;

(n)     The lending of money to any Member.

### 6.3 Duties of Manager.

In addition to the rights and duties of the Manager set forth elsewhere in this Agreement and the Act and without limiting such rights and duties, the Manager shall be responsible for and is hereby authorized to:

(a)     hire or appoint agents or independent contractors of the Company;

8

Exhibit A
Notice of Removal

(b)      select and engage the Company's accountants, attorneys, engineers and other professional advisors;

(c)      apply for and obtain appropriate insurance coverage for the Company;

(d)      temporarily invest funds of the Company in short term investments where there is appropriate safety of principal;

(e)      negotiate, execute and perform all agreements, contracts, leases, loan documents and other instruments and exercise all rights and remedies of the Company in connection with the foregoing.

### 6.4      Number, Appointment, Tenure and Election of Manager.

The Managers of the Company shall be Ahmad M. Alkhatib, Richard W. Trojan and Ihab Naserallah. The Members, by unanimous consent, may, from time to time, amend this Section to increase or decrease the number of Managers, but in no instance shall the number of Managers be less than one. A Manager does not have to be a Member and/or hold any Interest in the Company. If there is more than one (1) manager, all decisions and actions to be taken by the Manager pursuant to this Agreement shall be determined by majority vote of all Managers.

### 6.5      Resignation and Election of a Manager.

(a)      A Manager may resign from such position at any time upon giving thirty (30) days' prior Notice to the Members, unless a shorter period of time is agreed to by the Majority in Interest of Members.

(b)      Any vacancy created in a manager position by the resignation or death or incapacity of a Manager, or otherwise, shall be filled by a new Manager selected by the resigning Member or his estate, as applicable.

### 6.6      Compensation.

Except as otherwise provided herein, no Member shall be entitled to compensation for any services such Member may render to or for the Company or be entitled to reimbursement of any general overhead expenses incurred by such Member in his, her or its capacity as a Member. Each Member shall be entitled to reimbursement from the Company for all reasonable direct out-of-pocket expenses incurred on behalf of the Company upon presentation to the Company of receipts or other appropriate documentation evidencing such expenses. The Manager shall be entitled to compensation in an amount approved by the Majority in Interest or more of the Percentage Interests.

### 6.7      Authority to Execute Documents.

The Manager shall have the power and authority to execute, on behalf of the Company, any document filed with the Secretary of State of Illinois pursuant to the terms of the Act. In addition, the Manager shall have the power and authority to execute, on behalf of the Company, any contract or agreement authorized under this **Article 6**.

### 6.8      Liability of Manager.

The Manager and its respective agents, employees, shareholders, officers, members, directors and affiliates will not be liable to the Company or any of the Members or their successors or assigns for any acts performed or omitted within the scope of the authority conferred on the Manager and such agents, employees, shareholders, officers, members, directors and affiliates by this Agreement so long as the Manager or such parties (i) act in good faith within what he or she or they believe to be the scope of his or her or their authority for a purpose he or she or they believe to be not opposed to the interest of the Company, and (ii) are not guilty of willful misconduct or gross negligence.

Exhibit A
Notice of Removal

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/27/2023 10:14:28 AM

## Article 7.
### LIABILITY AND INDEMNIFICATION

**7.1     Liability of Members and Manager.**

(a)     A Member shall only be liable to make the payment of the Member's initial Capital Contribution pursuant to **Section 3.1** and the additional Capital Contributions, if any, required by **Section 3.2** hereof.  No Member or Manager shall be liable for any obligations of the Company or any other Member or Manager, unless personally guaranteed by the Member or Manager pursuant to a separate document.

(b)     No Member, except as otherwise specifically provided in the Act, shall be obligated to pay any distribution to or for the account of the Company or any creditor of the Company.

**7.2     Indemnification.**

The Members and the Manager, and their respective stockholders, members, managers, directors, officers, partners, agents and employees (individually and collectively, an "Indemnitee") shall be indemnified and held harmless by the Company from and against any and all losses, claims, damages, liabilities, expenses (including legal fees and expenses), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative (each a "Claim"), in which the Indemnitee may be involved, or threatened to be involved, as a party or otherwise by reason of such Indemnitee's status as any of the foregoing, which relates to or arises out of the Company, its assets, business or affairs, if in each of the foregoing cases (i) the Indemnitee acted in good faith and in a manner such Indemnitee believed to be in, or not opposed to, the best interests of the Company, and, with respect to any criminal proceeding, had no reasonable cause to believe such Indemnitee's conduct was unlawful, (ii) the Indemnitee's conduct did not constitute gross negligence or willful or wanton misconduct, (iii) the Indemnitee did not breach his, her or its duty of loyalty to the Company or the Members, and (iv) the Indemnitee did not receive any improper personal benefit with respect to the transaction at issue.  Any indemnification pursuant to this **Article 7** shall be made only out of the assets of the Company, and no Manager or Member shall have any personal liability on account thereof.

## Article 8.
### TRANSFERS OF INTERESTS

**8.1     General Restrictions.**

(a)     No Member may Transfer all or any part of such Member's Interest, nor any rights, obligations, covenants and other ownership of Member in and to the Company and/or such Member's Interest, except as provided in this **Article 8**.  Any purported Transfer of an Interest or a portion thereof or any other right, obligation, covenant or other ownership of Member in and to the Company and/or such Member's Interest in violation of the terms of this Agreement shall be null and void and of no effect.  If the Manager determines in its sole discretion that any Transfer will result in a termination of the Company under Code § 708(b)(1)(B), then the Manager may deem such Transfer null and void.  Any transferee desiring to make a further Transfer shall become subject to all the provisions of this **Article 8** to the same extent and in the same manner as any Member desiring to make any Transfer.

(b)     Unless otherwise agreed to by the unanimous consent of all Members entitled to vote, no Member shall have the right to withdraw or dissociate voluntarily from the Company as a Member.   A Member who does so in violation of this Agreement shall be liable to the Company for any and all damages caused by such violation.

(c)     All voting rights shall be forfeited with respect to all or any part of an Interest which is Transferred other than a Permitted Transfer wherein the transferee shall become a substitute Member in accordance with **Section 8.4**, whether such Transfer is voluntary or involuntary, by order of a court, judgment or by operation of law.

(d)     In the event that an Assignee exists, the voting percentages of all the Members shall be adjusted on a *pro rata* basis to equal 100%, unless and until such time as the interests held by such Assignee are held by the transferee of a Permitted Transfer at which time, the voting percentages shall then be adjusted again on a *pro rata* basis to equal 100%, taking into account such Permitted Transfer Interest.  An Assignee has only those rights described in the definition of "Assignee" in **Section 2.1**.

10

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08...

**Exhibit A**
**Notice of Removal**

(e)    If a Member who is an individual dies or a the Member is adjudged to be incompetent to manage his or her person or property, then the Member's executor, administrator, guardian, conservator or other legal representative shall automatically become a substitute member of such Member's Interest and Section 8.6 shall apply.

8.2    **Permitted Transfers.**   Each Member shall have the right to Transfer, by a written instrument, all or any part of such Member's Interest, if, and only if ("Permitted Transfer"): (i) the Manager and all of the Members have consented in writing to such Transfer, or (ii) the Transfer is to a Permitted Assignee; or (iii) such Transfer is made pursuant to and in accordance with the exercise of the purchase options set forth in Sections 8.3 or 8.6 hereof.

8.3    **Involuntary Transfers.**  All of the following shall constitute a material breach of this Agreement by a Member and such Member shall immediately and without further action deemed to be a Defaulting Member hereunder (such Defaulting Member is also referred to in this Section 8.3 as an "Involuntary Offeror") (i) any proceeding is instituted by or against a Member under the provisions of Federal, foreign or other bankruptcy, reorganization, arrangement of debt, insolvency or receivership laws or similar state, federal or foreign laws providing for the relief of debtors, (ii) a Member makes an assignment for the benefit of creditors, (iii) a Member is subject to any other possible involuntary transfer of his or her Interests by legal process, including, without limitation, an assignment or transfer pursuant to a divorce decree or settlement under the terms of which such Member would be required to transfer his or her Interests to any other person that is not a Permitted Assignee, (iv) a monetary judgment is granted against a Member and a creditor's charging order or lien is placed upon a Member's Interests; and/or (v) a receiver is appointed for a Member and/or its Interests hereunder.   The creditor, transferee or other claimant shall only have the rights of an Assignee hereunder and shall have no right to become a Member, or to participate in the management of the business and affairs of the Company as a Member or Manager under any circumstances and shall not be entitled to vote, shall not have the right to require any information or accounting of the Company's business nor shall they have the right to inspect the Company's books and records and such creditor, transferee or other claimant shall be entitled only to receive the share of profits and losses and the return of capital to which the Involuntary Offeror would otherwise have been entitled; provided, however, that no Assignee shall be entitled to any distributions to which the Involuntary Offeror would be entitled unless such Assignee has made or causes the Involuntary Offeror to make any and all required Additional Capital Contributions required to be made prior to such distribution date and not yet made by such Involuntary Offeror. Upon any such involuntary transfer, the following shall apply and the Members agree that the following remedies and valuation is a good faith attempt at fixing the value of the Interest of such Involuntary Offeror, after taking into account that the interest does not include all of the rights of a Member or Manager and after deducting damages that are due to the material breach by the Involuntary Offeror of this Agreement it being understood and agreed to by the Members that having the right to choose whom you are in business with is part of the consideration of entering into this Agreement:

(1)    the Company shall have the immediate right to proceed to purchase all of the Interests then owned by the Involuntary Offeror (the "Involuntary Offered Units") for an amount equal to the book value of such Interest, adjusted for profits and losses to the date of purchase (the "Involuntary Transfer Purchase Price") less any and all fees and costs incurred by the Company in connection with such involuntary transfer and any loans made to the Involuntary Offeror under Section 3.2 hereof and any and all damages suffered by the Company due to such involuntary transfer.  For purposes of this Section 8.3, book value shall mean the sum of (a) the lower of (i) the Company's basis in its assets minus accumulated depreciation or (ii) the fair market value of the Company's assets, minus (b) all liabilities of the Company (including Member loans not yet repaid), reasonable selling and liquidations expenses and reasonable reserves to be set aside for future liabilities Such right shall continue for a period of sixty (60) days from actual receipt of such notice (the "Company Involuntary Transfer Option Period"). Failure by the Involuntary Offeror to give such notice shall not limit the Company's right to purchase the Involuntary Offeror's Units, which right shall arise immediately prior to the commencement of any legal process or transaction set forth above and continue until the expiration of one hundred twenty (120) days from the later of the date the Company has received written order or judgment in such proceeding or the date the Assignee of such Involuntary Offeror provides written demand on the Company regarding such Involuntary Offeror's Interests.  In the event the Company elects to purchase the Involuntary Offered Units pursuant to this Section 8.3, the Company shall send written notification thereof (which notification shall set forth the purchase price for such Interests, determined as aforesaid, as well as the date, time and place of the closing of such purchase) to the Involuntary Offeror.

(2)    If the Company does not exercise its right under this Section 8.3 to purchase all of the Involuntary Offered Units, then the Members other than the Involuntary Offeror shall, upon the expiration of the Company Involuntary Transfer Option Period, have the right for a period of sixty (60) days after expiration of the Company Involuntary Transfer Option Period to purchase all, but in the aggregate not less than all, of the Involuntary Offered Units not otherwise purchased by the Company (the "Remaining Involuntary Offered Units") for the Involuntary Transfer Purchase Price.

11

**Exhibit A**
**Notice of Removal**

(3)     Any purchase of Involuntary Offered Units by either the Company or the Members shall be consummated as soon thereafter as reasonably possible.  The payment of any Involuntary Transfer Purchase Price shall be made to a lender Member under Section 3.2(b)(i) to the extent of any loans made pursuant to Section 3.2(i) hereof not yet repaid in full.  At the option of the purchaser of the Involuntary Offered Units, the payment of the Involuntary Transfer Purchase Price may be made over a period of time provided that such time period may not be longer than five (5) years and shall bear interest at the then prevailing interest rate for money market accounts at the bank in which the Company has its bank accounts.

8.4     **Substitute Members**.  A Permitted Transfer shall be effective as of the date specified in the instruments relating thereto.  For any Permitted Transfer, a Person shall cease to be a Member upon assignment of all such Member's Interest.  For any Permitted Transfer, the transferee under such Permitted Transfer shall be deemed to be a Member hereunder upon the date of such transfer without further action or notice; provided that if required by the Manager, the transferee shall execute an instrument accepting and adopting the terms and provisions of the Articles and this Agreement.  Upon a Permitted Transfer, the Manager shall cause the books and records of the Company to reflect the admission of the transferee as a substitute Member to the extent of the Transferred Interest held by the transferee.

8.5     **Effect of Admission as a Substitute Member.**  A transferee under a Permitted Transfer who has become a substitute Member has, to the extent of the Transferred Interest, all the rights, powers and benefits of and is subject to the restrictions and liabilities of a Member under the Articles, this Agreement and the Act.  Upon admission of a transferee as a substitute Member, the transferor of the Interest so acquired by the substitute Member shall cease to be a Member of the Company to the extent of such Transferred Interest.

8.6     **Right of Purchase of a Member's Interest.**

(a)     Without limiting the rights of the Company, the Manager and/or the other Members upon any Transfer that is not a Permitted Transfer (including without limitation to the extent not prohibited under applicable law, the right to deem such Transfer to be null and void), if a Member ("Selling Member") attempts to Transfer all or any portion of its Interests in the Company which is not a Permitted Transfer and is also not a transfer under **Section 8.3** above, then a Majority in Interest (determined by excluding any such Selling Member) may, but are not required to, elect to cause the Company to purchase such Selling Member's Interest as provided in this **Section 8.6** by providing Notice to the Selling Member.  Such Notice shall be given to the Selling Member within ninety (90) days following the date of such attempted Transfer (the "Valuation Date").  The purchase price for any Interest to be purchased by the Company pursuant to this **Section 8.6** shall be the lower of the (i) fair market value of such Interest as determined below, or (ii) the purchase price for which the Selling Member was going to Transfer such Interest.

(b)     The fair market value shall be determined by a licensed MAI appraiser selected by mutual agreement of the Company and the Selling Member or his or her executor, administrator, guardian, conservator or legal representative, as the case may be, without any minority or liquidity discount and shall equal the amount that would be received by the Selling Member if all of the assets of the Company were sold for cash equal to their fair market value and all liabilities of the Company were paid in full (including Member loans not yet repaid), including selling and liquidations expenses.

(c)     Within fifteen (15) days after the fair market value is determined, the Manager shall give Notice to the Selling Member and the other Members as to the purchase price of the Selling Member's Interest.  A Majority in Interest (determined by excluding the Selling Member) shall then have the option (i) to not purchase the Selling Member's Interest, in which event the Selling Member shall have the status of an Assignee of an Interest, or (ii) to have the Company purchase the Interest, and if so, shall promptly set the date on which the closing of the purchase shall occur (the "Closing Date"), which date shall not be less than ten (10) days or more than sixty (60) days from the date the Notice by the Manager is given.   If the Company does not exercise its right under this Section 8.6 to purchase, then the Members shall have the right for a period of sixty (60) days after expiration of the Company's rights hereunder to purchase all, but in the aggregate not less than all, of the Selling Member's Interests for the fair market value (provided that if more than one Member shall desire to exercise the foregoing right, such purchase shall be pro rata between the purchasing Members).

(d)     At the closing, the Selling Member shall execute and deliver to the Company or purchasing Member(s) such assignments of the Interest and amendments to this Agreement and other instruments as shall reasonably be requested by the Company to effect the Transfer, as of the Valuation Date, of all the Selling Member's right, title and interest in the Company and its Property.  Unless otherwise agreed, the purchase price shall be paid to the Selling Member in cash on the Closing Date; provided that payment of the purchase price shall be made to a lender Member under Section 3.2(i) to the extent of any loans made pursuant to Section 3.2(i) hereof not yet repaid in full.  The purchase price shall

12

Exhibit A
Notice of Removal

be deemed a payment with respect to the Property under Section 736(b) of the Code (as defined in Schedule B hereto) to the extent of the Selling Member's Capital Account balance, and the remainder shall be deemed a distributive share under Section 736(a) of the Code.

8.7    <u>Mutual Forced Buy-Sell Option.</u>    The Members recognize that, due to the small number of Members of the Company and the restriction on transferability of Interests, irreconcilable differences may arise in the future which might jeopardize the efficient operation of the Company and its business.  The Members desire to incorporate in this Agreement an equitable procedure for severing their business relationship in the event such irreconcilable differences should arise:

(a)    A Member may activate the procedure outlined in this article by serving written notice upon the other Members.  Such notice shall expressly state the intention of such Member to activate and take advantage of this provision.  For the purposes of this provision, the Member serving such notice shall be referred to as the "Activating Member".

(b)    The written notice activating this provision shall specify a Buy-Sell Price.  The Buy-Sell Price shall be the price at which the Activating Member agrees to either:

(i)    Sell all of the Activating Member's Interest in the Company to the other Member; or

(ii)    Purchase from the other Member all of the other Member's Interest in the Company.

In the event the Members do not own an equal number of Interests, the Buy-Sell Price shall be stated in the terms of price per Interest, but shall provide that all such Interests shall be either sold or purchased.

In the event there are more than two (2) Members, the Activating Member may direct his notice to a single Member; provided, however, copies of such notice shall be served upon all Members.  Two or more Members may join in a single notice activating this provision.

(c)    Within sixty (60) calendar days after the Activating Member serves upon the other Member(s) a written notice activating this provision, the Member(s) served with such notice shall, by serving written notice upon the Activating Member, elect to either:

(i)    purchase all of the Activating Member's Interest at the Buy-Sell Price; or

(ii)    sell all such Member's Interest to the Activating Member at the Buy-Sell Price.  The election to either buy or sell, as herein above provided, shall be in writing and shall be served upon the Activating Member.  Failure to serve a written notice electing to either buy or sell, as herein provided, shall be deemed an election to sell to the Activating Member.

(d)    Unless otherwise agreed in writing between the Interested Members, or their attorneys prior to closing, in the event a Member has elected to purchase the Interest of the other Member(s) (or, in the case of the Activating Member, in the event no other Member has elected to purchase the Activating Member's, thereby binding the Activating Member to purchase the Membership Interest of the other Member(s)) but such Member shall fail to be ready, willing and able to pay the Buy-Sell price and to otherwise consummate the purchase of such Interest at the Closing, the Closing shall be rescheduled (the "Rescheduled Closing") for ten (10) business days after the originally scheduled Closing. In such event, the Buy-Sell Price shall be increased by ten percent (10%) (i.e., Buy-Sell Price multiplied by 110%) as liquidated damages for such delay.  Unless otherwise agreed in writing, the Rescheduled Closing shall be held at the same hour and location as theretofore specified for the Closing.  Notice of the Rescheduled Closing shall be served upon each Interested Member by the other Interested Member(s) unless the requirement for serving notice of the Rescheduled Closing shall be waived in writing by the Member entitled to receive such notice.  A Member shall be deemed

13

Exhibit A
Notice of Removal

an "Interested Member" if he is bound hereunder to either sell or purchase Interest at the closing.

(e)    In the event the Member obligated to purchase the Interest of the other Member shall fail to be ready, willing and able to consummate such purchase of Interest at the Rescheduled Closing, the other Interested Member may elect to proceed as follows, by serving, within (10) business days after the rescheduled Closing, written notice upon such Member obligated to purchase Interest:

(i)    To purchase the Interest of the Member who was obligated to purchase Interest at the Closing and the Rescheduled Closing. In such event the Buy-Sell Price shall be reduced by twenty percent (20%) (i.e., Buy-Sell Price multiplied by 80%). The closing of such transaction ("the Reverse Closing") shall be thirty (30) business days after the Rescheduled Closing. Unless otherwise agreed, the Reverse Closing shall be at the hour of 3:00 P.M. at the Registered Office of the Company. Between the date of service of an effective election to hold a Reverse Closing, as herein provided, and the date of the Reverse Closing, the voting rights of the Interest of the Member obligated to transfer his Interest at the Reverse Closing shall be suspended; or

(ii)    To terminate the entire effect of the activation of this Mutual Forced Buy-Sell Option, in which event the parties shall return to the status quo as existed prior to notice by the Activating Member pursuant to subparagraph (a) of this provision. In the event no notice is served effectively electing to proceed under either subparagraph (i) or subparagraph (ii) of this subparagraph (e), or in the event of the Member obligated to purchase the Interest of the other at the Reverse Closing shall fail to be ready, willing and able to consummate such Reverse Closing, this subparagraph (e) (iii) shall be deemed to have been elected.

(f)    In the event a Member who is entitled to purchase the Interest of the Member at the Closing, Rescheduled Closing or Reverse Closing appears at such Closing, Rescheduled Closing or Reverse Closing (either in person or by an authorized representative) and is ready, willing and able to deliver the Buy-Sell Price (as may be adjusted in accordance herewith) and shall tender the same to the Member obligated to sell such Interest (or to the escrowee, as hereafter provided) but if the Member obligated to sell such Interest shall not be present (either in person or by an authorized representative) or shall otherwise fail or refuse to consummate the transaction contemplated hereby, the Member entitled to purchase such Interest may satisfy his obligations hereunder by depositing the Buy-Sell Price (as may be adjusted pursuant hereto) with the Registered Agent of the Company, as Escrowee, for the benefit of the Member obligated to transfer such Interest. In such event, the Interest of the Member obligated to transfer such Interest shall be conclusively deemed to be transferred to the purchasing Member and such transfer shall be reflected on the books and records of the Company as of the date of delivery of the Buy-Sell Price (as may be adjusted in accordance herewith) to the aforesaid Escrowee. In the event the Registered Agent of the Company shall fail or refuse to act as Escrowee for the purposes aforesaid, such funds may be deposited with any trust company licensed to transact business in the State of Illinois, to be held for the benefit of the Member entitled to receive such funds. All fees of such trustee shall be chargeable against and paid from the funds deposited in escrow with such trustee as as Escrowee in accordance herewith.

(g)    This Mutual Forced Buy-Sell Option provision shall be deemed a material part of the First Amended and Restated Operating Agreement of which it is a part and time shall be deemed to be of the essence with respect to the exercise of any rights arising hereunder.

## Article 9.
### DISSOLUTION AND TERMINATION

9.1    <u>Events Causing Dissolution</u>.    The Company shall be dissolved upon the first to occur of the following events:

(i)    Upon the unanimous consent of all of the Members and the Manager; or

Exhibit A

Notice of Removal

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

(ii) Upon a decree of judicial dissolution pursuant to the Act.

**9.2 Continuation of Company.**

(a) Upon the occurrence of any event which terminates the continued membership of a Member in the Company and/or upon the occurrence of a bankruptcy of a Member or the occurrence of any other involuntary withdrawal of a Member, the Company shall not be dissolved and the business of the Company shall continue. Each Member hereby specifically consents to such continuation of the business of the Company upon the termination of membership of any Member, a bankruptcy of any Member or any other involuntary withdrawal of a Member.

(b) The Company shall not be dissolved by the transfer of any Interest of any Member, or by the admission of a Member or a Substitute Member. If, notwithstanding the foregoing, the Company is deemed to have dissolved or terminated for tax purposes due to a sale or exchange of the Interests under the Treasury Regulations, the Members hereby specifically consent to reconstitute and continue the business of the Company and shall execute an instrument confirming such fact, if required.

**9.3 Notices to Secretary of State.**

(a) As soon as possible following the occurrence of the events specified in **Section 9.1** above, the Company shall file a notice of winding-up with the Secretary of State of Illinois which discloses the dissolution of the Company and the commencement of the winding-up of its business and affairs.

(b) When all of the Property has been distributed, the Articles shall be canceled by filing a certificate of cancellation with the Secretary of State of Illinois.

**9.4 Cash Distributions Upon Dissolution.**

(a) Upon the dissolution of the Company as a result of the occurrence of any of the events set forth in **Section 9.1**, the Manager shall proceed to wind up the affairs of and liquidate the Company, and the Liquidation Proceeds shall be applied and distributed in the following order of priority:

(i) First, to the payment of debts and liabilities of the Company in the order of priority as provided by law (including any loans or advances that may have been made by any of the Members to the Company) and the expenses of liquidation.

(ii) Second, to the establishment of any reserve which the Manager may deem reasonably necessary for any contingent, conditional or unasserted claims or obligations of the Company.

(iii) Third, *pro rata* to the Members in the amounts equal to their then Unreturned Capital Contributions; provided that if any Member is a Defaulting member under Section 3.2 hereof, such Member's distribution shall be made to the lender Member under Section 3.2(b)(i) to the extent of any loans made pursuant to Section 3.2(i) hereof not yet repaid in full; and

(iv) Finally, the remaining balance of the Liquidation Proceeds, if any, to the Members *pro rata* in proportion to their respective Percentage Interests; provided that if any Member is a Defaulting member under Section 3.2 hereof, such Member's distribution shall be made to the lender Member under Section 3.2(b)(i) to the extent of any loans made pursuant to Section 3.2(i) hereof not yet repaid in full.

**9.5 In-Kind.**

Notwithstanding the foregoing, in the event the Manager shall determine that an immediate sale of part or all of the Property would cause undue loss to the Members, or the Manager determines that it would be in the best interest of the Members to distribute the Property to the Members in-kind (which distributions do not, as to the in-kind portions, have to be in the same proportions as they would be if cash were distributed, but all such in-kind distributions shall be equalized, to the extent necessary, with cash), then the Manager may either defer liquidation of, and withhold from distribution for a reasonable time, any of the Property except that necessary to satisfy the Company's debts and obligations, or distribute the Property to the Members in-kind.

15

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

**9.6**     <u>Limitations on Payments in Dissolution.</u>   Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of such Member's positive Capital Account balance and shall have no recourse for such Member's Capital Contribution or share of profits (on dissolution or otherwise) against any other Member.

## Article 10.
## ACCOUNTING AND BANK ACCOUNTS

**10.1**     <u>Fiscal Year and Accounting Method.</u>

The fiscal year and taxable year of the Company shall be as designated by the Manager in accordance with the Code. The Manager shall also determine the accounting method to be used by the Company.

**10.2**     <u>Books and Records.</u>

The books and records of the Company shall be maintained at its principal place of business.

**10.3**     <u>Books and Financial Reports.</u>

Proper and complete records and books of account shall be kept by the Manager in which shall be entered all transactions and other matters relative to the Company business. The Company's books and records shall be prepared in accordance with commercially reasonable accounting standards.

**10.4**     <u>Tax Returns and Elections.</u>

(a)     The Company shall elect to be taxed as a partnership for Federal income tax purposes. The Manager is authorized to make such election.

(b)     The Company shall cause to be prepared and timely filed all federal, state and local income tax returns or other returns or statements required by applicable law.

(a)     As soon as reasonably practicable after the end of each fiscal year of the Company, the Company shall cause to be prepared and delivered to each Member all information with respect to the Company necessary for the Member's federal and state income tax returns.

**10.5**     <u>Bank Accounts.</u>

All funds of the Company shall be deposited in a separate bank, money market or similar account(s) approved by the Manager and in the Company's name. Withdrawals therefrom shall be made only by Persons authorized to do so by the Manager. All withdrawals over One Thousand Dollars ($1,000.00) shall require the signature of two Managers.

## Article 11.
## MISCELLANEOUS

**11.1**     <u>Title to Property; No Partition.</u>

Title to the Property shall be held in the name of the Company. No Member shall individually have any ownership interest or rights in the Property, except indirectly by virtue of such Member's ownership of an Interest. No Member shall have any right to any specific assets of the Company upon the liquidation of, or any distribution from, the Company. All Members hereby waive any and all rights to partition to which they may be entitled now or in the future with respect to any and all Property of the Company.

**11.2**     <u>Waiver of Default.</u>

No consent or waiver, express or implied, by the Company or a Member with respect to any breach or default by the Company or a Member hereunder shall be deemed or construed to be a consent or waiver with respect to any other breach or default by any party of the same provision or any other provision of this Agreement. Failure on the part of

16

Exhibit A
Notice of Removal

the Company or a Member to complain of any act or failure to act of the Company or a Member or to declare such party in default shall not be deemed or constitute a waiver by the Company or the Member of any rights hereunder.

11.3    **Notice.**

(a)      Any Notice required or permitted to be given hereunder shall be in writing and shall be (i) personally delivered, (ii) transmitted by postage pre-paid first class certified United States mail, (iii) transmitted by pre-paid, overnight delivery, or (iv) transmitted by email or facsimile transmission.

(b)      All Notices and other communications shall be deemed to have been duly given, received and effective on (i) the date of receipt if delivered personally, (ii) two (2) business days after the date of posting if transmitted by mail, (iii) the business day after the date of transmission if by overnight delivery, or (iv) if transmitted by email or facsimile transmission, the date of transmission with confirmation by the originating facsimile transmission machine of receipt by the receiving facsimile machine of such transmission.

(c)      Any Member may change his, her or its address for purposes hereof by Notice given to the other Members and the Company.

Notices hereunder shall be directed to the last known address of a Member as shown in the records of the Company.

11.4    **Amendment.**

(a)      Except as otherwise expressly provided elsewhere in this Agreement, this Agreement shall not be altered, modified or changed except by an amendment approved by the Manager and all of the Members.

(b)      In addition to any amendments otherwise authorized herein, amendments may be made to this Agreement from time to time by the Manager without the consent of the Members (i) to cure any ambiguity or to correct or supplement any provision herein which may be inconsistent with any other provision herein or (ii) to delete or add any provisions of this Agreement required to be so deleted or added by federal, state or local law or by the Securities and Exchange Commission, the Internal Revenue Service, or any other Federal agency or by a state securities or "blue sky" commission, a state revenue or taxing authority or any other similar entity or official.

11.5    **No Third Party Rights.**

None of the provisions contained in this Agreement shall be for the benefit of or enforceable by any third parties, including creditors of the Company and/or the Members, nor give any third parties, including creditors of the Company and/or the Members, any right of subrogation or action over or against any party to this Agreement. The parties to this Agreement expressly retain any and all rights to amend this Agreement as herein provided, notwithstanding any interest in this Agreement or in any party to this Agreement held by any other Person.

11.6    **Severability.**

In the event any provision of this Agreement is held to be illegal, invalid or unenforceable to any extent, the legality, validity and enforceability of the remainder of this Agreement shall not be affected thereby and shall remain in full force and effect and shall be enforced to the greatest extent permitted by law.

11.7    **Nature of Interest in the Company.**

A Member's Interest shall be personal property for all purposes.

11.8    **Binding Agreement.**

Subject to the restrictions on the disposition of Interests herein contained, the provisions of this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, personal representatives, successors and permitted assigns.

17

**Exhibit A**
Notice of Removal
REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08

### 11.9 Headings.

The headings of the Articles and sections of this Agreement are for convenience only and shall not be considered in construing or interpreting any of the terms or provisions hereof.

### 11.10 Word Meanings.

The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural, and vice versa, unless the context otherwise requires.

### 11.11 Counterparts.

This Agreement may be executed in multiple counterparts, each one of which shall be deemed an original but all of which, taken collectively, shall be deemed a single instrument; provided, that this Agreement shall not be enforceable against any party hereto unless all parties hereto have executed at least one (1) counterpart. Facsimile, electronic (e.g., DocuSign) and .pdf signatures shall have the same binding effect as original signatures, and the parties waive any defense to validity based on any such signatures.

### 11.12 Entire Agreement.

This Agreement contains the entire agreement between the parties and supersedes all prior writings or agreements with respect to the subject matter hereof.

### 11.13 Representations and Acknowledgments.

Each Member does hereby represent and warrant by the signing of a counterpart of this Agreement that the Interest acquired by him, her or it was acquired for his, her or its own account, for investment only, and not for the benefit of any other Person, and not for resale to any other Person or future distribution, and that he, she or it has relied solely on the advice of his, her or its personal tax, investment or other advisor(s) in making his, her or its investment decision. The Manager has not made and hereby makes no warranties or representations other than those set forth in this Agreement.

### 11.14 Dispute Resolution and Arbitration.

Except as provided in this **Section 11.14**, any dispute arising out of or relating to this Agreement or the breach, termination or validity hereof (collectively, a "Dispute") shall be settled as follows: the parties shall meet in a good faith attempt to resolve such matter or matters. If such meeting does not result in resolution, all parties must meet with an independent facilitator or mediator, who shall be designated by agreement of the parties, to resolve the disputed matter or matters. If unsuccessful, then the dispute shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules then in effect of the American Arbitration Association. The arbitrator(s) shall not award punitive, exemplary or consequential damages. These procedures are for the settlement of Disputes only and are not to be used for disagreements concerning the policy, organization, management or practice of the Company. Any action or proceeding subsequent to any award rendered by arbitration shall be filed in a court of competent jurisdiction and Illinois law shall apply in any such action or proceeding.

### 11.15 Intentionally Omitted.

### 11.16 Nature of Agreement.

This Agreement shall be personal in nature.

### 11.17 Attorneys' Fees.

In any dispute between or among the Company and one or more of the Members, the prevailing party or parties in such dispute shall be entitled to recover from the non-prevailing party or parties all reasonable fees, costs and expenses, including without limitation, attorneys' fees, costs and expenses, all of which shall be deemed to have accrued on the commencement of such action, proceeding or arbitration. Prevailing party shall mean the party that is determined in the arbitration, action or proceeding to have prevailed or who prevails by dismissal, default or otherwise.

18

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

**11.18** <u>Legal Representation</u>. The Company has engaged Skoubis & Mantas, LLC ("SAM"), as legal counsel to the Company, with respect to the preparation of this Agreement. SAM has not been engaged by any of the Members to protect or otherwise represent the interests of the Members with respect to the preparation of this Agreement or with respect to the interests of such Member vis-a-vis the Company. Each Member: (a) approves SAM's representation of the Company in the preparation of this Agreement; (b) acknowledges that no legal counsel has been engaged by the Company to protect or otherwise represent the interests of the Members, that SAM has not been engaged by any Member to protect or represent the interests of such Member, as the case may be, vis-a-vis the Company or the preparation of this Agreement, and that actual or potential conflicts of interest may exist among the Members in connection with the preparation of this Agreement (with the consequence that a Member's interests may not be vigorously represented unless such Member engages its own legal counsel); (c) acknowledges further that such Member has been afforded the opportunity to engage and seek the advice of its own legal counsel before entering into this Agreement; and (d) forever waives any conflict of interest claims, actions or causes of action against SAM and its members.

THE COMPANY HAS DISCLOSED AND THE MEMBERS ACKNOWLEDGE AND AGREE THAT THE TRANSFERABILITY OF THE INTERESTS IS SEVERELY LIMITED AND THE MEMBERS MUST CONTINUE TO BEAR THE ECONOMIC RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD. THE MEMBERSHIP INTERESTS EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION, BUT HAVE BEEN ISSUED PURSUANT TO EXEMPTIONS UNDER THE SECURITIES ACT OF 1933, AS AMENDED. FURTHER, THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED WITH THE SECURITIES COMMISSIONER OF THE STATE OF ILLINOIS OR ANY OTHER STATE. ACCORDINGLY, THE SALE, TRANSFER, PLEDGE, HYPOTHECATION, OR OTHER DISPOSITION OF ANY OF SAID MEMBERSHIP INTERESTS IS RESTRICTED AND MAY NOT BE ACCOMPLISHED EXCEPT IN ACCORDANCE WITH THIS AGREEMENT.

Exhibit A
Notice of Removal

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/27/2023 10:14:28 AM

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**MEMBERS**

Ahmad M. Alkhatib

Richard W. Trojan

Ihab Naserallah

**MANAGERS:**

Ahmad M. Alkhatib

Richard W. Trojan

Ihab Naserallah

20

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

**Exhibit A**
**Notice of Removal**

## SCHEDULE A – MEMBERS

| Name | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| Ahmad M. Alkhatib<br>1131 W. Bryn Mawr, 2nd. Floor<br>Chicago, IL 60660 | $383,000.00 | 33 1/3% |
| Richard W. Trojan<br>433 8th St.<br>Wilmette, IL 60091 | $383,000.00 | 33 1/3% |
| Ihab Naserallah<br>530 1st. Street<br>Lemont, IL 60439 | $383,000.00 | 33 1/3% |

21

## SCHEDULE B - TAXES

1.  **Tax Election.**

   If the Company elects to be taxed as a corporation and/or a subchapter S corporation for Federal income tax purposes, the provisions of the Code as they apply to such corporations and/or subchapter S corporations shall apply to the books, records, profits, losses and other tax provisions and reporting relating the Company. To the extent that any of the provisions set forth in Sections 2-8 below are not inconsistent with the election to be taxes as a corporation and/or a subchapter S corporation, such provisions shall apply. To the extent that any of the provisions set forth in Sections 2-8 below are inconsistent with the election to be taxed as a corporation and/or a subchapter S corporation, such provisions shall be deemed null and void and no force and effect.

   If the Company elects to be taxed as a partnership for Federal income tax purposes, the provisions of Sections 2-8 below shall apply as written.

2.  **Definitions.**

   "**Adjusted Capital Account**" means the Capital Account balance of a Member increased by such Member's Share of Company Minimum Gain.

   "**Capital Account**" means a separate account established by the Company and maintained for each Member in accordance with this **Schedule B.**

   "**Member's Share of Company Minimum Gain**" means an amount determined (i) in accordance with rules applicable to partnerships in Treasury Regulation Section 1.704-2(g) with respect to a nonrecourse liability of the Company in which no Member bears the economic risk of loss and (ii) in accordance with rules applicable to partnerships in Treasury Regulation Section 1.704-2(i) with respect to a nonrecourse liability of the Company in which any Member bears any portion of the economic risk of loss.

   "**Minimum Gain**" means the amount of gain, if any, as set forth in rules applicable to partnerships in Treasury Regulations Section 1.704-2(d) that would be realized by the Company if it disposed of (in a taxable transaction) property subject to a nonrecourse liability of such Company, in full satisfaction of such liability (and for no other consideration).

   "**Profits and Losses For Tax Purposes**" means, for accounting and tax purposes, the various items with respect to partnerships set forth in Section 702(a) of the Code and all applicable regulations, or any successor law, and shall include, but not be limited to, items such as capital gain or loss, tax preferences, credits, depreciation, other deductions and depreciation recapture.

   "**Treasury Regulations**" means the regulations promulgated by the Treasury Department with respect to the Code, as such regulations are amended from time to time, or corresponding provisions of future regulations.

3.  **Maintenance of Capital Accounts.**

   The Company shall maintain for each Member a separate account ("Capital Account") in accordance with the rules applicable to partnerships in Treasury Regulation 1.704-1(b)(2)(iv) or any successor Treasury Regulations which by their terms would be applicable to the Company. No Member shall be entitled to receive or be credited with any interest on the balance of such Member's Capital Account at any time.

4.  **Allocation of Profits and Losses For Tax Purposes**

4.1 Except as otherwise provided in **Section 5** of this **Schedule B**, all Profits and Losses for Tax Purposes of the Company shall be allocated among the Members in accordance with this **Section 4.**

(a)   Profits shall be allocated to and among the Members as follows:

   i.   First to the Members in proportion to and to the extent of Losses allocated pursuant to Section 4.1(b)(i); and

22

**Exhibit A**
**Notice of Removal**

     ii.     Thereafter, the balance of Profits, if any, shall be allocated to the Members in accordance with their Percentage Interests, as may be adjusted from time to time, pursuant to this Agreement.

(b)     Losses shall be allocated to and among the Members as follows:

     i.     First, to the Members in proportion to and to the extent of the Capital Accounts of the Members until such Capital Accounts have been reduced to zero; and

     ii.     Thereafter, the balance of Losses, if any, shall be allocated to the Members in accordance with their Percentage Interests, as may be adjusted from time to time, pursuant to the Agreement.

4.2     General Provisions.

(a)     Except as otherwise provided in this Agreement, the Members' distributive shares of all items of Company income, gain, loss, and deduction are the same as their distributive shares of Profits and Losses.

(b)     The Manager shall allocate Profits, Losses, and other items properly allocable to any period using any method permitted by Code Section 706 and the Regulations thereunder.

(c)     To the extent permitted by Regulations Section 1.704 2(h) and Section 1.704 2(i)(6), the Managers shall endeavor to avoid treating distributions of Cash Flow as being from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt (as defined in Regulation Sections 1.704 2(b)(3) and 1.704 2(b)(4), respectively).

(d)     If there is a change in any Member's Interest in the Company during a Fiscal Year, each Member's distributive share of Profits or Losses or any item thereof for such Fiscal Year, shall be determined by any method prescribed by Code Section 706(d) or the Regulations thereunder that takes into account the varying Interests of the Members in the Company during such Fiscal Year.

(e)     The Members agree to report their shares of income and loss for federal income tax purposes in accordance with the provisions of this Article 4.

     5.     **Special Allocations.**

     5.1     Notwithstanding any other provisions of this Agreement to the contrary, if the amount of any Minimum Gain at the end of any taxable year is less than the amount of such Minimum Gain at the beginning of such taxable year, there shall be allocated to each Member gross income or gain (in respect of the current taxable year and any future taxable year) in an amount equal to such Member's share of the net decrease in Minimum Gain during such year in accordance with Treasury Regulation Section 1.704-2(f). Such allocation of gross income and gain shall be made prior to any other allocation of income, gain, loss, deduction or Section 705(a)(2)(B) expenditure for such year. Any such allocation of gross income or gain pursuant to this Section shall be taken into account, to the extent feasible, in computing subsequent allocations of income, gain, loss, deduction or credit of the Company so that the net amount of all items allocated to each Member pursuant to this paragraph shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this paragraph if the allocations made pursuant to the first sentence of this paragraph had not occurred. This provision is intended to be a minimum gain chargeback as described in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistent therewith.

     5.2     Notwithstanding any other provisions of this Agreement to the contrary, except as provided in **Section 5.1 of this Schedule B**, if there is a net decrease (as determined in accordance with Treasury Regulation Section 1.704-2(i)(3)) during a taxable year in Minimum Gain attributable to a non-recourse debt of the Company for which any Member bears the economic risk of loss (as determined accordance with Treasury Regulation Section 1.704-2(b)(4)), then any Member with a share of the Minimum Gain (as determined in accordance with Treasury Regulation Section 1.704-2(i)(5)) attributable to such debt (determined at the beginning of such taxable year) shall be allocated in accordance with Treasury Regulation Section 1.704-2(i)(4) items of Company income and gain for such taxable year (and, if necessary, for subsequent years) in an amount equal to such Member's share of the net decrease in the Minimum Gain attributable to such Member in accordance with Treasury Regulation Section 1.704-2(i). Any allocations of items of gross income or gain pursuant to this paragraph shall not duplicate any allocations of gross income or gain pursuant to **Section 5.1 of this Schedule B** and shall be taken into account, to the extent feasible, in computing subsequent allocations of the Company, so that the net amount of all items allocated to each Member pursuant to this paragraph shall, to the extent possible, be equal to the net

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/

**Exhibit A**
**Notice of Removal**

amount that would have been allocated to each Member pursuant to the provisions of this paragraph if the allocations made pursuant to the first sentence of this paragraph had not occurred. This provision is intended to be a partner minimum gain chargeback as described in Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistent therewith.

5.3 Notwithstanding any other provisions of this Agreement to the contrary, except as provided in **Sections 5.1 and 5.2 of this Schedule B**, if any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that reduces any Member's Capital Account below zero or increases the negative balance in such Member's Capital Account (taking into account such Member's deficit restoration obligation), gross income and gain shall be allocated to such Member in an amount and manner sufficient to eliminate any negative balance in such Member's Capital Account (taking into account such Member's deficit restoration obligation) created by such adjustments, allocations or distributions as quickly as possible in accordance with Treasury Regulation Section 1.704-1(b)(2)(ii)(d). Any such allocation of gross income or gain pursuant to this paragraph shall be in proportion with such negative Capital Accounts of the Members. Any allocations of items of gross income or gain pursuant to this paragraph shall not duplicate any allocations of gross income or gain made pursuant to **Section 5.1 or 5.2 of this Schedule B** and shall be taken into account, to the extent feasible, in computing subsequent allocations of income, gain, loss, deduction or credit, so that the net amount of all items allocated to each Member pursuant to this paragraph shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this paragraph if such adjustments, allocations or distributions had not occurred. This provision is intended to be a qualified income offset as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistent therewith.

5.4 Any item of Company loss, deduction or Section 705(a)(2)(B) expenditure that is attributable to a non recourse debt of the Company for which any Member bears the economic risk of loss (as determined in accordance with rules applicable to partnerships in Treasury Regulation Section 1.704-2(b)(4)) shall be allocated to such Member in accordance with Treasury Regulation Section 1.704-2(i).

5.5 In accordance with Section 704(c) and the Regulations thereunder, if property is contributed to the Company and the fair market value of such property on the date of its contribution differs from the adjusted tax basis of such property, any income, gain, loss and deduction with respect to such property shall, solely for tax purposes, be allocated among the Members so as to take into account any variation between the adjusted tax basis to the Company of such property for federal income tax purposes and the fair market value of such property on the date of contribution to the Company. Such allocations shall be made using a reasonable method that is consistent with the purpose of Section 704(c) of the Code pursuant to Treasury Regulation Section 1.704-3.

6. **Persons Entitled to Allocations.**

With respect to any period in which a transferee of the interest of a Member is first entitled to a share of the Profits And Losses For Tax Purposes, the Company shall, with respect to such Profits And Losses For Tax Purposes, allocate such items among the Persons who were entitled to such items on a basis consistent with the provisions of the Code and the Treasury Regulations.

7. **Tax Matters Representative.**

A. The "partnership representative" of the Company pursuant to Section 6223(a) of the Code shall be Ahmad M. Alkhatib, or such other person with a substantial presence in the United States designated by the Manager in the manner prescribed by the Internal Revenue Service. (Any person who is designated as the partnership representative is referred to herein as the "Partnership Representative"). The Partnership Representative is authorized to take such actions and to execute and file all statements and forms on behalf of the Company under Subchapter C of Section 63 of the Internal Revenue Service Code (relating to Internal Revenue Service Partnership audit proceedings) and any tax proceedings brought by other taxing authorities, and the Company and all Members shall be bound by the actions taken by the Partnership Representative in such capacity. The Partnership Representative shall be reimbursed by the Company for all expenses incurred in connection with all examinations of the Company's affairs by tax authorities, including resulting proceedings, and is authorized to expend Company funds for professional services and costs associated therewith. If an audit results in an imputed underpayment by the Company as determined under Section 6225 of the Code, the Partnership Representative may make the election under Section 6226(a) of the Code within 45 days after the date of the notice of final partnership adjustment in the manner provided by the Internal Revenue Service. If such an election is made, the Company shall furnish to each Member of the Company for the year under audit a statement reflecting the Member's share of the adjusted items as determined in the notice of final partnership adjustment and each such Member shall take such adjustment into account as required under Section 6226(b) of the Code and shall be liable for any related interest penalty, addition to tax, or additional amount.

24

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/27/2023 10:14:28 AM

Exhibit A
Notice of Removal

B. The Members agree to make the election provided in Section 6221(b)(1) of the Code for each taxable year of the Company is eligible to make such election. The Manager is authorized to make the disclosure required under Section 6221(b)(D)(ii) of the Code and the Members hereby agree to provide their names and taxpayer identification numbers to the Managers for this purpose.

8. **Negative Balance.**

No Member with a negative balance in such Member's Capital Account shall have any obligation to the Company or any other Member to restore said negative balance to zero.

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

**Exhibit A**
**Notice of Removal**

## OPERATING AGREEMENT OF FLEET RAIL TERMINALS, LLC

**THIS OPERATING AGREEMENT** is made and entered into as of the 8th day of November, 2021 (the "Effective Date") by and among the Persons executing this Agreement as a Member on the signature page hereof ("Members").

**WHEREAS**, the Members have caused Fleet Rail Terminals, LLC (the "Company") to be formed as a limited liability company under the Act (as hereinafter defined) and, as required thereunder.

**NOW, THEREFORE**, in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

### Article 1.
### FORMATION AND OFFICES

**1.1    Formation.**

Pursuant to the Act, the Members have formed an Illinois limited liability company effective upon the filing of the Articles of the Company with the Secretary of State of Illinois.

**1.2    Principal Office.**

The principal office of the Company shall be located at 1131 W. Bryn Mawr Avenue, 2nd Floor, Chicago, Illinois 60660, or at such other place(s) as the Manager may determine from time to time.

**1.3    Registered Office and Registered Agent.**

The location of the registered office and the name of the registered agent of the Company in the State of Illinois shall be as stated in the Articles, as determined from time to time by the Manager.

**1.4    Purpose of Company.**

The purposes for which the Company is organized is to engage in any or all lawful business for which a limited liability company may be organized under the Act. Subject to the provisions of this Agreement, the Company shall have the power to do any and all acts and things necessary, appropriate, advisable or convenient for the furtherance and accomplishment of the purposes of the Company, including, without limitation, to engage in any kind of activity and to enter into and perform obligations of any kind necessary to or in connection with, or incidental to, the accomplishment of the purposes of the Company, so long as said activities and obligations may be lawfully engaged in or performed by a limited liability company under the Act.

**1.5    Duration.**

The duration of the Company shall be perpetual unless dissolved as provided herein.

**1.6    Name.**

The name of the Company shall be Fleet Rail Terminals, LLC.

**1.7    Governing Law.**

This Agreement shall be construed according to and governed by the laws of the State of Illinois, including without limitation the Act. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that any portion of this Agreement is inconsistent with any provision of the Act, this Agreement shall govern the extent permitted by the Act.

EXHIBIT
"B"

1

Exhibit A
Notice of Removal

## Article 2.
## DEFINITIONS

### 2.1 Terms Defined Herein.

As used herein, the following terms shall have the following meanings, unless the context otherwise requires:

"Act" shall mean the Illinois Limited Liability Company Act at 805 ILCS 180/9 - 9, *et seq.*, as amended from time to time.

"Affiliate" of a specified Person (the "Specified Person") means any Person (a) who directly or indirectly controls, is controlled by, or is under common control with the Specified Person; (b) who owns or controls ten percent (10%) or more of the Specified Person's outstanding voting securities or equity interests; (c) in whom such Specified Person owns or controls ten percent (10%) or more of the outstanding voting securities or equity interests; (d) who is a director, partner, manager, executive officer or trustee of the Specified Person; (e) in whom the Specified Person is a director, partner, manager, executive officer or trustee; or (f) who has any relationship with the Specified Person by blood, marriage or adoption, not more remote than first cousin.

"Agreement" means this Operating Agreement, as amended or restated from time to time.

"Articles" means the Articles of Organization of the Company filed with the Secretary of State of Illinois, as amended or restated from time to time.

"Assignee" means any Person who is the holder of an Interest but is not then a Member. An Assignee (i) shall not be entitled to participate in the management of the business and affairs of the Company, (ii) shall not be entitled to become a Member unless otherwise permitted under Article 8 hereof, (iii) shall not be entitled to exercise the rights of a Member, (iv) shall not be entitled to vote a Member's Interest, (v) shall not have the right to require any information or accounting of the Company's business and/or (vi) shall not have the right to inspect the Company's books and records. An Assignee shall only be entitled to receive, to the extent of the Interest held by such Assignee, the share of distributions and profits, including distributions representing the return of Capital Contributions, to be made to the transferring Member hereunder with respect to the Interest during the time Assignee is the holder of such Interest; provided, however, that (i) no Assignee shall be entitled to any distributions to be made to the transferring Member unless such Assignee has made or caused the Member to make any and all required Additional Capital Contributions required to be made prior to such distribution date and not yet made by such transferring Member and/or (ii) if any loans have been made to the transferring Member under Section 3.2(i), all such loans that are outstanding under Section 3.2(i) with respect to such transferring Member shall be made to the lending Member(s) first until such loans are repaid in full, including interest due thereon.

"Capital Contribution" means the total amount of cash, other property, the use of property, services rendered, promissory note or other binding written obligation to contribute cash or property or perform services or other valuable consideration contributed to the Company by each Member pursuant to the terms of this Agreement. Any reference in this Agreement to the Capital Contribution of a Member shall include the Capital Contribution made by any predecessor holder of the Interest of that Member.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, including the rules and regulations promulgated thereunder.

"Company" means Fleet Rail Terminals, LLC.

"Defaulting Member" shall mean a Member who (i) has failed to make its capital contribution under Section 3.2 hereof; and/ or (ii) a Member that is an Involuntary Offeror under Section 8.3 hereof.

"Interest" refers to an Interest Holder's share as set forth herein of the profits and losses of and the right to receive distributions from the Company which would be made to a Member hereunder.

"Interest Holder" means any Person who holds an Interest whether as a Member or an Assignee.

2

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

"Liquidation Proceeds" means all Property at the time of liquidation of the Company and all proceeds thereof.

"Majority in Interest" means any individual Member or group of Members holding an aggregate of more than 50% of the Percentage Interests held by all Members; provided that if a holder of an Interest is an Assignee, such Percentage Interests shall be calculated as though such Interest was not included.

"Manager(s)" means the Person(s) designated or elected from time to time pursuant to this Agreement as manager(s) of the Company, acting in their capacity as Manager(s).

"Members" means those Persons executing this Agreement as members of the Company, including any substitute Members or additional Members permitted under Article 8 hereof, in each such Person's capacity as a Member of the Company.

"Net Cash Flow" means, with respect to any fiscal period, all operating and investment revenues during such period and any amounts theretofore held in any reserve which the Manager determines need not be held any longer in reserve, all determined in accordance with the Company's method of accounting, less Operating Expenses.

"Notice" means a writing, containing the information required by this Agreement to be communicated to a Person in accordance with Section 11.3.

"Operating Expenses" means, with respect to any fiscal period, (a) to the extent paid other than with cash withdrawn from reserves therefor, the amount of cash disbursed in such period in order to operate the Company and to pay all expenses (including, without limitation, management fees, wages, taxes, insurance and/or other costs and expenses) incident to the operation of the Company or its Property and (b) the amount of any reserves created during such period or the amount of any increase in any existing reserve, as provided in Section 4.3.

"Percentage Interest" of a Member means, at any particular time, a Member's Interest in the Company. The Members' percentage interests are set forth on Schedule A and shall hereafter be reflected in the books and records of the Company.

"Permitted Assignee" means (i) any Member, a Member's then current spouse (which shall not include any spouse that has instituted or is a party to a divorce proceeding with such Member) or any of a Member's descendants, (ii) the settlor of a trust that is a Member; (iii) any trust for the primary benefit of a Member, a Member's spouse or any of a Member's descendants, so long as, in each case, each trustee entitled to vote thereunder is also either a Member or a settlor of a trust that is a Permitted Assignee.

"Permitted Transfer" shall have the meaning given it in Section 8.2 hereof.

"Person" means any individual, partnership, domestic or foreign limited partnership, domestic or foreign limited liability company, domestic or foreign corporation, trust, business trust, employee stock ownership trust, real estate investment trust, estate, association and other business or not for profit entity.

"Property" means all properties and assets that the Company may own or otherwise have an interest in from time to time.

"Transfer" means (a) when used as a verb, to give, sell, exchange, assign, transfer, pledge, hypothecate, bequeath, devise or otherwise dispose of or encumber, in whole or in part and (b) when used as a noun, the nouns corresponding to such verbs, in either case voluntarily or involuntarily, by operation of law, judgment or otherwise in whole or in part.

"Unreturned Capital Contributions" means with respect to each Member, the amount of such Member's Capital Contribution less any amounts paid to such Member as a return of its Capital Contributions as required by Sections 4.1 and 9.4.

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

Exhibit A
Notice of Removal

## Article 3.
## CAPITALIZATION OF THE COMPANY

**3.1** <u>Initial Capital Contributions.</u>

Upon execution hereof, each Member shall make its initial Capital Contribution to the capital of the Company as set forth in the books and records of the Company in the amounts set forth on <u>Schedule A</u> attached hereto

**3.2** <u>Additional Capital Contributions.</u> If the Manager, in its commercially reasonable discretion, determines that additional funds are required to fund any actual or anticipated expenses of the Company, including without limitation reserves, the provisions of this **Section 3.2** shall apply. Upon such determination, the Manager shall notify all Members of the need for such Additional Funds and upon the consent of the Majority in Interest of Members to such capital call, the Interest Holder shall pay such additional funds as additional capital contributions ("Additional Capital") within ten days of request by the Manager in proportion to the Members' respective Percentage Interests. If any or all of the Interest Holders do not pay their Additional Capital, such non-paying Interest Holder shall be considered a Defaulting Member and the following procedures shall apply:

(i)  any other Member or Members (in proportion to their respective Percentage Interests if more than one Member desires to make such loans) may make or cause to be made a short term ninety (90) day loan to the Defaulting Member equal to the unpaid Additional Capital. Such loan shall bear interest at the rate per annum equal to the sum of (a) five percent (5%) plus (b) the higher of the prime rate then being published by the *Wall Street Journal* as its prime rate ("Prime Rate"), which rate shall change when and as such prime rate or other rate changes. Any and all loans made under this Subsection 3.2(i) including interest accrued thereon shall be repaid prior to any other distributions to such Defaulting Member to be made hereunder. Such lending Member(s) shall have a lien upon the Interests of the Defaulting Member as security for the loan, including interest accrued thereon and such Defaulting Member shall execute any and all pledges or other documents evidencing and/or perfecting same upon request of the lending Member. The Defaulting Member hereby directs the Company to pay the Defaulting member's share of any Company distributions to the lending Member(s) for application upon the loan until the loan has been paid in full. This direction is non-revocable unless the revocation is consented to in writing by the lending Member(s). As long as a portion of the advance and interest remains unpaid by the Defaulting Member, the Defaulting Member shall have no right to vote on Company matters, and, accordingly, during such time for purposes of determining whether any matter requiring the consent of the members has received the requisite percentage of votes or unanimous approval, such Defaulting Member's Interest shall be excluded as if not outstanding. In the event that the loan is not repaid within ten (10) days after the Maturity Date together with any and all interest thereon, then, in any such event, the lending Member(s) may elect, at any time, thereafter to either (1) cause a redistribution of the Percentage Interest of the Defaulting Member in accordance with the provisions of this subsection 3.2(i) by ten (10) days' notice thereof to the Defaulting Member or (2) purchase within thirty (30) days the entire interest of the Defaulting Member at a purchase price equal to the sum of the aggregate Capital Contributions made by such Defaulting Member to the date of such purchaser minus the principal and unpaid interest of the unpaid loan to the date of such purchase. The Defaulting Member shall have an absolute right to cure the deficiency by paying all principal, interest and reasonable costs arising out of the loan at any time prior to the expiration of the ten (10) day notice period required under this subsection 3.2(i), thereby terminating any right of redistribution or purchase by the lending Member(s) making the loan.;

(ii)  any other Member or Members (in proportion to their respective Percentage Interests if more than one Member desires to make such contribution) may contribute such unpaid Additional Capital to the Company. Upon any such contribution, the Percentage Interests of the Members shall be adjusted so that each Member's Percentage Interest equals (i) the total Capital Contributions made by such Member over (ii) the aggregate Capital Contributions of all Members, determined after all Capital Contributions to date, including the then existing Additional Capital;

(iii)  if the Member(s) choose, in their discretion, not to make the loan(s) and/or capital contributions referenced in subsections 3.2(i) and (ii) above, then the Manager shall attempt to seek financing from another party to meet such Additional Capital needs on terms acceptable to the Manager and/or may, without approval of the Defaulting Members, admit new Members into the Company in order to raise such capital contributions and in connection with any financing or additional Member, Manager shall be authorized to pledge or cause to be transferred the Defaulting Member's Percentage Interests or so much thereof as is necessary to obtain such funds;

(iv)  if the Member(s) choose, in their discretion, not to make the loan(s) and/or capital contributions referenced in subsections 3.2(i) and (ii) above, then the Manager shall have the right, in its sole discretion, to adjust the

4

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08

Member's Percentage Interests to reduce the Defaulting Member's Percentage Interest to (i) the total Capital Contributions made by such Member over (ii) the aggregate Capital Contributions of all Members, determined after all Capital Contributions to date, including the then existing Additional Capital;

In the event that a Member advances a Defaulting Members Additional Capital Contribution and does not specify in writing the election between Subsections (i) and (ii) above, then alternative (i) shall apply.

### 3.3    Capital Contributions.

No Member shall have the right to reduce such Member's Capital Contribution or to receive any distributions from the Company except as provided in **Sections 4.1 and 9.4.** No Member shall be entitled to receive or be credited with any interest on the balance of such Member's Capital Contribution at any time.

### 3.4    Loans to Company.

Nothing in this Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company and on such terms as are agreed to by a Majority in Interest; provided, however, that (i) all Members shall have the right to participate in any loans made pursuant to this Section 3.4 in proportion to the relative Percentage Interests of the Members so electing to participate; and (ii) the loans shall be repaid from available cash revenues and funds of the Company prior to any distributions to Members of cash of other property.

### 3.5    Loans to Members.

Nothing in this Agreement shall prevent the Company from making loans to Members on such terms as are agreed to by a Majority in Interest, including, if desired, a requirement that such loans to be secured by a pledge of such Member's Interest in the Company.

### Article 4.
### CASH DISTRIBUTIONS; PROFITS AND LOSSES FOR TAX PURPOSES

### 4.1    Cash Distributions Prior to Dissolution.

(a)    No Member and/or Interest Holder has a right to demand distributions of Net Cash Flow or any other Property of the Company. It is the primary intent of the Company to retain funds and Property in amounts and as determined by the Manager in its sole discretion to meet the needs of the Company.

(b)    Except as otherwise provided in this Sections 4.1, from time to time, the Managers shall determine and distribute the Cash Flow to the Members in the following order and amounts:

(i) First, to the Members in payment of loans to the Company owing to the Members; if more than one Member has loaned funds to the Company, the repayment of such loans shall be made on a pari passu basis; and

(ii) Second, to the Members in proportion to their Percentage Interests, as may be adjusted from time to time, pursuant to this Agreement.

(c)    If there is a change in a Member's Percentage Interest in the Company during a Fiscal Year, any distributions thereafter shall be made so as to take into account the varying Interests of the Members during the period to which the distribution relates in any manner chosen by the Managers that is provided in Code Section 706(d) and the Regulations thereunder.

(d) Notwithstanding any other provision of this Agreement, if any Member is allocated Profit which exceeds, on a cumulative basis, the amount of Losses previously allocated to such Member for tax purposes (the "Excess Income Allocation"), then such Member shall be entitled to receive a "Minimum Distribution" to the extent that there is available Cash Flow to make such Minimum Distribution. The Minimum Distribution is the amount, if any, by which (i) the Excess Income Allocation multiplied by the combined maximum individual federal and state income tax rates (reduced to reflect the maximum individual federal tax benefit from the deduction of state income taxes), exceeds (ii) the amount of cash previously distributed to such Member. The Minimum Distribution shall be payable

5

Exhibit A
Notice of Removal

before any other distributions. Any Minimum Distribution received by a Member shall be credited against and reduce the amount of distributions that such Member shall be entitled to receive in the future. If the Manager determines that a distribution is to be considered a repayment of Unreturned Capital Contributions, such distribution shall be made to all the Members *pro rata* in an amount equal to their respective Unreturned Capital Contributions; provided, however, that if any loans are outstanding under Section 3.2(i) above, any distributions to the Defaulting Member shall be made to the lending Member(s).

(e)     Notwithstanding anything to the contrary herein provided, no distribution hereunder shall be permitted to the extent prohibited by the Act.

(f)     No distribution of Net Cash Flow or other cash made to any Member shall be determined a return or withdrawal of a Capital Contribution unless so designated by the Manager in its sole and exclusive discretion.

**4.2     Persons Entitled to Distributions.**

All distributions of Net Cash Flow to the Members under **Section 4.1** hereof shall be made to the Persons shown on the records of the Company to be Members as of the last day of the fiscal period prior to the time for which such distribution is to be made, unless the transferring Member and a Permitted Assignees otherwise agree in writing to a different distribution and such distribution is consented to in writing by the Manager.

**4.3     Reserves.**

The Manager shall have the right to establish, maintain and expend reserves to provide for working capital, future investments, debt service and such other purposes as it may deem necessary or advisable.

**4.4     Allocation of Profits and Losses for Tax Purposes and Special Allocations.**

Unless otherwise determined by Manager, all Profits and Losses for Tax Purposes of the Company and all special allocations of the Company shall be made in accordance with attached **Schedule B**.

**4.5     Withholding Taxes.**

If the Company is required to withhold any portion of any amounts distributed, allocated or otherwise attributable to a Member of the Company by applicable U.S. federal, state, local or foreign tax laws, the Company may withhold such amounts and make such payments to taxing authorities as are necessary to ensure compliance with such tax laws. Any funds withheld by reason of this **Section 4.5** shall nonetheless be deemed distributed to such Member in question for purposes of **Article 4 and Article 9**. If the Company does not withhold from actual distributions any amounts it was required to withhold by applicable tax laws, the Company may, at its option, (i) require the Member to which the withholding was credited to reimburse the Company for withholding required by such laws, including any interest, penalties or additions thereto; or (ii) reduce any subsequent distributions to such Member by such withholding, interest, penalties or additions thereto. The obligation of a Member to reimburse the Company for such amounts shall continue after such Member transfers or liquidates its interest in the Company. Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist in determining the extent of, and in fulfilling, any withholding obligations it may have.

**4.6     Return of Contribution Nonrecourse to Other Members.**

Except as provided by Law, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

**Exhibit A**
REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08... **Notice of Removal**

## Article 5.
## MEMBERS

### 5.1    Meetings of Members; Place of Meetings.

Meetings of the Members may be held for any purpose or purposes, unless otherwise prohibited by law or by the Articles, and may be called by the Manager. All meetings of the Members shall be held at the principal offices of the Company as set forth in **Section 1.2** hereof, or at such other place as shall be designated from time to time by the Manager and stated in the Notice of the meeting or in a duly executed waiver of the Notice thereof. Members may participate in a meeting of the Members by means of conference telephone or other similar communication equipment whereby all Members participating in the meeting can hear each other. Participation in a meeting in this manner shall constitute presence in person at the meeting.

### 5.2    Quorum; Voting Requirement.

The presence, in person or by proxy, of a Majority In Interest shall constitute a quorum for the transaction of business by the Members.

### 5.3    Proxies.

At any meeting of the Members, every Member having the right to vote thereat shall be entitled to vote in person or by proxy appointed by an instrument in writing (by means of electronic transmission or as otherwise permitted by applicable law) signed by such Member and bearing a date not more than one year prior to such meeting.

### 5.4    Action Without Meeting.

Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting, without prior Notice and without a vote if a consent in writing setting forth the action so taken is signed by all the Members.

### 5.5    Notice.

Notice stating the place, day and hour of the meeting and, the purpose for which the meeting is called shall be delivered not less than ten (10) days nor more than sixty (60) days before the date of the meeting by or at the direction of the Manager or other Persons calling the meeting, to each Member entitled to vote at such meeting. When any Notice is required to be given to any Member hereunder, a waiver thereof in writing signed by the Member, whether before, at, or after the time stated therein, shall be equivalent to the giving of such Notice. A Member may also waive Notice by attending a meeting without objection to a lack of Notice.

### 5.6    Powers of the Members.

Except as otherwise provided herein, no Member, acting solely in his, her or its capacity as a Member, shall act as an agent of the Company or have any authority to act for or to bind the Company.

### 5.7    Other Business Ventures.

(a)    Any Member or the Manager (or Affiliate thereof) may engage in or possess an interest in other business ventures of every nature and description, independently or with others, whether or not similar to the business of the Company, and neither the Company nor the Members shall have any right by virtue of this Agreement in or to such other business ventures or to the income or profits derived therefrom; provided, however, that each Member and the Manager agree that the confidential information and trade secrets of the Company, if any, are the proprietary property of the Company and may not be used by such Member or Manager (or an Affiliate thereof) for the benefit of any Person not the Company.

(b)    Unless otherwise agreed to, the Manager shall not be required to devote all such Manager's time or business efforts to the affairs of the Company, but shall devote so much of such Manager's time and attention to the Company as is reasonably necessary and advisable to manage the affairs of the Company to the best advantage of the Company.

**Exhibit A**
**Notice of Removal**
REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/27/2023 10:14:28 AM

### 5.8    Defaulting Members.

A Defaulting Member shall not have any right to vote hereunder and/or attend any meetings of the Members and all votes, including without limitation determining a quorum, shall be calculated without taking into account the Interests held by such Defaulting Member.   A Defaulting Member shall not have the right to review and/or inspect the Company's books and records nor receive any copies thereof.

### Article 6.
### MANAGERS

### 6.1    Powers of the Manager.

Except as otherwise provided hereunder, the business and affairs of the Company shall be managed by the Manager.  Any decision or act of the Manager within the scope of the Manager's power and authority granted hereunder shall control and shall bind the Company.

### 6.2    Limitation on Powers of Manager.

Without the approval of a Majority in Interest of Members, the Manager shall not have the authority to:

(a)    terminate, dissolve or wind-up the Company;

(b)    issue an Interest to any Person and admit such Person as an additional Member except as provided in **Section 8.6;**

(c)    change the status of the Company from one in which management is vested in the Manager to one in which management is vested in the Members;

(d)    The purchase or sale of any real property;

(e)    The lease of any real property;

(f)    Cancellation or amendment of the Articles of Organization or this Agreement;

(g)    Approval of mergers or consolidations of the Company with or into any other entity;

(h)    Approval of any transactions outside the ordinary course of the Company's business;

(i)    The borrowing of money or incurrence of debt on behalf of the Company;

(j)    The pledging of assets of the Company to secure any indebtedness;

(k)    The confession of judgment against the Company;

(l)    The assignment of the Company's assets for the benefit of creditors or filing a voluntary bankruptcy petition by the Company;

(m)    The lending of money or Company property;

(n)    The lending of money to any Member.

### 6.3    Duties of Manager.

In addition to the rights and duties of the Manager set forth elsewhere in this Agreement and the Act and without limiting such rights and duties, the Manager shall be responsible for and is hereby authorized to:

(a)    hire or appoint agents or independent contractors of the Company;

8

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/27/2023 10:14:28

(b)    select and engage the Company's accountants, attorneys, engineers and other professional advisors;

(c)    apply for and obtain appropriate insurance coverage for the Company;

(d)    temporarily invest funds of the Company in short term investments where there is appropriate safety of principal;

(e)    negotiate, execute and perform all agreements, contracts, leases, loan documents and other instruments and exercise all rights and remedies of the Company in connection with the foregoing.

### 6.4    Number, Appointment, Tenure and Election of Manager.

The Managers of the Company shall be Ahmad M. Alkhatib, Richard W. Trojan and Ihab Naserallah. The Members, by unanimous consent, may, from time to time, amend this Section to increase or decrease the number of Managers, but in no instance shall the number of Managers be less than one. A Manager does not have to be a Member and/or hold any Interest in the Company. If there is more than one (1) manager, all decisions and actions to be taken by the Manager pursuant to this Agreement shall be determined by majority vote of all Managers.

### 6.5    Resignation and Election of a Manager.

(a)    A Manager may resign from such position at any time upon giving thirty (30) days' prior Notice to the Members, unless a shorter period of time is agreed to by the Majority in Interest of Members.

(b)    Any vacancy created in a manager position by the resignation or death or incapacity of a Manager, or otherwise, shall be filled by a new Manager selected by the resigning Member or his estate, as applicable.

### 6.6    Compensation.

Except as otherwise provided herein, no Member shall be entitled to compensation for any services such Member may render to or for the Company or be entitled to reimbursement of any general overhead expenses incurred by such Member in his, her or its capacity as a Member. Each Member shall be entitled to reimbursement from the Company for all reasonable direct out-of-pocket expenses incurred on behalf of the Company upon presentation to the Company of receipts or other appropriate documentation evidencing such expenses. Provided there is sufficient Net Cash Flow, each Manager shall be entitled to a gross compensation of $3,000.00 per month, or such other amounts unanimously agreed to by the Members, commencing two (2) months after the Commencement date of the lease for the business premises entered into by the Company, provided that such Manager will contribute an average of twenty (20) hours per week to the business of the Company either individually or through a person appointed by such Manager..

### 6.7    Authority to Execute Documents.

The Manager shall have the power and authority to execute, on behalf of the Company, any document filed with the Secretary of State of Illinois pursuant to the terms of the Act. In addition, the Manager shall have the power and authority to execute, on behalf of the Company, any contract or agreement authorized under this **Article 6**.

### 6.8    Liability of Manager.

The Manager and its respective agents, employees, shareholders, officers, members, directors and affiliates will not be liable to the Company or any of the Members or their successors or assigns for any acts performed or omitted within the scope of the authority conferred on the Manager and such agents, employees, shareholders, officers, members, directors and affiliates by this Agreement so long as the Manager or such parties (i) act in good faith within what he or she or they believe to be the scope of his or her or their authority for a purpose he or she or they believe to be not opposed to the interest of the Company, and (ii) are not guilty of willful misconduct or gross negligence.

9

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/... Notice of Removal

Exhibit A
Notice of Removal

## Article 7.
## LIABILITY AND INDEMNIFICATION

### 7.1    Liability of Members and Manager.

(a)      A Member shall only be liable to make the payment of the Member's initial Capital Contribution pursuant to Section 3.1 and the additional Capital Contributions, if any, required by Section 3.2 hereof. No Member or Manager shall be liable for any obligations of the Company or any other Member or Manager, unless personally guaranteed by the Member or Manager pursuant to a separate document.

(b)      No Member, except as otherwise specifically provided in the Act, shall be obligated to pay any distribution to or for the account of the Company or any creditor of the Company.

### 7.2     Indemnification.

The Members and the Manager, and their respective stockholders, members, managers, directors, officers, partners, agents and employees (individually and collectively, an "Indemnitee") shall be indemnified and held harmless by the Company from and against any and all losses, claims, damages, liabilities, expenses (including legal fees and expenses), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative (each a "Claim"), in which the Indemnitee may be involved, or threatened to be involved, as a party or otherwise by reason of such Indemnitee's status as any of the foregoing, which relates to or arises out of the Company, its assets, business or affairs, if in each of the foregoing cases (i) the Indemnitee acted in good faith and in a manner such Indemnitee believed to be in, or not opposed to, the best interests of the Company, and, with respect to any criminal proceeding, had no reasonable cause to believe such Indemnitee's conduct was unlawful, (ii) the Indemnitee's conduct did not constitute gross negligence or willful or wanton misconduct, (iii) the Indemnitee did not breach his, her or its duty of loyalty to the Company or the Members, and (iv) the Indemnitee did not receive any improper personal benefit with respect to the transaction at issue. Any indemnification pursuant to this Article 7 shall be made only out of the assets of the Company, and no Manager or Member shall have any personal liability on account thereof.

## Article 8.
## TRANSFERS OF INTERESTS

### 8.1     General Restrictions.

(a)      No Member may Transfer all or any part of such Member's Interest, nor any rights, obligations, covenants and other ownership of Member in and to the Company and/or such Member's Interest, except as provided in this Article 8. Any purported Transfer of an Interest or a portion thereof or any other right, obligation, covenant or other ownership of Member in and to the Company and/or such Member's Interest in violation of the terms of this Agreement shall be null and void and of no effect. If the Manager determines in its sole discretion that any Transfer will result in a termination of the Company under Code § 708(b)(1)(B), then the Manager may deem such Transfer null and void. Any transferee desiring to make a further Transfer shall become subject to all the provisions of this Article 8 to the same extent and in the same manner as any Member desiring to make any Transfer.

(b)      Unless otherwise agreed to by the unanimous consent of all Members entitled to vote, no Member shall have the right to withdraw or dissociate voluntarily from the Company as a Member.   A Member who does so in violation of this Agreement shall be liable to the Company for any and all damages caused by such violation.

(c)      All voting rights shall be forfeited with respect to all or any part of an Interest which is Transferred other than a Permitted Transfer wherein the transferee shall become a substitute Member in accordance with Section 8.4, whether such Transfer is voluntary or involuntary, by order of a court, judgment or by operation of law.

(d)      In the event that an Assignee exists, the voting percentages of all the Members shall be adjusted on a *pro rata* basis to equal 100%, unless and until such time as the interests held by such Assignee are held by the transferee of a Permitted Transfer at which time, the voting percentages shall then be adjusted again on a *pro rata* basis to equal 100%, taking into account such Permitted Transfer Interest.  An Assignee has only those rights described in the definition of "Assignee" in Section 2.1.

10

Exhibit A
Notice of Removal

(e)     If a Member who is an individual dies or a the Member is adjudged to be incompetent to manage his or her person or property, then the Member's executor, administrator, guardian, conservator or other legal representative shall automatically become a substitute Member of such Member's Interest and **Section 8.6** shall apply.

8.2     **Permitted Transfers.**     Each Member shall have the right to Transfer, by a written instrument, all or any part of such Member's Interest, if, and only if ("Permitted Transfer"): (i) the Manager and all of the Members have consented in writing to such Transfer, or (ii) the Transfer is to a Permitted Assignee; or (iii) such Transfer is made pursuant to and in accordance with the exercise of the purchase options set forth in **Sections 8.3 or 8.6** hereof.

8.3     **Involuntary Transfers.** All of the following shall constitute a material breach of this Agreement by a Member and such Member shall immediately and without further action deemed to be a Defaulting Member hereunder (such Defaulting Member is also referred to in this Section 8.3 as an "Involuntary Offeror") (i) any proceeding is instituted by or against a Member under the provisions of Federal, foreign or other bankruptcy, reorganization, arrangement of debt, insolvency or receivership laws or similar state, federal or foreign laws providing for the relief of debtors, (ii) a Member makes an assignment for the benefit of creditors, (iii) a Member is subject to any other possible involuntary transfer of his or her Interests by legal process, including, without limitation, an assignment or transfer pursuant to a divorce decree or settlement under the terms of which such Member would be required to transfer his or her Interests to any other person that is not a Permitted Assignee, (iv) a monetary judgment is granted against a Member and a creditor's charging order or lien is placed upon a Member's Interests; and/or (v) a receiver is appointed for a Member and/or its Interests hereunder.   The creditor, transferee or other claimant shall only have the rights of an Assignee hereunder and shall have no right to become a Member, or to participate in the management of the business and affairs of the Company as a Member or Manager under any circumstances and shall not be entitled to vote, shall not have the right to require any information or accounting of the Company's business nor shall they have the right to inspect the Company's books and records and such creditor, transferee or other claimant shall be entitled only to receive the share of profits and losses and the return of capital to which the Involuntary Offeror would otherwise have been entitled; provided, however, that no Assignee shall be entitled to any distributions to which the Involuntary Offeror would be entitled unless such Assignee has made or causes the Involuntary Offeror to make any and all required Additional Capital Contributions required to be made prior to such distribution date and not yet made by such Involuntary Offeror. Upon any such involuntary transfer, the following shall apply and the Members agree that the following remedies and valuation is a good faith attempt at fixing the value of the Interest of such Involuntary Offeror, after taking into account that the interest does not include all of the rights of a Member or Manager and after deducting damages that are due to the material breach by the Involuntary Offeror of this Agreement it being understood and agreed to by the Members that having the right to choose whom you are in business with is part of the consideration of entering into this Agreement:

(1)     the Company shall have the immediate right to proceed to purchase all of the Interests then owned by the Involuntary Offeror (the "Involuntary Offered Units") for an amount equal to the book value of such Interest, adjusted for profits and losses to the date of purchase (the "Involuntary Transfer Purchase Price") less any and all fees and costs incurred by the Company in connection with such involuntary transfer and any loans made to the Involuntary Offeror under Section 3.2 hereof and any and all damages suffered by the Company due to such involuntary transfer.  For purposes of this **Section 8.3**, book value shall mean the sum of (a) the lower of (i) the Company's basis in its assets minus accumulated depreciation or (ii) the fair market value of the Company's assets, minus (b) all liabilities of the Company (including Member loans not yet repaid), reasonable selling and liquidations expenses and reasonable reserves to be set aside for future liabilities  Such right shall continue for a period of sixty (60) days from actual receipt of such notice (the "Company Involuntary Transfer Option Period").  Failure by the Involuntary Offeror to give such notice shall not limit the Company's right to purchase the Involuntary Offeror's Units, which right shall arise immediately prior to the commencement of any legal process or transaction set forth above and continue until the expiration of one hundred twenty (120) days from the later of the date the Company has received written order or judgment in such proceeding or the date the Assignee of such Involuntary Offeror provides written demand on the Company regarding such Involuntary Offeror's Interests. In the event the Company elects to purchase the Involuntary Offered Units pursuant to this **Section 8.3**, the Company shall send written notification thereof (which notification shall set forth the purchase price for such Interests, determined as aforesaid, as well as the date, time and place of the closing of such purchase) to the Involuntary Offeror.

(2)     If the Company does not exercise its right under this Section 8.3 to purchase all of the Involuntary Offered Units, then the Members other than the Involuntary Offeror shall, upon the expiration of the Company Involuntary Transfer Option Period, have the right for a period of sixty (60) days after expiration of the Company Involuntary Transfer Option Period to purchase all, but in the aggregate not less than all, of the Involuntary Offered Units not otherwise purchased by the Company (the "Remaining Involuntary Offered Units") for the Involuntary Transfer Purchase Price.

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08

**Exhibit A**
**Notice of Removal**

(3)     Any purchase of Involuntary Offered Units by either the Company or the Members shall be consummated as soon thereafter as reasonably possible.  The payment of any Involuntary Transfer Purchase Price shall be made to a lender Member under Section 3.2(b)(i) to the extent of any loans made pursuant to Section 3.2(i) hereof not yet repaid in full.  At the option of the purchaser of the Involuntary Offered Units, the payment of the Involuntary Transfer Purchase Price may be made over a period of time provided that such time period may not be longer than five (5) years and shall bear interest at the then prevailing interest rate for money market accounts at the bank in which the Company has its bank accounts.

8.4     **Substitute Members**.  A Permitted Transfer shall be effective as of the date specified in the instruments relating thereto.  For any Permitted Transfer, a Person shall cease to be a Member upon assignment of all such Member's Interest.  For any Permitted Transfer, the transferee under such Permitted Transfer shall be deemed to be a Member hereunder upon the date of such transfer without further action or notice; provided that if required by the Manager, the transferee shall execute an instrument accepting and adopting the terms and provisions of the Articles and this Agreement.  Upon a Permitted Transfer, the Manager shall cause the books and records of the Company to reflect the admission of the transferee as a substitute Member to the extent of the Transferred Interest held by the transferee.

8.5     **Effect of Admission as a Substitute Member.**  A transferee under a Permitted Transfer who has become a substitute Member has, to the extent of the Transferred Interest, all the rights, powers and benefits of and is subject to the restrictions and liabilities of a Member under the Articles, this Agreement and the Act.  Upon admission of a transferee as a substitute Member, the transferor of the Interest so acquired by the substitute Member shall cease to be a Member of the Company to the extent of such Transferred Interest.

8.6     **Right of Purchase of a Member's Interest.**

(a)     Without limiting the rights of the Company, the Manager and/or the other Members upon any Transfer that is not a Permitted Transfer (including without limitation to the extent not prohibited under applicable law, the right to deem such Transfer to be null and void), if a Member ("Selling Member") attempts to Transfer all or any portion of its Interests in the Company which is not a Permitted Transfer and is also not a transfer under Section 8.3 above, then a Majority in Interest (determined by excluding any such Selling Member) may, but are not required to, elect to cause the Company to purchase such Selling Member's Interest as provided in this Section 8.6 by providing Notice to the Selling Member.  Such Notice shall be given to the Selling Member within ninety (90) days following the date of such attempted Transfer (the "Valuation Date").  The purchase price for any Interest to be purchased by the Company pursuant to this Section 8.6 shall be the lower of the (i) fair market value of such Interest as determined below, or (ii) the purchase price for which the Selling Member was going to Transfer such Interest.

(b)     The fair market value shall be determined by a licensed business appraiser selected by mutual agreement of the Company and the Selling Member or his or her executor, administrator, guardian, conservator or legal representative, as the case may be, without any minority or liquidity discount and shall equal the amount that would be received by the Selling Member if all of the assets of the Company were sold for cash equal to their fair market value and all liabilities of the Company were paid in full (including Member loans not yet repaid), including selling and liquidations expenses.

(c)     Within fifteen (15) days after the fair market value is determined, the Manager shall give Notice to the Selling Member and the other Members as to the purchase price of the Selling Member's Interest.  A Majority in Interest (determined by excluding the Selling Member) shall then have the option (i) to not purchase the Selling Member's Interest, in which event the Selling Member shall have the status of an Assignee of an Interest, or (ii) to have the Company purchase the Interest, and if so, shall promptly set the date on which the closing of the purchase shall occur (the "Closing Date"), which date shall not be less than ten (10) days or more than sixty (60) days from the date the Notice by the Manager is given.   If the Company does not exercise its right under this Section 8.6 to purchase, then the Members shall have the right for a period of sixty (60) days after expiration of the Company's rights hereunder to purchase all, but in the aggregate not less than all, of the Selling Member's Interests for the fair market value (provided that if more than one Member shall desire to exercise the foregoing right, such purchase shall be pro rata between the purchasing Members).

(d)     At the closing, the Selling Member shall execute and deliver to the Company or purchasing Member(s) such assignments of the Interest and amendments to this Agreement and other instruments as shall reasonably be requested by the Company to effect the Transfer, as of the Valuation Date, of all the Selling Member's right, title and interest in the Company and its Property.   Unless otherwise agreed, the purchase price shall be paid to the Selling Member in cash on the Closing Date; provided that payment of the purchase price shall be made to a lender Member under Section 3.2(i) to the extent of any loans made pursuant to Section 3.2(i) hereof not yet repaid in full.  The purchase price shall

12

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08

Exhibit A
Notice of Removal

be deemed a payment with respect to the Property under Section 736(b) of the Code (as defined in Schedule B hereto) to the extent of the Selling Member's Capital Account balance, and the remainder shall be deemed a distributive share under Section 736(a) of the Code.

    **8.7**   <u>Mutual Forced Buy-Sell Option.</u>   The Members recognize that, due to the small number of Members of the Company and the restriction on transferability of Interests, irreconcilable differences may arise in the future which might jeopardize the efficient operation of the Company and its business. The Members desire to incorporate in this Agreement an equitable procedure for severing their business relationship in the event such irreconcilable differences should arise:

    (a)   A Member may activate the procedure outlined in this article by serving written notice upon the other Members. Such notice shall expressly state the intention of such Member to activate and take advantage of this provision. For the purposes of this provision, the Member serving such notice shall be referred to as the "Activating Member".

    (b)   The written notice activating this provision shall specify a Buy-Sell Price. The Buy-Sell Price shall be the price at which the Activating Member agrees to either:

        (i)   Sell all of the Activating Member's Interest in the Company to the other Member; or

        (ii)   Purchase from the other Member all of the other Member's Interest in the Company.

    In the event the Members do not own an equal number of Interests, the Buy-Sell Price shall be stated in the terms of price per Interest, but shall provide that all such Interests shall be either sold or purchased.

    In the event there are more than two (2) Members, the Activating Member may direct his notice to a single Member; provided, however, copies of such notice shall be served upon all Members. Two or more Members may join in a single notice activating this provision.

    (c)   Within sixty (60) calendar days after the Activating Member serves upon the other Member(s) a written notice activating this provision, the Member(s) served with such notice shall, by serving written notice upon the Activating Member, elect to either:

        (i)   purchase all of the Activating Member's Interest at the Buy-Sell Price; or

        (ii)   sell all such Member's Interest to the Activating Member at the Buy-Sell Price. The election to either buy or sell, as herein above provided, shall be in writing and shall be served upon the Activating Member. Failure to serve a written notice electing to either buy or sell, as herein provided, shall be deemed an election to sell to the Activating Member.

    (d)   Unless otherwise agreed in writing between the Interested Members, or their attorneys prior to closing, in the event a Member has elected to purchase the Interest of the other Member(s) (or, in the case of the Activating Member, in the event no other Member has elected to purchase the Activating Member's, thereby binding the Activating Member to purchase the Membership Interest of the other Member(s)) but such Member shall fail to be ready, willing and able to pay the Buy-Sell price and to otherwise consummate the purchase of such Interest at the Closing, the Closing shall be rescheduled (the "Rescheduled Closing") for ten (10) business days after the originally scheduled Closing. In such event, the Buy-Sell Price shall be increased by ten percent (10%) (i.e., Buy-Sell Price multiplied by 110%) as liquidated damages for such delay. Unless otherwise agreed in writing, the Rescheduled Closing shall be held at the same hour and location as theretofore specified for the Closing. Notice of the Rescheduled Closing shall be served upon each Interested Member by the other Interested Member(s) unless the requirement for serving notice of the Rescheduled Closing shall be waived in writing by the Member entitled to receive such notice. A Member shall be deemed

13

**Exhibit A**
**Notice of Removal**

an "Interested Member" if he is bound hereunder to either sell or purchase Interest at the closing.

(e)     In the event the Member obligated to purchase the Interest of the other Member shall fail to be ready, willing and able to consummate such purchase of Interest at the Rescheduled Closing, the other Interested Member may elect to proceed as follows, by serving, within (10) business days after the rescheduled Closing, written notice upon such Member obligated to purchase Interest:

(i)     To purchase the Interest of the Member who was obligated to purchase Interest at the Closing and the Rescheduled Closing. In such event the Buy-Sell Price shall be reduced by twenty percent (20%) (i.e., Buy-Sell Price multiplied by 80%). The closing of such transaction ("the Reverse Closing") shall be thirty (30) business days after the Rescheduled Closing. Unless otherwise agreed, the Reverse Closing shall be at the hour of 3:00 P.M. at the Registered Office of the Company. Between the date of service of an effective election to hold a Reverse Closing, as herein provided, and the date of the Reverse Closing, the voting rights of the Interest of the Member obligated to transfer his Interest at the Reverse Closing shall be suspended; or

(ii)     To terminate the entire effect of the activation of this Mutual Forced Buy-Sell Option, in which event the parties shall return to the status quo as existed prior to notice by the Activating Member pursuant to subparagraph (a) of this provision. In the event no notice is served effectively electing to proceed under either subparagraph (i) or subparagraph (ii) of this subparagraph (e), or in the event of the Member obligated to purchase the Interest of the other at the Reverse Closing shall fail to be ready, willing and able to consummate such Reverse Closing, this subparagraph (e) (iii) shall be deemed to have been elected.

(f)     In the event a Member who is entitled to purchase the Interest of the Member at the Closing, Rescheduled Closing or Reverse Closing appears at such Closing, Rescheduled Closing or Reverse Closing (either in person or by an authorized representative) and is ready, willing and able to deliver the Buy-Sell Price (as may be adjusted in accordance herewith) and shall tender the same to the Member obligated to sell such Interest (or to the escrowee, as hereafter provided) but if the Member obligated to sell such Interest shall not be present (either in person or by an authorized representative) or shall otherwise fail or refuse to consummate the transaction contemplated hereby, the Member entitled to purchase such Interest may satisfy his obligations hereunder by depositing the Buy-Sell Price (as may be adjusted pursuant hereto) with the Registered Agent of the Company, as Escrowee, for the benefit of the Member obligated to transfer such Interest. In such event, the Interest of the Member obligated to transfer such Interest shall be conclusively deemed to be transferred to the purchasing Member and such transfer shall be reflected on the books and records of the Company as of the date of delivery of the Buy-Sell Price (as may be adjusted in accordance herewith) to the aforesaid Escrowee. In the event the Registered Agent of the Company shall fail or refuse to act as Escrowee for the purposes aforesaid, such funds may be deposited with any trust company licensed to transact business in the State of Illinois, to be held for the benefit of the Member entitled to receive such funds. All fees of such trustee shall be chargeable against and paid from the funds deposited in escrow with such trustee as as Escrowee in accordance herewith.

(g)     This Mutual Forced Buy-Sell Option provision shall be deemed a material part of this Operating Agreement of which it is a part and time shall be deemed to be of the essence with respect to the exercise of any rights arising hereunder.

## Article 9.
## DISSOLUTION AND TERMINATION

9.1     **Events Causing Dissolution.**     The Company shall be dissolved upon the first to occur of the following events:

(i)   Upon the unanimous consent of all of the Members and the Manager; or

14

**Exhibit A**
**Notice of Removal**

(ii) Upon a decree of judicial dissolution pursuant to the Act.

**9.2**     <u>Continuation of Company</u>.

(a)     Upon the occurrence of any event which terminates the continued membership of a Member in the Company and/or upon the occurrence of a bankruptcy of a Member or the occurrence of any other involuntary withdrawal of a Member, the Company shall not be dissolved and the business of the Company shall continue. Each Member hereby specifically consents to such continuation of the business of the Company upon the termination of membership of any Member, a bankruptcy of any Member or any other involuntary withdrawal of a Member.

(b)     The Company shall not be dissolved by the transfer of any Interest of any Member, or by the admission of a Member or a Substitute Member. If, notwithstanding the foregoing, the Company is deemed to have dissolved or terminated for tax purposes due to a sale or exchange of the Interests under the Treasury Regulations, the Members hereby specifically consent to reconstitute and continue the business of the Company and shall execute an instrument confirming such fact, if required.

**9.3**     <u>Notices to Secretary of State</u>.

(a)     As soon as possible following the occurrence of the events specified in **Section 9.1** above, the Company shall file a notice of winding-up with the Secretary of State of Illinois which discloses the dissolution of the Company and the commencement of the winding-up of its business and affairs.

(b)     When all of the Property has been distributed, the Articles shall be canceled by filing a certificate of cancellation with the Secretary of State of Illinois.

**9.4**     <u>Cash Distributions Upon Dissolution</u>.

(a)     Upon the dissolution of the Company as a result of the occurrence of any of the events set forth in **Section 9.1**, the Manager shall proceed to wind up the affairs of and liquidate the Company, and the Liquidation Proceeds shall be applied and distributed in the following order of priority:

(i)     First, to the payment of debts and liabilities of the Company in the order of priority as provided by law (including any loans or advances that may have been made by any of the Members to the Company) and the expenses of liquidation.

(ii)     Second, to the establishment of any reserve which the Manager may deem reasonably necessary for any contingent, conditional or unasserted claims or obligations of the Company.

(iii)     Third, *pro rata* to the Members in the amounts equal to their then Unreturned Capital Contributions; provided that if any Member is a Defaulting member under Section 3.2 hereof, such Member's distribution shall be made to the lender Member under Section 3.2(b)(i) to the extent of any loans made pursuant to Section 3.2(i) hereof not yet repaid in full; and

(iv)     Finally, the remaining balance of the Liquidation Proceeds, if any, to the Members *pro rata* in proportion to their respective Percentage Interests; provided that if any Member is a Defaulting member under Section 3.2 hereof, such Member's distribution shall be made to the lender Member under Section 3.2(b)(i) to the extent of any loans made pursuant to Section 3.2(i) hereof not yet repaid in full.

**9.5**     <u>In-Kind</u>.

Notwithstanding the foregoing, in the event the Manager shall determine that an immediate sale of part or all of the Property would cause undue loss to the Members, or the Manager determines that it would be in the best interest of the Members to distribute the Property to the Members in-kind (which distributions do not, as to the in-kind portions, have to be in the same proportions as they would be if cash were distributed, but all such in-kind distributions shall be equalized, to the extent necessary, with cash), then the Manager may either defer liquidation of, and withhold from distribution for a reasonable time, any of the Property except that necessary to satisfy the Company's debts and obligations, or distribute the Property to the Members in-kind.

15

**Exhibit A**
**Notice of Removal**

**9.6** **Limitations on Payments in Dissolution.** Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of such Member's positive Capital Account balance and shall have no recourse for such Member's Capital Contribution or share of profits (on dissolution or otherwise) against any other Member.

## Article 10.
## ACCOUNTING AND BANK ACCOUNTS

**10.1** **Fiscal Year and Accounting Method.**

The fiscal year and taxable year of the Company shall be as designated by the Manager in accordance with the Code. The Manager shall also determine the accounting method to be used by the Company.

**10.2** **Books and Records.**

The books and records of the Company shall be maintained at its principal place of business.

**10.3** **Books and Financial Reports.**

Proper and complete records and books of account shall be kept by the Manager in which shall be entered all transactions and other matters relative to the Company business. The Company's books and records shall be prepared in accordance with commercially reasonable accounting standards.

**10.4** **Tax Returns and Elections.**

(a) The Company shall elect to be taxed as a partnership for Federal income tax purposes. The Manager is authorized to make such election.

(b) The Company shall cause to be prepared and timely filed all federal, state and local income tax returns or other returns or statements required by applicable law.

(a) As soon as reasonably practicable after the end of each fiscal year of the Company, the Company shall cause to be prepared and delivered to each Member all information with respect to the Company necessary for the Member's federal and state income tax returns.

**10.5** **Bank Accounts.**

All funds of the Company shall be deposited in a separate bank, money market or similar account(s) approved by the Manager and in the Company's name. Withdrawals therefrom shall be made only by Persons authorized to do so by the Manager. All withdrawals over One Thousand Dollars ($1,000.00) shall require the signature of two Managers.

## Article 11.
## MISCELLANEOUS

**11.1** **Title to Property; No Partition.**

Title to the Property shall be held in the name of the Company. No Member shall individually have any ownership interest or rights in the Property, except indirectly by virtue of such Member's ownership of an Interest. No Member shall have any right to any specific assets of the Company upon the liquidation of, or any distribution from, the Company. All Members hereby waive any and all rights to partition to which they may be entitled now or in the future with respect to any and all Property of the Company.

**11.2** **Waiver of Default.**

No consent or waiver, express or implied, by the Company or a Member with respect to any breach or default by the Company or a Member hereunder shall be deemed or construed to be a consent or waiver with respect to any other breach or default by any party of the same provision or any other provision of this Agreement. Failure on the part of

16

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

**Exhibit A**
Notice of Removal

the Company or a Member to complain of any act or failure to act of the Company or a Member or to declare such party in default shall not be deemed or constitute a waiver by the Company or the Member of any rights hereunder.

**11.3    Notice.**

(a)    Any Notice required or permitted to be given hereunder shall be in writing and shall be (i) personally delivered, (ii) transmitted by postage pre-paid first class certified United States mail, (iii) transmitted by pre-paid, overnight delivery, or (iv) transmitted by email or facsimile transmission.

(b)    All Notices and other communications shall be deemed to have been duly given, received and effective on (i) the date of receipt if delivered personally, (ii) two (2) business days after the date of posting if transmitted by mail, (iii) the business day after the date of transmission if by overnight delivery, or (iv) if transmitted by email or facsimile transmission, the date of transmission with confirmation by the originating facsimile transmission machine of receipt by the receiving facsimile machine of such transmission.

(c)    Any Member may change his, her or its address for purposes hereof by Notice given to the other Members and the Company.

Notices hereunder shall be directed to the last known address of a Member as shown in the records of the Company.

**11.4    Amendment.**

(a)    Except as otherwise expressly provided elsewhere in this Agreement, this Agreement shall not be altered, modified or changed except by an amendment approved by the Manager and all of the Members.

(b)    In addition to any amendments otherwise authorized herein, amendments may be made to this Agreement from time to time by the Manager without the consent of the Members (i) to cure any ambiguity or to correct or supplement any provision herein which may be inconsistent with any other provision herein or (ii) to delete or add any provisions of this Agreement required to be so deleted or added by federal, state or local law or by the Securities and Exchange Commission, the Internal Revenue Service, or any other Federal agency or by a state securities or "blue sky" commission, a state revenue or taxing authority or any other similar entity or official.

**11.5    No Third Party Rights.**

None of the provisions contained in this Agreement shall be for the benefit of or enforceable by any third parties, including creditors of the Company and/or the Members, nor give any third parties, including creditors of the Company and/or the Members, any right of subrogation or action over or against any party to this Agreement. The parties to this Agreement expressly retain any and all rights to amend this Agreement as herein provided, notwithstanding any interest in this Agreement or in any party to this Agreement held by any other Person.

**11.6    Severability.**

In the event any provision of this Agreement is held to be illegal, invalid or unenforceable to any extent, the legality, validity and enforceability of the remainder of this Agreement shall not be affected thereby and shall remain in full force and effect and shall be enforced to the greatest extent permitted by law.

**11.7    Nature of Interest in the Company.**

A Member's Interest shall be personal property for all purposes.

**11.8    Binding Agreement.**

Subject to the restrictions on the disposition of Interests herein contained, the provisions of this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, personal representatives, successors and permitted assigns.

17

Exhibit A
Notice of Removal

### 11.9 Headings.

The headings of the Articles and sections of this Agreement are for convenience only and shall not be considered in construing or interpreting any of the terms or provisions hereof.

### 11.10 Word Meanings.

The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural, and vice versa, unless the context otherwise requires.

### 11.11 Counterparts.

This Agreement may be executed in multiple counterparts, each one of which shall be deemed an original but all of which, taken collectively, shall be deemed a single instrument; provided, that this Agreement shall not be enforceable against any party hereto unless all parties hereto have executed at least one (1) counterpart. Facsimile, electronic (e.g., DocuSign) and .pdf signatures shall have the same binding effect as original signatures, and the parties waive any defense to validity based on any such signatures.

### 11.12 Entire Agreement.

This Agreement contains the entire agreement between the parties and supersedes all prior writings or agreements with respect to the subject matter hereof.

### 11.13 Representations and Acknowledgments.

Each Member does hereby represent and warrant by the signing of a counterpart of this Agreement that the Interest acquired by him, her or it was acquired for his, her or its own account, for investment only, and not for the benefit of any other Person, and not for resale to any other Person or future distribution, and that he, she or it has relied solely on the advice of his, her or its personal tax, investment or other advisor(s) in making his, her or its investment decision. The Manager has not made and hereby makes no warranties or representations other than those set forth in this Agreement.

### 11.14 Dispute Resolution and Arbitration.

Except as provided in this Section 11.14, any dispute arising out of or relating to this Agreement or the breach, termination or validity hereof (collectively, a "Dispute") shall be settled as follows: the parties shall meet in a good faith attempt to resolve such matter or matters. If such meeting does not result in resolution, all parties must meet with an independent facilitator or mediator, who shall be designated by agreement of the parties, to resolve the disputed matter or matters. If unsuccessful, then the dispute shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules then in effect of the American Arbitration Association. The arbitrator(s) shall not award punitive, exemplary or consequential damages. These procedures are for the settlement of Disputes only and are not to be used for disagreements concerning the policy, organization, management or practice of the Company. Any action or proceeding subsequent to any award rendered by arbitration shall be filed in a court of competent jurisdiction and Illinois law shall apply in any such action or proceeding.

### 11.15 Intentionally Omitted.

### 11.16 Nature of Agreement.

This Agreement shall be personal in nature.

### 11.17 Attorneys' Fees. In any dispute between or among the Company and one or more of the Members, the prevailing party or parties in such dispute shall be entitled to recover from the non-prevailing party or parties all reasonable fees, costs and expenses, including without limitation, attorneys' fees, costs and expenses, all of which shall be deemed to have accrued on the commencement of such action, proceeding or arbitration. Prevailing party shall mean the party that is determined in the arbitration, action or proceeding to have prevailed or who prevails by dismissal, default or otherwise.

18

Exhibit A
Notice of Removal

**11.18  Legal Representation**. The Company has engaged Skoubis & Mantas, LLC ("SAM"), as legal counsel to the Company, with respect to the preparation of this Agreement.  SAM has not been engaged by any of the Members to protect or otherwise represent the interests of the Members with respect to the preparation of this Agreement or with respect to the interests of such Member vis-a-vis the Company.  Each Member: (a) approves SAM's representation of the Company in the preparation of this Agreement; (b) acknowledges that no legal counsel has been engaged by the Company to protect or otherwise represent the interests of the Members, that SAM has not been engaged by any Member to protect or represent the interests of such Member, as the case may be, vis-a-vis the Company or the preparation of this Agreement, and that actual or potential conflicts of interest may exist among the Members in connection with the preparation of this Agreement (with the consequence that a Member's interests may not be vigorously represented unless such Member engages its own legal counsel); (c) acknowledges further that such Member has been afforded the opportunity to engage and seek the advice of its own legal counsel before entering into this Agreement; and (d) forever waives any conflict of interest claims, actions or causes of action against SAM and its members.

THE COMPANY HAS DISCLOSED AND THE MEMBERS ACKNOWLEDGE AND AGREE THAT THE TRANSFERABILITY OF THE INTERESTS IS SEVERELY LIMITED AND THE MEMBERS MUST CONTINUE TO BEAR THE ECONOMIC RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD.  THE MEMBERSHIP INTERESTS EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION, BUT HAVE BEEN ISSUED PURSUANT TO EXEMPTIONS UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  FURTHER, THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED WITH THE SECURITIES COMMISSIONER OF THE STATE OF ILLINOIS OR ANY OTHER STATE.  ACCORDINGLY, THE SALE, TRANSFER, PLEDGE, HYPOTHECATION, OR OTHER DISPOSITION OF ANY OF SAID MEMBERSHIP INTERESTS IS RESTRICTED AND MAY NOT BE ACCOMPLISHED EXCEPT IN ACCORDANCE WITH THIS AGREEMENT.

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

**Exhibit A**
**Notice of Removal**

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**MEMBERS**

Ahmad M. Alkhatib

Richard W. Trojan

Ihab Naserallah

**MANAGERS:**

Ahmad M. Alkhatib

Richard W. Trojan

Ihab Naserallah

20

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/

**Exhibit A**
**Notice of Removal**

## SCHEDULE A – MEMBERS

| Name | Initial Capital Contribution | Percentage Interest |
|------|------------------------------|---------------------|
| Ahmad M. Alkhatib<br>1131 W. Bryn Mawr, 2nd. Floor<br>Chicago, IL 60660 | $1,000.00 | 33 1/3% |
| Richard W. Trojan<br>433 8th St.<br>Wilmette, IL 60091 | $1,000.00 | 33 1/3% |
| Ihab Naserallah<br>530 1st. Street<br>Lemont, IL 60439 | $1,000.00 | 33 1/3% |

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/27/2023 10:14:28 AM

**Exhibit A**
**Notice of Removal**

## SCHEDULE B - TAXES

1.      **Tax Election.**

If the Company elects to be taxed as a corporation and/or a subchapter S corporation for Federal income tax purposes, the provisions of the Code as they apply to such corporations and/or subchapter S corporations shall apply to the books, records, profits, losses and other tax provisions and reporting relating the Company.  To the extent that any of the provisions set forth in Sections 2-8 below are not inconsistent with the election to be taxes as a corporation and/or a subchapter S corporation, such provisions shall apply.  To the extent that any of the provisions set forth in Sections 2-8 below are inconsistent with the election to be taxed as a corporation and/or a subchapter S corporation, such provisions shall be deemed null and void and no force and effect.

If the Company elects to be taxed as a partnership for Federal income tax purposes, the provisions of Sections 2-8 below shall apply as written.

2.      **Definitions.**

"Adjusted Capital Account" means the Capital Account balance of a Member increased by such Member's Share of Company Minimum Gain.

"Capital Account" means a separate account established by the Company and maintained for each Member in accordance with this **Schedule B**.

"Member's Share of Company Minimum Gain" means an amount determined (i) in accordance with rules applicable to partnerships in Treasury Regulation Section 1.704-2(g) with respect to a nonrecourse liability of the Company in which no Member bears the economic risk of loss and (ii) in accordance with rules applicable to partnerships in Treasury Regulation Section 1.704-2(i) with respect to a nonrecourse liability of the Company in which any Member bears any portion of the economic risk of loss.

"Minimum Gain" means the amount of gain, if any, as set forth in rules applicable to partnerships in Treasury Regulations Section 1.704-2(d) that would be realized by the Company if it disposed of (in a taxable transaction) property subject to a nonrecourse liability of such Company, in full satisfaction of such liability (and for no other consideration).

"Profits and Losses For Tax Purposes" means, for accounting and tax purposes, the various items with respect to partnerships set forth in Section 702(a) of the Code and all applicable regulations, or any successor law, and shall include, but not be limited to, items such as capital gain or loss, tax preferences, credits, depreciation, other deductions and depreciation recapture.

"Treasury Regulations" means the regulations promulgated by the Treasury Department with respect to the Code, as such regulations are amended from time to time, or corresponding provisions of future regulations.

3.      **Maintenance of Capital Accounts.**

The Company shall maintain for each Member a separate account ("Capital Account") in accordance with the rules applicable to partnerships in Treasury Regulation 1.704-1(b)(2)(iv) or any successor Treasury Regulations which by their terms would be applicable to the Company.  No Member shall be entitled to receive or be credited with any interest on the balance of such Member's Capital Account at any time.

4.      **Allocation of Profits and Losses For Tax Purposes**

4.1     Except as otherwise provided in **Section 5** of this **Schedule B**, all Profits and Losses for Tax Purposes of the Company shall be allocated among the Members in accordance with this **Section 4**.

(a)     Profits shall be allocated to and among the Members as follows:

   i.      First to the Members in proportion to and to the extent of Losses allocated pursuant to Section 4.1(b)(i); and

22

**Exhibit A**
**Notice of Removal**

ii.     Thereafter, the balance of Profits, if any, shall be allocated to the Members in accordance with their Percentage Interests, as may be adjusted from time to time, pursuant to this Agreement.

(b)     Losses shall be allocated to and among the Members as follows:

i.     First, to the Members in proportion to and to the extent of the Capital Accounts of the Members until such Capital Accounts have been reduced to zero; and

ii.     Thereafter, the balance of Losses, if any, shall be allocated to the Members in accordance with their Percentage Interests, as may be adjusted from time to time, pursuant to the Agreement.

4.2     General Provisions.

(a)     Except as otherwise provided in this Agreement, the Members' distributive shares of all items of Company income, gain, loss, and deduction are the same as their distributive shares of Profits and Losses.

(b)     The Manager shall allocate Profits, Losses, and other items properly allocable to any period using any method permitted by Code Section 706 and the Regulations thereunder.

(c)     To the extent permitted by Regulations Section 1.704 2(h) and Section 1.704 2(i)(6), the Managers shall endeavor to avoid treating distributions of Cash Flow as being from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt (as defined in Regulation Sections 1.704 2(b)(3) and 1.704 2(b)(4), respectively).

(d)     If there is a change in any Member's Interest in the Company during a Fiscal Year, each Member's distributive share of Profits or Losses or any item thereof for such Fiscal Year, shall be determined by any method prescribed by Code Section 706(d) or the Regulations thereunder that takes into account the varying Interests of the Members in the Company during such Fiscal Year.

(e)     The Members agree to report their shares of income and loss for federal income tax purposes in accordance with the provisions of this Article 4.

## 5.     Special Allocations.

5.1     Notwithstanding any other provisions of this Agreement to the contrary, if the amount of any Minimum Gain at the end of any taxable year is less than the amount of such Minimum Gain at the beginning of such taxable year, there shall be allocated to each Member gross income or gain (in respect of the current taxable year and any future taxable year) in an amount equal to such Member's share of the net decrease in Minimum Gain during such year in accordance with Treasury Regulation Section 1.704-2(f). Such allocation of gross income and gain shall be made prior to any other allocation of income, gain, loss, deduction or Section 705(a)(2)(B) expenditure for such year. Any such allocation of gross income or gain pursuant to this Section shall be taken into account, to the extent feasible, in computing subsequent allocations of income, gain, loss, deduction or credit of the Company so that the net amount of all items allocated to each Member pursuant to this paragraph shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this paragraph if the allocations made pursuant to the first sentence of this paragraph had not occurred. This provision is intended to be a minimum gain chargeback as described in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistent therewith.

5.2     Notwithstanding any other provisions of this Agreement to the contrary, except as provided in **Section 5.1 of this Schedule B**, if there is a net decrease (as determined in accordance with Treasury Regulation Section 1.704-2(i)(3)) during a taxable year in Minimum Gain attributable to a non-recourse debt of the Company for which any Member bears the economic risk of loss (as determined accordance with Treasury Regulation Section 1.704-2(b)(4)), then any Member with a share of the Minimum Gain (as determined in accordance with Treasury Regulation Section 1.704-2(i)(5)) attributable to such debt (determined at the beginning of such taxable year) shall be allocated in accordance with Treasury Regulation Section 1.704-2(i)(4) items of Company income and gain for such taxable year (and, if necessary, for subsequent years) in an amount equal to such Member's share of the net decrease in the Minimum Gain attributable to such Member in accordance with Treasury Regulation Section 1.704-2(i). Any allocations of items of gross income or gain pursuant to this paragraph shall not duplicate any allocations of gross income or gain pursuant to **Section 5.1 of this Schedule B** and shall be taken into account, to the extent feasible, in computing subsequent allocations of the Company, so that the net amount of all items allocated to each Member pursuant to this paragraph shall, to the extent possible, be equal to the net

23

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08

Exhibit A
Notice of Removal

amount that would have been allocated to each Member pursuant to the provisions of this paragraph if the allocations made pursuant to the first sentence of this paragraph had not occurred. This provision is intended to be a partner minimum gain chargeback as described in Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistent therewith.

5.3      Notwithstanding any other provisions of this Agreement to the contrary, except as provided in **Sections 5.1 and 5.2 of this Schedule B**, if any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that reduces any Member's Capital Account below zero or increases the negative balance in such Member's Capital Account (taking into account such Member's deficit restoration obligation), gross income and gain shall be allocated to such Member in an amount and manner sufficient to eliminate any negative balance in such Member's Capital Account (taking into account such Member's deficit restoration obligation) created by such adjustments, allocations or distributions as quickly as possible in accordance with Treasury Regulation Section 1.704-1(b)(2)(ii)(d). Any such allocation of gross income or gain pursuant to this paragraph shall be in proportion with such negative Capital Accounts of the Members. Any allocations of items of gross income or gain pursuant to this paragraph shall not duplicate any allocations of gross income or gain made pursuant to **Section 5.1 or 5.2 of this Schedule B** and shall be taken into account, to the extent feasible, in computing subsequent allocations of income, gain, loss, deduction or credit, so that the net amount of all items allocated to each Member pursuant to this paragraph shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this paragraph if such adjustments, allocations or distributions had not occurred. This provision is intended to be a qualified income offset as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistent therewith.

5.4      Any item of Company loss, deduction or Section 705(a)(2)(B) expenditure that is attributable to a non recourse debt of the Company for which any Member bears the economic risk of loss (as determined in accordance with rules applicable to partnerships in Treasury Regulation Section 1.704-2(b)(4)) shall be allocated to such Member in accordance with Treasury Regulation Section 1.704-2(i).

5.5      In accordance with Section 704(c) and the Regulations thereunder, if property is contributed to the Company and the fair market value of such property on the date of its contribution differs from the adjusted tax basis of such property, any income, gain, loss and deduction with respect to such property shall, solely for tax purposes, be allocated among the Members so as to take into account any variation between the adjusted tax basis to the Company of such property for federal income tax purposes and the fair market value of such property on the date of contribution to the Company. Such allocations shall be made using a reasonable method that is consistent with the purpose of Section 704(c) of the Code pursuant to Treasury Regulation Section 1.704-3.

6.      **Persons Entitled to Allocations.**

With respect to any period in which a transferee of the interest of a Member is first entitled to a share of the Profits And Losses For Tax Purposes, the Company shall, with respect to such Profits And Losses For Tax Purposes, allocate such items among the Persons who were entitled to such items on a basis consistent with the provisions of the Code and the Treasury Regulations.

7.      **Tax Matters Representative.**

A. The "partnership representative" of the Company pursuant to Section 6223(a) of the Code shall be Ahmad M. Alkhatib, or such other person with a substantial presence in the United States designated by the Manager in the manner prescribed by the Internal Revenue Service. (Any person who is designated as the partnership representative is referred to herein as the "Partnership Representative"). The Partnership Representative is authorized to take such actions and to execute and file all statements and forms on behalf of the Company under Subchapter C of Section 63 of the Internal Revenue Service Code (relating to Internal Revenue Service Partnership audit proceedings) and any tax proceedings brought by other taxing authorities, and the Company and all Members shall be bound by the actions taken by the Partnership Representative in such capacity. The Partnership Representative shall be reimbursed by the Company for all expenses incurred in connection with all examinations of the Company's affairs by tax authorities, including resulting proceedings, and is authorized to expend Company funds for professional services and costs associated therewith. If an audit results in an imputed underpayment by the Company as determined under Section 6225 of the Code, the Partnership Representative may make the election under Section 6226(a) of the Code within 45 days after the date of the notice of final partnership adjustment in the manner provided by the Internal Revenue Service. If such an election is made, the Company shall furnish to each Member of the Company for the year under audit a statement reflecting the Member's share of the adjusted items as determined in the notice of final partnership adjustment and each such Member shall take such adjustment into account as required under Section 6226(b) of the Code and shall be liable for any related interest penalty, addition to tax, or additional amount.

24

Exhibit A
Notice of Removal

B. The Members agree to make the election provided in Section 6221(b)(1) of the Code for each taxable year of the Company is eligible to make such election. The Manager is authorized to make the disclosure required under Section 6221(b)(D)(ii) of the Code and the Members hereby agree to provide their names and taxpayer identification numbers to the Managers for this purpose.

8. **Negative Balance.**

No Member with a negative balance in such Member's Capital Account shall have any obligation to the Company or any other Member to restore said negative balance to zero.

25

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/28/2023 08:44:00 PM

**Exhibit A**
**Notice of Removal**

# Operating Agreement

OF

## ROSE CITY INVESTMENT, LLC

A LIMITED LIABILITY COMPANY

ORGANIZED UNDER THE LAWS OF

THE STATE OF

## ILLINOIS

CAT. NO. B159

Blumberg Excelsior, Inc  NYC 10013

**EXHIBIT**

"C"

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

# TABLE OF CONTENTS

**PAGE**

**ARTICLE 1**
 **FORMATION, PURPOSE AND DEFINITIONS** ............................ 1
 1.1 Establishment of Limited Liability Company. ........................ 1
 1.2 Name ....................................................... 1
 1.3 Principal Office of the Company ................................ 1
 1.4 Purpose .................................................... 2
 1.5 Term. ...................................................... 2
 1.6 Other Activities of Members. ................................. 2
 1.7 Defined Terms. .............................................. 2

**ARTICLE 2**
 **CONTRIBUTIONS AND CAPITAL ACCOUNTS** ...................... 2
 2.1 Capital Contributions. ....................................... 2
 2.2 Maintenance of Capital Accounts. .............................. 2
 2.3 Withdrawal of Capital. ....................................... 2
 2.4 Additional Capital Contributions. .............................. 2
 2.5 Interest on Capital Contributions. .............................. 2
 2.6 Priority and Return of Capital. ................................ 2
 2.7 Limitation on Liability of Member .............................. 3
 2.8 Loans. ..................................................... 3
 2.9 Default in Capital Contribution. ............................... 3

**ARTICLE 3**
 **ALLOCATION OF PROFITS AND LOSSES** ......................... 3
 3.1 Profits & Losses. ............................................ 3
 3.2 Special Allocations. .......................................... 3

**ARTICLE 4**
 **DISTRIBUTIONS OF CASH FLOW** ................................ 4
 4.1 Net Cash from Operations and Net Cash from Sales or Refinancings. ..... 4
 4.2 Restrictions on Distributions of Cash Flow. ...................... 5

**ARTICLE 5**
 **RIGHTS AND DUTIES OF MEMBERS** .............................. 5
 5.1 Management. ................................................ 5
 5.2 Voting Decisions By Members. ................................. 6
 5.3 Powers of Employee and Agents. ............................... 7
 5.4 Liability for Certain Acts. ..................................... 7
 5.5 Indemnification ............................................. 7

i

**ARTICLE 6**
**TRANSFER OF MEMBERSHIP INTERESTS** .............................. 8
6.1    General Restriction .................................................. 8
6.2    Transfer of Membership Interest Without Substitution ................. 8
6.3    Admission of Substituted Members. .................................. 8
6.4    Admission of Additional Members. ................................... 8
6.5    Conditions on Transfers of Membership or Economic Interest .......... 9
6.6    Obligations of Transferring Member ................................. 9
6.7    Allocations Upon Transfer of Membership or Economic Interest or Upon Admission .......................................................... 9
6.8    Provisions Regarding Transfer Agreements and Repurchases Among the Members. ......................................................... 10

**ARTICLE 7**
**DISSOCIATION OF A MEMBER** ...................................... 10
7.1    Dissociation ....................................................... 10
7.2    Rights of Dissociating Member. ..................................... 10
7.3    Withdrawal of Member. ............................................. 11
7.4    Effect of Dissociation of a Member. ................................. 11

**ARTICLE 8**
**DISSOLUTION AND LIQUIDATION** .................................... 11
8.1    Events Triggering Dissolution. ....................................... 11
8.2    Effect of Dissolution. ............................................... 11
8.3    Liquidation. ....................................................... 12
8.4    Revaluation. ....................................................... 12
8.5    Distributions in Kind. ............................................... 12
8.6    Timing of Liquidation. .............................................. 12
8.7    Certificate of Cancellation. .......................................... 13

**ARTICLE 9**
**ACCOUNTING AND FISCAL MATTERS** ................................ 13
9.1    Fiscal Year ........................................................ 13
9.2    Method of Accounting .............................................. 13
9.3    Books and Records ................................................. 13
9.4    Bank Accounts. .................................................... 13
9.5    Tax Matters Partner. ................................................ 13

**ARTICLE 10**
**MISCELLANEOUS** .................................................. 14
10.1    Amendment. ...................................................... 14
10.2    Glossary. ......................................................... 14

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

**Exhibit A**
**Notice of Removal**

| | | |
|---|---|---|
| 10.3 | Notices. | 19 |
| 10.4 | Binding Effect. | 19 |
| 10.5 | Counterparts. | 19 |
| 10.6 | Governing Law. | 19 |
| 10.7 | Severability. | 19 |
| 10.8 | Gender. | 19 |

iii

# OPERATING AGREEMENT

## OF

## ROSE CITY INVESTMENT, LLC

### A LIMITED LIABILITY COMPANY

This **OPERATING AGREEMENT OF** ROSE CITY INVESTMENT, LLC
is entered into and shall be effective as of January 25, 2021
by and among the parties whose names are set forth on Schedule A attached to this Agreement and
incorporated by reference in this Agreement.

### RECITAL

The persons listed on attached Schedule A (the "Members") desire to establish a limited
liability company (the "Company"). The Members desire to set forth in this Agreement the terms
of their understandings and agreement. In consideration of the mutual promises in this Agreement,
the parties, intending legally to be bound, agree as follows:

### ARTICLE 1
### FORMATION, PURPOSE AND DEFINITIONS

**1.1     Establishment of Limited Liability Company.** The Members hereby agree to
establish a limited liability company pursuant to the provision of the ILLINOIS
Limited Liability Company Act (the "Act") and upon the terms set forth in this Agreement.

**1.2     Name.** Pursuant to the terms of this Agreement, the Members intend to carry on a
Business for profit as co-owners under the name ROSE CITY INVESTMENT, LLC
The Company may conduct its activities under any other permissible name designated by the
Members. The Members shall be responsible for complying with any registration requirements in
the event an alternate name is used.

**1.3     Principal Office of the Company.** The principal office of the Company shall be
located at 6262 S. Route 83 STE#210, Willowbrook, IL.60527
or at such other location as the Members may determine. The registered agent for the service of
process and registered office of the Company shall be the person and location set forth in the
Certificate of Formation filed with the Secretary of State, and the Members may, from time to time,
change such agent and office by appropriate filings as required by law.

1

Exhibit A
Notice of Removal

**1.4** **Purpose.** The Company may engage in any lawful business permitted under the Act or the laws of any jurisdiction in which the Company may do business. The Company shall have the authority to do all things necessary or advisable in order to accomplish such purposes.

**1.5** **Term.** The term of this Company shall begin on the date of filing of a Certificate of Formation with the Secretary of State. The duration of the Company shall be indefinite and shall continue until the Company is dissolved in accordance with the provisions of Article 8 of this Agreement or the Act, which shall constitute the time specified for dissolution of the Company, as contemplated by the Act.

**1.6** **Other Activities of Members.** Any Member may engage in or possess an interest in other business ventures of any nature, whether or not similar to or competitive with the activities of the Company.

**1.7** **Defined Terms.** Capitalized words and phrases used in this Agreement shall have the meanings ascribed to such terms in the Glossary contained in Section 10.2 of this Agreement.

## ARTICLE 2
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

**2.1** **Capital Contributions.** Upon formation of the Company, the Members shall make the Capital Contributions set forth on Schedule A.

**2.2** **Maintenance of Capital Accounts.** The Company shall establish and maintain a Capital Account for each Member.

**2.3** **Withdrawal of Capital.** A Member shall not be entitled to withdraw any part of such Member's Capital Account or to receive any distribution from the Company, except as provided in this Agreement.

**2.4** **Additional Capital Contributions.** No Member shall be required to make any additional capital contribution to the Company or to restore any deficit in such Member's Capital Account, except as provided in this Agreement, and such deficit, if any, shall not be considered a debt owed to the Company or to any other person for any purpose.

**2.5** **Interest on Capital Contributions.** No interest shall be due from the Company on any Capital Contribution of any Member.

**2.6** **Priority and Return of Capital.** Except as may be expressly provided in this Agreement, no Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either for the return of Capital Contributions or for Net Cash from

2

Exhibit A

Operations or from Sales or Refinancings, provided that this section shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

**2.7    Limitation on Liability of Member.**  The Members shall have no liability or obligation for any debts, liabilities or obligations of the Company beyond the Member's respective Capital Contribution or obligation to make a Capital Contribution, except as expressly required by this Agreement or applicable law.  A Member who rightfully received any distribution of cash or Property from the Company is nevertheless liable to the Company only to the extent now or hereafter provided by the Act.

**2.8    Loans.** If any Member makes any loan or loans to the Company, or advances money on its behalf, the amount of any such loan or advance shall not be deemed an increase in, or contribution to, the capital account of the lending Member or entitle the lending Member to any increase in his, her or its share of the distributions of the Company.  Interest shall accrue on any such loan at an annual rate agreed to by the Company and the lending Member (but not in excess of the maximum rate allowable under applicable usury laws).

**2.9    Default in Capital Contribution.**  If any Member fails to make any Capital Contribution when due, such Member shall be in default, and the Company may exercise all legal rights including, without limitation, the commencement of an action to collect from such defaulting Member by legal process the entire amount of the unpaid Capital Contribution (including those not currently in default), together with all court costs and reasonable attorney fees.

## ARTICLE 3
## ALLOCATION OF PROFITS AND LOSSES

**3.1    Profits & Losses.**  After giving effect to the special allocations set forth in Section 3.2, Profits and Losses for any fiscal year shall be allocated, without priority, to the Members in proportion to their respective Membership Interests, unless the Members have agreed, in a writing signed by all Members and attached to this Agreement, to a different allocation of Profits and Losses permitted by law and applicable regulation.

**3.2    Special Allocations.** The following special allocations shall be made in the following order:

(a) **Tax Allocations:  Code Section 704(c).** In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial fair market value as of the date of contribution.  Allocations pursuant to this Section 3.2(a) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's

3

Exhibit A
Notice of Removal

Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

(b) <u>Company Minimum Gain Chargeback.</u> If there is a net decrease in Company Minimum Gain during any Company fiscal year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain (determined in accordance with Regulation Section 1.704-2(g)(2)). Allocations pursuant to the preceding sentence shall be made in proportion to the respective amounts required to be allocated to each Member. The items to be so allocated shall be determined in accordance with Regulation Section 1.704-2(i). This Section 3.2(b) is intended to comply with the minimum gain chargeback requirement in Regulation Section 1.704-2(f) and shall be interpreted consistent with such Section.

(c) <u>Qualified Income Offset Allocation.</u> In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) which causes or increases a Member's Capital Account Deficit as of the end of the taxable year to which such allocation, distribution or adjustment relates, then items of Company income and gain shall be specially allocated (after the allocation required by the foregoing provisions of this Section 3.2) to such Member in an amount and manner sufficient to eliminate (to the extent required by the Regulations) the Capital Account Deficit balances, if any, created by such adjustments, allocations, or distributions as quickly as possible; provided that an allocation pursuant to this Section 3.2(c) shall be made only if and to the extent that such Member would have a Capital Account Deficit after all other allocations provided for in this Article 3 have been tentatively made as if this Section 3.2(c) was not in the Agreement.

(d) <u>Company Nonrecourse Deductions.</u> Company Nonrecourse Deductions for any fiscal year or other period shall be specially allocated among the Members in accordance with their respective Membership Interests.

## ARTICLE 4
## DISTRIBUTIONS OF CASH FLOW

4.1 **Net Cash from Operations and Net Cash from Sales or Refinancings.** Net Cash from Operations and Net Cash from Sales or Refinancings shall be distributed in the following priority, subject to Section 4.2 and Article 8:

(a) First, to any Member who has advanced funds to the Company as a Lender, to the extent of and in proportion to such advances, including interest thereon, if any;

(b) Additional distributions, if any, will be made, without priority, to the Members in proportion to their respective Membership Interests, unless the Members have agreed,

4

Exhibit A
Notice of Removal

in a writing signed by all Members and attached to this Agreement, to a different division permitted by law and applicable regulation.

**4.2     Restrictions on Distributions of Cash Flow.**

(a)     Distributions of Net Cash from Operations or Net Cash from Sales or Refinancings shall be made in such amounts and at such times as determined by the Members.  The Company may distribute at least annually to the Members so much of its Net Cash as is not, in the opinion of the Members, necessary for the conduct of the Company's business, after setting aside such amounts as the Members deem necessary to create adequate reserves for future capital or operating needs of the Company.  The Members may elect, notwithstanding anything to the contrary in this Agreement, to withhold any distributions of Net Cash or return of capital to the Members in order to accomplish the business purposes of the Company as may be established from time to time.  Distributions to the Members, as a class, unless otherwise expressly indicated, shall be divided among them without priority.

(b)     If any assets of the Company are distributed in kind, such assets shall be distributed to the Members entitled thereto as tenants-in-common in the same proportions as such Members would have been entitled to cash distributions.

(c)     No Member shall be entitled to demand and receive property other than cash in return for Capital Contributions to the Company.

(d)     The Members irrevocably waive, during the term of the Company and during the period of any liquidation following the dissolution of the Company, any right to maintain any action or claim for partition with respect to any assets of the Company.


**ARTICLE 5**
**RIGHTS AND DUTIES OF MEMBERS**

**5.1     Management.**  The business and affairs of the Company shall be managed by its Members.  Any difference arising as to any matter within the authority of the Members shall be decided by the Members holding at least a majority of the Membership Interests (unless a higher or lower vote is expressly required in this Agreement or applicable law for a particular action or decision of the Members).  Any Member may bind the Company, except that no Member may bind the Company in contravention of a determination by the Members with respect to persons having knowledge of such determination.  Nothing contained in this Agreement shall require any person to inquire into the authority of any of the Members to execute and deliver any document on behalf of the Company or to bind the Company pursuant to such document.

5

Exhibit A
Notice of Removal

**5.2     Voting Decisions By Members.**

(a)  <u>General Rules.</u>  Actions and decisions requiring the approval of the Members pursuant to any provision of this Agreement may be authorized or made either by vote of the required number of Members taken at a meeting of the Members or by unanimous written consent without a meeting.  In addition, emergency actions may be taken in accordance with the provisions of Section 5.2(e) of this Agreement.  Economic Interest Owners shall not be entitled to receive notices, vote, call meetings, or act as proxies, and their consent shall not be required for any purpose under this Agreement.  The Interests in the Company held by such persons shall be excluded for purposes of determining the number of affirmative votes required for decisions or actions to be taken under this Agreement, except where expressly indicated otherwise.

(b)  <u>Meetings.</u>  Any Member may call a meeting to consider approval of an action or decision under any provision of this Agreement by delivering to each other Member notice of the time and purpose of such meeting at least ten (10) days before the day of such meeting.  A Member may waive the requirement of notice of a meeting either by attending such meeting or executing a written waiver before or after such meeting.  Any such meeting shall be held during the regular business hours at the Company's principal place of business unless all of the other Members consent in writing or by their attendance at such meeting to its being held at another location or time.

(c)  <u>Unanimous Consent.</u>  Any Member may propose that the Company authorize an action or decision pursuant to any provision of this Agreement by unanimous written consent of all Members in lieu of a meeting.  A Member's written consent may be evidenced by such person's signature on a counterpart of the proposal or by a separate writing (including a facsimile) that identifies the proposal with reasonable specificity and states that the Member consents to such proposal.

(d)  <u>Vote by Proxy.</u>  A Member may vote (or execute a written consent) by proxy given to any other Member.  Any such proxy must be in writing and must identify the specific meeting or matter to which the proxy applies or state that it applies to all matters (subject to specified reservations, if any) coming before the Members for approval under any provision of this Agreement prior to a specified date (which shall not be later than the first anniversary date on which such proxy is given).  Any such proxy shall be revocable at any time and shall not be effective at any meeting at which the Member giving such proxy is in attendance.

(e)  <u>Emergency Procedures.</u>  Notwithstanding any provisions of this Section 5.2, in the event that Members who could authorize a Company action or decision at a duly called meeting reasonably determine, in writing, that the Company is facing a significant emergency that requires immediate action, such Members may, without complying with generally applicable procedures or meetings or actions by unanimous consent, authorize any action or decision that they deem reasonably necessary to allow the Company to benefit from a significant opportunity or to protect the Company from significant loss or damage, provided that they make reasonable efforts under the circumstances to contact and consult all Members concerning such action or decision and

6

Exhibit A
Notice of Removal

the reasons why such action or decision must be made without observing generally applicable procedures.

        (f)    <u>Records.</u> The Company shall maintain permanent records of all actions taken by the Members pursuant to any provision of this Agreement, including minutes of all Company meetings, copies of all actions taken by consent of the Members, and copies of all proxies pursuant to which one Member votes or executes a consent on behalf of another.

    **5.3**    **Powers of Employee and Agents.**    Unless authorized to do so by this Operating Agreement or by the Members of the Company, no attorney-in-fact, employee, or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

    **5.4**    **Liability for Certain Acts.**    To the extent permitted by law, no Member of the Company shall be personally liable to the Company or its other Members for damages for breach of any duty owed to the Company or its Members except that a Member shall not be relieved from liability for any breach of duty based on an act or omission (a) in breach of such person's duty of loyalty to the Company or its Members, (b) not in good faith or involving a knowing violation of law or this Agreement, or (c) resulting in receipt by such person of an improper personal benefit. Notwithstanding anything to the contrary in this Agreement, and to the extent permitted by law, no Member shall have any fiduciary duty or obligation to any Economic Interest Owner or other transferee of an interest in the Company or to any other creditor of the Company.

    **5.5**    **Indemnification.**

        (a)    Each Member shall indemnify and hold harmless the Company from any loss, damage, claim or liability (including reasonable attorney fees) incurred by reason of the such Member's gross negligence or willful misconduct.

        (b)    The Members shall be indemnified by the Company against any losses, judgments, liabilities and expenses (including reasonable attorney fees) incurred by the Members by reason of any act or omission performed or omitted by the Members in good faith on behalf of the Company in a manner reasonably believed by the Members to be within the scope of the authority granted to the Members by this Agreement, providing that this indemnity shall extend only to Members who were not guilty of gross negligence or willful misconduct. The Company may also indemnify its employees and other agents who are not Members to the fullest extent permitted by law, provided that the indemnification in any given situation is approved by Members owning a majority of the Membership Interests.

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/27/2023

**Exhibit A**

**Notice of Removal**

## ARTICLE 6
## TRANSFER OF MEMBERSHIP INTERESTS

**6.1 General Restriction.** Neither a Member nor an Economic Interest Owner may transfer, whether voluntarily or involuntarily, any portion of such person's Membership Interest or Economic Interest, except as otherwise expressly provided for in this Agreement. For purposes of this Agreement, a *"transfer"* includes, but is not limited to, any sale, assignment, gift, exchange, hypothecation, collateral assignment or subjection to any security interest.

**6.2 Transfer of Membership Interest Without Substitution.** Subject to compliance with the conditions of Section 6.5, a Member shall have the right to transfer all or part of such Member's Membership Interest by a written instrument of transfer, the terms of which are not in contravention of any of the provisions of this Agreement. Unless and until admitted as a substitute or additional Member in accordance with this Agreement, a transferee shall only be an Economic Interest Owner, who shall be entitled to receive distributions from the Company, and be allocated Profits and Losses of the Company, attributable to the Membership Interest acquired by reason of such transfer from and after the effective date of the assignment of such Interest, and all other Company rights attributable to such transferred Interest, including, without limitation, the right to inspect Company books and to vote on Company matters, shall terminate until and unless such transferee becomes a substituted or additional Member; provided, however, that the Members and the Company shall be entitled to treat the transferor of such Membership Interest as the owner thereof in all respects, and shall incur no liability for distributions made in good faith to such transferor, until such time as both the beneficiary of such transfer has been recognized by the Company as a transferee in accordance with this Article 6 and the effective date of the transfer has passed.

**6.3 Admission of Substituted Members.** An Economic Interest Owner may become a substituted or additional Member in the Company if, in addition to the requirements of Section 6.5, (i) the Economic Interest Owner obtains the written consent of the Members, which consent may be withheld for any reason or without reason as a matter of absolute discretion; and (ii) the transferor and transferee named in such assignment have executed and acknowledged such other instruments as such Members may reasonably deem necessary or desirable to effect such admission. A transferee accepted as a substitute or additional Member shall have all of the rights and obligations of its predecessor in interest in the Company, to the extent that they relate to the transferred interest.

**6.4 Admission of Additional Members.** Any person acceptable to the Members may become an additional Member in the Company by the issuance of additional Membership Interests in exchange for such consideration as such Members may determine as a matter of absolute discretion. Such person may become an additional Member in the Company only if, in addition to the requirements of Section 6.5, the person executes such instruments as such Members may deem necessary or desirable to effect such admission.

8

Exhibit A

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/ Notice of Removal 8

Notice of Removal

**6.5    Conditions on Transfers of Membership or Economic Interest.**  A transfer of a Membership Interest or Economic Interest, and the admission of additional Members, otherwise permitted by this Article 6 shall be subject to the following additional limitations:

(a)    No Membership or Economic Interest may be transferred or issued if such proposed action, in the opinion of counsel for the Company, (i)  would result in the termination of the Company under Section 708 of the Code, or (ii)  would result in the cancellation of the Certificate of Formation or an obligation to file a Certificate of Cancellation, or (iii)  would impair the ability of the Company to be taxed as a partnership for Federal income tax purposes.

(b)    No Membership (or Economic Interest) may be issued by the Company or transferred by a Member unless the transferee (whether such person is to be admitted as a Member or will merely be an Economic Interest Owner) confirms in writing acceptable to the Members that such transferee has accepted, assumed, and agreed to be bound subject to and bound by all of the terms and conditions of this Agreement.  No Membership (or Economic) Interest may be transferred unless the assigning Member or Economic Interest Owner delivers to the Members a written instrument of assignment in form and substance satisfactory to the Members, duly executed by the transferor or such transferor's personal representative or authorized agent.  The assignment shall be accompanied by such assurances of genuineness and effectiveness and by such consents or authorizations of governmental or other authorities as may be reasonably required by the Members.

**6.6    Obligations of Transferring Member.**  Except as otherwise agreed to by the Members, no transfer by a Member of all or any portion of an interest in the Company shall, to any extent, relieve the transferring Member of any of such Member's obligations to the Company or liability, if any, as a Member (whether or not such person remains as a Member).

**6.7    Allocations Upon Transfer of Membership or Economic Interest or Upon Admission.**

(a)    As between a Member and such Member's transferee, profits, losses and credits for any semi-monthly period shall be apportioned to the person who is the holder of the Membership Interest transferred on the last day of such semi-monthly period, without regard to the results of the Company's operations during the period before or after such transfer. However, in the event that it is determined by the Members that the convention adopted by the Company to allocate income, gain, loss, deduction or credit of the Company is not in compliance with Section 706(d) of the Code, as modified by Regulations promulgated thereunder, then the Members shall revise the method of allocation to comply with such Regulations.

(b)    No new Members or Economic Interest Owners shall be entitled to any retroactive allocation of Profits or Losses incurred by the Company.  The Members may, at their option, at the time a Member is admitted, or an Interest transferred, close the Company's books or make an allocation of tax items using any reasonable method permitted under Section 706(d) of the Code and applicable Treasury Regulations.

9

(c)     Any distributions of cash or other property shall be made to the holder of record of any portion of a Membership Interest (or Economic Interest) on the date of distribution.

6.8     **Provisions Regarding Transfer Agreements and Repurchases Among the Members.**  The Members may establish among themselves certain additional agreements from time to time regarding the transfers of a Membership Interest or Economic Interest in the Company, whether in the nature of restrictions or otherwise, and may accord the Company certain rights to reacquire interests in the Company.  All such agreements must be in writing.  At the date of execution of this Agreement, if the parties have agreed to such provisions the terms of such agreements are attached to this Agreement as a Supplemental Exhibit, and signed by all of the Members whose Interests are to be bound by such terms.   The provisions of such Exhibit, as presently agreed and as may be amended from time to time,  are incorporated into this Agreement by reference and are made a part of this Agreement as if fully set forth in the body of this Agreement.

## ARTICLE 7
## DISSOCIATION OF A MEMBER

7.1     **Dissociation.**  A person shall cease to be a Member upon the happening of any of the following events:

(a)     the bankruptcy of a Member;

(b)     the assignment or transfer by a Member of such person's entire Membership Interest in accordance with the terms of this Agreement;

(c)     in the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

(d)     in the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(e)     in the case of a Member that is a separate organization other than a corporation, the dissolution and commencement of winding up of the separate organization; or

(f)     in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter.

7.2     **Rights of Dissociating Member.**  In the event any Member dissociates prior to the expiration of the term of the Company, then the Member who dissociates, or such Member's successor in interest shall, regardless of whether the dissociation was the result of a voluntary act

10

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

**Exhibit A**
**Notice of Removal**

by such Member, only be entitled to receive distributions to which the Member would otherwise have been entitled had the Member remained a Member, and the dissociating Member shall thereafter be an Economic Interest Owner. Further, if the dissociation occurs by virtue of an assignment of such person's entire Membership Interest in accordance with this Agreement, then the rights and obligations of the dissociating Member (and such Member's successor) shall be subject to the provisions of Article 6.

    **7.3    Withdrawal of Member.** Except as otherwise provided in Article 6, no Member shall be entitled to withdraw or resign from the Company.

    **7.4    Effect of Dissociation of a Member.** Notwithstanding anything to the contrary in this Agreement, the Act or otherwise applicable state law, the dissociation of a Member shall not cause the dissolution, termination or liquidation of the Company.

## ARTICLE 8
## DISSOLUTION AND LIQUIDATION

    **8.1    Events Triggering Dissolution.** The Company shall dissolve and commence winding up and liquidating upon the first to occur of any of the following (*"Liquidating Events"*):

        (a)    the determination by the Managers, or by unanimous agreement of all of the Members, that the Company should be dissolved;

        (b)    the insolvency or bankruptcy of the Company;

        (c)    the sale of all or substantially all of the Company's assets; or

        (d)    any event that makes it impossible, unlawful or impractical to carry on the business of the Company.

Notwithstanding anything to the contrary in the Act, the Members agree that the Company shall not be dissolved or liquidated prior to the occurrence of a Liquidating Event, as set forth in this Article 8. If it is determined by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Liquidating Event, then within a 90-day period after such determination (the *"Reconstitution Period"*), the Members may elect to reconstitute the Company and continue its business on the same terms and conditions set forth in this Agreement by forming a new limited liability company on identical terms. Upon such election within the Reconstitution Period all Members and Economic Interest Owners (and their successors in interest) shall be bound thereby and shall be deemed to have consented to such election.

    **8.2    Effect of Dissolution.** No dissolution of the Company shall release any of the parties to this Agreement from their contractual obligations under this Agreement.

11

**8.3    Liquidation.** Upon dissolution of the Company in accordance with Section 8.1, the Company shall be liquidated. The Members shall select a Liquidating Manager (who may be any Member) who shall serve only for purposes of winding up the Company. The proceeds of such liquidation shall be applied and distributed in the following order of priority:

(a)    to the payment of the debts and liabilities of the Company (other than debts or liabilities owing to a Member or Economic Interest Owner) and the expenses of liquidation (including, if applicable, the reasonable fees of the Liquidating Manager);

(b)    the setting up of any reserves which the Liquidating Manager may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, which reserves shall be paid over to an attorney at law, as escrow-holder, to be held for the purpose of disbursing (under the direction of the Liquidating Manager) such reserves in payment of any of the aforementioned liabilities and, at the expiration of such period (not to exceed two (2) years) as the Liquidating Manager may deem advisable, for distribution in the manner hereinafter provided;

(c)    to the repayment of any outstanding advances or loans that may have been made by any of the Members or Economic Interest Owners to the Company, other than capital contributions, pro rata among them on the basis of such advances and loans to the Company; and

(d)    the balance, if any, to the Members or Economic Interest Owners (or to their permitted transferees of their Interest in the Company, in whole or in part) in accordance with their respective Capital Accounts, after adjustment for all income, loss, and gain of the Company and after adjustment for all previous contributions and distributions of the Company.

**8.4    Revaluation.** If the Company's assets are not sold, but instead are distributed in kind, such assets, for purposes of determining the amount to be distributed to the parties, shall be revalued on the Company books to reflect their then current fair market value as of a date reasonably close to the date of liquidation. Any unrealized appreciation or depreciation shall be allocated among the Members (in accordance with the provisions of Article 3 as if such assets were sold at such fair market value) and taken into account in determining the Capital Accounts of the Members as of the date of liquidation.

**8.5    Distributions in Kind.** The Liquidating Manager may make distributions to the Members in cash or in kind, or partly in cash and partly in kind, in divided or undivided interests, and to allocate any property towards the satisfaction of any payment or distribution due to the Members in such manner as the Liquidating Manager may determine, whether or not such distributive shares may as a result be composed of differently. Distribution of any asset in kind to a Member shall be considered as a distribution of an amount equal to the asset's fair market value for purposes of this Article 8.

12

Exhibit A
Notice of Removal

**8.6     Timing of Liquidation.** Distributions and liquidation of the Company shall be made in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(*b*). Distributions may be made to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Members arising out of or in connection with the Company. The assets of any such trust shall be distributed to the Members and Economic Interest Owners from time to time in the reasonable discretion of the Liquidating Manager, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to such persons pursuant to this Agreement.

**8.7     Certificate of Cancellation.**     Upon the dissolution of the Company and the completion of the liquidation and winding up of the Company's affairs and business, the Liquidating Manager shall (or if the Liquidating Manager fails to act, then any Member may) prepare and file a certificate of cancellation with the Secretary of State, as required by the Act. When such certificate is filed, the Company's existence shall cease.

## ARTICLE 9
## ACCOUNTING AND FISCAL MATTERS

**9.1     Fiscal Year.** The fiscal year of the Company shall be the calendar year.

**9.2     Method of Accounting.** The Members shall select a method of accounting for the Company as deemed necessary or advisable and shall keep, or cause to be kept, full and accurate records of all transactions of the Company in accordance with sound accounting principles consistently applied.

**9.3     Books and Records.** All books of account shall, at all times, be maintained in the principal office of the Company. Upon reasonable request, each Member or Economic Interest Owner shall have the right, during ordinary business hours, to inspect and copy all accounts, books, and other relevant Company documents at the requesting Member's and Economic Interest Owner's expense. Upon written request of any Member, the Company shall provide a list showing the names, addresses, and Membership Interests and Economic Interests of all Members, and a copy of the operating agreement and Certificate of Formation of the Company.

**9.4     Bank Accounts.** The Members shall open and maintain (in the name of the Company) such bank accounts in which shall be deposited all funds of the Company. Withdrawals from such account or accounts shall be made upon the signature or signatures of such person or persons as the Members shall designate.

**9.5     Tax Matters Partner.** The Members may designate one of their number to act as the *"Tax Matters Partner"* under Section 6231(a)(7) of the Internal Revenue Code of 1986, as amended, to manage administrative tax proceedings with the Internal Revenue Service.

13

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

## ARTICLE 10
## MISCELLANEOUS

**10.1    Amendment.**  Except as otherwise provided in this Section 10.1 or elsewhere in this Agreement, this Agreement may be amended only with the consent of the Members holding at least 75% of the Membership Interests.  Notwithstanding anything to the contrary in this Section 10.1, this Agreement may not be amended, without the consent of the Member or Members affected by any amendment to this Agreement, to (i) modify the limited liability of a Member;  (ii) alter the status of the Company as a partnership for federal income tax purposes;  or (iii) otherwise modify the compensation, distributions, or rights of reimbursement to which such Member(s) are entitled, or affect the duties of such Members serving as Managers or the indemnification to which such Members serving as Managers, and their affiliates, employees or agents, are entitled.

**10.2    Glossary.**       As used in this Agreement, capitalized words and phrases shall have the following meanings:

(a)    **Bankruptcy.**  *"Bankruptcy"* of any individual, corporation or partnership shall be deemed to occur when (1) such individual, corporation or partnership files a petition in bankruptcy, or voluntarily takes advantage of any bankruptcy or insolvency law, or (2) is the subject of a petition or answer proposing the adjudication of such person as a bankrupt, and such individual, corporation or partnership either consents to the filing thereof, or fails to cause such petition or answer to be discharged or denied prior to the expiration of sixty (60)  days from the date of such filing, or (3) such person's or entity's assets are insufficient to pay his, her or its liabilities, or he, she or it has so admitted in writing.

(b)    **Capital Account.**  *"Capital Account"* means, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions:

(i)    To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to Section 3.2 (other than Section 3.2(a)) of this Agreement, and the amount of any Company liabilities that are assumed by such Member or that are secured by any Company property distributed to such Member.

(ii)    To each Member's Capital Account there shall be debited the amount of cash (exclusive of amounts, if any, paid as compensation in exchange for management services of the Members) and the fair market value of any Company property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Section 3.2 (other than Section 3.2(a)) of this Agreement, such Member's distributive share of noncapital, nonde-ductible expenditures of the Company under Code Section 705(a)(2)(B) (including items treated as

14

Exhibit A
Notice of Removal

such expenditures pursuant to Treasury Regulation 1.704-1(b)(2)(iv)(*i*)), and the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company.

(iii)     In the event any Member transfers all or any portion of its Membership Interest in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

(iv)     In determining the amount of any liability for purposes of this Section 10.2(b), there shall be taken into account Code Section 752(c) and other applicable Code Sections and Treasury Regulations.

(v)     The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with the Treasury Regulations.  In the event the Members determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or the Members), are computed in order to comply with such Regulations, the Members may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Article 8 of this Agreement upon the dissolution of the Company.  The Members also shall (1) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*g*), and (2) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704(b).

(c)     **Capital Account Deficit.**  *"Capital Account Deficit"* means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year of the Company, after giving effect to the following adjustments:

(i)     Credit to such Capital Account any amounts which such Member is obligated to restore (pursuant to the terms of any promissory note of such Member or otherwise) or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)     Debit to such Member's Capital Account the items described in Sections 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) or (*6*) of the Regulations.

The foregoing definition of Capital Account Deficit is intended to comply with Regulations Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

15

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

(d)      **Capital Contribution.** *"Capital Contribution"* means, with respect to any Member, the amount of money and the initial fair market value of any property (other than money) contributed to the Company with respect to a Membership Interest held by such Member. The principal amount of a promissory note which is not readily tradable on an established securities market and which is contributed to the Company by the maker of the note (or a person related to the maker of the note within the meaning of Treasury Regulation 1.704-1(b)(2)(ii)(c)) shall not be included in the Capital Account of any Member until the Company makes a taxable disposition of the note or until (and to the extent that) principal payments are made on the note, all in accordance with Treasury Regulation 1.704-1(b)(2)(iv)(d)(2).

(e)      **Code.** *"Code"* means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(f)      **Company.** *"Company"* means the limited liability company governed by this Agreement.

(g)      **Company Minimum Gain.** *"Company Minimum Gain,"* which generally refers to the excess of the outstanding Company Nonrecourse Liability mortgage balance over the adjusted basis of the Property, shall have the meaning ascribed to such term under Regulation Section 1.704-2(d).

(h)      **Company Nonrecourse Deductions.** *"Company Nonrecourse Deductions"* shall have the meaning set forth in Regulation Section 1.704-2(c), which provides generally that the amount of Company Nonrecourse Deductions (as identified in Regulation Section 1.704-2(j)(1)(ii)) for a Company fiscal year equals the excess, if any, of the net increase, if any, in the amount of Company Minimum Gain during that fiscal year over the amount of any distributions during that fiscal year of proceeds of a Company Nonrecourse Liability that are allocable to an increase in Company Minimum Gain.

(i)      **Company Nonrecourse Liability.** *"Company Nonrecourse Liability"* shall have the meaning set forth in Regulation Sections 1.704-2(b)(3) and 1.752-1(a)(2), which generally refer to liabilities of the Company for which no Member (or person related to a Member) bears the economic risk of loss.

(j)      **Depreciation.** *"Depreciation"* means, for each fiscal year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable, if any, with respect to a Company asset for such year or other period, except that if the fair market value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning fair market value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis.

16

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/ ... **Notice of Removal**

**Exhibit A**

(k)     **Economic Interest.**  *"Economic Interest"* means a Member's or Economic Interest Owner's share of the Company's Profits, Losses, Net Cash Flow, and other distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including, without limitation, the right to vote on, consent to, or otherwise participate in any decision of the Members, all as provided in Section 6.2.

(l)     **Economic Interest Owner.**  *"Economic Interest Owner"* shall mean the owner of an Economic Interest who is not a Member, including without limitation, a person who has acquired an Economic Interest (i) as an assignee pursuant to Section 6.2, or (ii) as the personal representative, guardian or other successor in interest upon the death (in the case of a Member who is an individual), dissolution (in the case of a Member who is not an individual), bankruptcy or physical or mental incapacity of a Member pursuant to Article 7.

(m)     **Lender.**  *"Lender"* means any Member who advances (other than as a Capital Contribution) any money or property to the Company.

(n)     **Members.**  *"Members"* means the persons listed on attached Schedule A, and any person admitted to the Company as a Member in accordance with Article 6.  The Members shall have the powers, rights and privileges provided to them in this Agreement.

(o)     **Membership Interest.**  *"Membership Interest"* means a Member's Economic Interest in the Company and such Member's right to participate in the management of the business and affairs of the Company, including, without limitation, the right to vote on, consent to, or otherwise participate in any decision or action of the Members pursuant to this Agreement or the Act.  Unless otherwise agreed to in a writing signed by all of the Members and attached to this Agreement, the Members' respective percentage Membership Interests shall be equal to the proportionate agreed-upon values of the Capital Contributions made by each Member, to the extent that such Contributions have been received by the Company and not returned.  For this purpose, distributions pursuant to Article 4 shall not be considered as a return of Capital Contributions unless specifically identified as such by the Members in writing.

(p)     **Net Cash from Operations.**  *"Net Cash from Operations"* means the gross cash proceeds from Company operations (including sales and dispositions in the ordinary course of business) less the portion of such proceeds used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements, and contingencies, all as determined by the Members.  "Net Cash from Operations" shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to Section 5.  Payments of principal and interest on any debts or other obligations of the Company, whether or not secured by mortgages or liens on Company property, shall be considered as a deduction from Net Cash from Operations.

17

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/27/2023 10:14:28

**Exhibit A**
**Notice of Removal**

(q)     **Net Cash from Sales or Refinancings.** *"Net Cash from Sales or Refinancings"* means the net cash proceeds from all sales and other dispositions (other than in the ordinary course of business) and all refinancings or placement of new mortgages on the Property, less any portion of such proceeds used to establish reserves or applied to capital improvements, all as determined by the Members. "Net Cash from Sales or Refinancings" shall include all principal and interest payments received by the Company with respect to any note or other obligations received by the Company in connection with sales and other dispositions (other than in the ordinary course of business) of Property. Payments of principal and interest on any debts or other obligations of the Company, whether or not secured by mortgages or liens on Company property, shall be considered as a deduction from Net Cash from Sales or Refinancings. For purposes of this Agreement, Net Cash from Sales or Refinancings shall also include any Capital Contributions of the Members as well as any incremental adjustment to the value of the Company's property in connection with a Revaluation under Section 8.4.

(r)     **Profit and Losses.** *"Profits"* and *"Losses"* means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (and for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Subsection shall be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*i*), and not otherwise required to be taken into account in computing Profits or Losses pursuant to this Subsection, shall be subtracted from such taxable income or loss;

(iii)     Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to its fair market value (as of the time of receipt of the property by the Company), notwithstanding that the adjusted tax basis of such property differs from its fair market value;

(iv)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with Section 10.2(j) of this Agreement;

(v)     To the extent that an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required under Treasury Regulation 1.704-1(b)(2)(iv)(*m*)(*4*) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount

18

**Exhibit A**
**Notice of Removal**
REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/...

of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

        (vi)     Any items that are specially allocated pursuant to Section 3.2(a) shall not be taken into account in computing Profits or Losses.

        (s)    **Property.**   *"Property"* means the Company's interest in any tangible or intangible property, real or personal, but excluding services and promises to perform services in the future.

i.        (t)    **Treasury Regulations.** *"Treasury Regulations"* means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

     **10.3**   **Notices.**  Unless otherwise provided in this Agreement or by written agreement of the Members, all notices or other communications required or permitted to be given under this Agreement shall be deemed given when delivered personally or mailed by registered or certified mail, return receipt required, postage prepaid, or delivered by overnight courier service, to the Members at their addresses on the records of the Company, or at such other addresses as a Member may designate to the Company in writing.

     **10.4**   **Binding Effect.** Except as otherwise provided in this Agreement to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties, their personal representatives, successors and assigns.

     **10.5**   **Counterparts.**  This Agreement may be executed in several counterparts, each of which shall be deemed an original, and said counterparts shall constitute but one and the same instrument which may be sufficiently evidenced by one counterpart.

     **10.6**   **Governing Law.** This Agreement shall be governed by, and construed in accordance with, the laws of the State under which the Certificate of Formation of the Company was originally filed.

     **10.7**   **Severability.** The invalidity or unenforceability of any particular provision of this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

     **10.8**   **Gender.**  As used in this Agreement, the masculine gender shall include the feminine and the neuter, and vice versa.

REQUEST RECEIVED ON-DEBLASIO@DGLLC.NET-08/27/2023 10:14:28 AM DOCUMENT SUPPLIED ON 08/27/2023 10:14:28 AM

**Exhibit A**
**Notice of Removal**

## CERTIFICATE

The undersigned agree, acknowledge and certify that the foregoing document constitutes the Operating Agreement adopted by the Members of the Company as of the date of this Agreement.

Richard Trojan

Naserallah Ihab

20

Exhibit A
Notice of Removal

## SCHEDULE A

| Member (Name and Address) | Capital Contributions | Membership Interest (Optional) |
|---|---|---|
| Richard Trojan 433 8th St Wilmette, Il. 60091 | $1000.00 | 50% % |
| Naserallah Ihab 6262 S. Route 83 Ste#210 Willowbrook, Il. 60527 | $1,000.00 | 50% |

21

**Exhibit A**
**Notice of Removal**